# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

RYERSON INC.

v.

FEDERAL INSURANCE COMPANY

No.    2009L006815
CALENDAR/ROOM U
TIME 00:00
Breach of Contract

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. ONLY ONE (1) CASE TYPE MAY BE CHECKED WITH THIS COVER SHEET.

Jury Demand  ☑ Yes  ☐ No

**2009 JUN 10 PM 3:58**

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027  Motor Vehicle
- ☐ 040  Medical Malpractice
- ☐ 047  Asbestos
- ☐ 048  Dram Shop
- ☐ 049  Product Liability
- ☐ 051  Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052  Railroad/FELA
- ☐ 053  Pediatric Lead Exposure
- ☐ 061  Other Personal Injury/Wrongful Death
- ☐ 063  Intentional Tort
- ☐ 064  Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065  Premises Liability
- ☐ 078  Fen-phen/Redux Litigation
- ☐ 199  Silicone Implant

### COMMERCIAL LITIGATION
CASE TYPES:
- ☑ 002  Breach of Contract
- ☐ 070  Professional Malpractice
  (other than legal or medical)
- ☐ 071  Fraud
- ☐ 072  Consumer Fraud
- ☐ 073  Breach of Warranty
- ☐ 074  Statutory Action
  (Please Specify Below**)
- ☐ 075  Other Commercial Litigation
  (Please Specify Below**)
- ☐ 076  Retaliatory Discharge

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007  Confession of Judgment
- ☐ 008  Replevin
- ☐ 009  Tax
- ☐ 015  Condemnation
- ☐ 017  Detinue
- ☐ 029  Unemployment Compensation
- ☐ 036  Administrative Review Action
- ☐ 085  Petition to Register Foreign Judgment
- ☐ 099  All Other Extraordinary Remedies

### OTHER ACTIONS
CASE TYPES:
- ☐ 062  Property Damage
- ☐ 066  Legal Malpractice
- ☐ 077  Libel/Slander
- ☐ 079  Petition for Qualified Orders
- ☐ 084  Petition to Issue Subpoena
- ☐ 100  Petition for Discovery

**

By: Barnes & Thornburg LLP
_____
(Attorney)

(P)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION 2009L006815

CALENDAR/ROOM U
TIME 00:00
Breach of Contract

| | | |
|---|---|---|
| RYERSON INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

2009 JUN 10 PM 3:

## COMPLAINT

Plaintiff, Ryerson Inc., ("Ryerson"), by its attorneys, Barnes & Thornburg LLP, brings its

Complaint against Defendant, Federal Insurance Company ("Federal"), as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.      Ryerson brings this Complaint against Federal for monetary and statutory

damages arising out of Federal's breach of its contractual obligations to indemnify Ryerson for

matters alleged and losses incurred as covered under Executive Protection Policy No. 8114-31-

05H, effective from January 1, 1998 to January 1, 2001 issued by Federal (the "Federal Policy").

Ryerson, formerly known as Inland Steel Industries, Inc., is an Insured under the Federal Policy.

2.      In connection with certain underlying allegations made against it and Ryerson's

settlement of the associated claims, Ryerson seeks, among other relief: (a) monetary damages

and other relief for the harm caused by Federal's breach of its contractual obligations to

indemnify Ryerson for defense and settlement costs; (b) monetary and statutory damages and

other relief for Federal's vexatious and unreasonable failure to honor its obligations under the

Federal Policy, as provided for under §155 of the Illinois Insurance Code, 215 ILCS 5/155; and

(c) a determination that Federal breached both its defense and settlement payment obligations

and that Federal is both estopped from denying coverage and, in any event, liable for coverage under the plain terms of the Federal Policy.

## JURISDICTION AND VENUE

3.      Ryerson is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. Ryerson was formerly known as Inland Steel Industries, Inc. and Ryerson Tull, Inc.

4.      Federal is an insurance company corporation organized and existing under the laws of the State of Indiana with its principal place of business located in the State of New Jersey. At all relevant times, Federal has been licensed to do business in Illinois and was engaged in the business of selling and/or administering contracts of insurance in Illinois.

5.      This Court has jurisdiction over this action pursuant to both 735 ILCS 5/2-209(a)(1) and (4) and 735 ILCS 5/2-209(b)(4) because: (a) Ryerson's causes of action arise out of Federal's transaction of business within the State; and (b) at all times relevant hereto, Federal was a corporation doing business in Illinois.

6.      Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 and 102(a) because the transaction out of which this cause of action arose occurred in Cook County, Illinois. Additionally, at all times relevant hereto, Federal was authorized to do business in Illinois and was doing business in Cook County, Illinois. Thus, Federal is a resident of Cook County, Illinois.

## THE FEDERAL POLICY

7.      In consideration of premiums paid, Federal issued the Federal Policy, a copy of which (subject to verification for completeness and accuracy as may be necessary through discovery) is attached as Exhibit A.

2

8.     All premiums due under the Federal Policy have been paid, and at all times relevant to this Complaint, all pertinent terms and conditions of the Federal Policy have been satisfied.

9.     The effective period of the Federal Policy is January 1, 1998 to January 1, 2001. Ex. A, Premium Bill.

10.    The Federal Policy identifies Inland Steel Industries, Inc. (now known as Ryerson) as the Parent Organization and the Insured Organization. Ex. A, Declarations, Items 1 and 5.

11.    In general, under the Insured Organization Coverage of Insuring Clause 3, the Federal Policy requires Federal to pay on behalf of Ryerson all "loss" for which Ryerson becomes obligated to pay on account of any "claim" first made against Ryerson during the policy period or, if exercised, during the extended reporting period, for a "wrongful act" committed, attempted, or allegedly committed or attempted by Ryerson, among others, before or during the policy period. Ex. A, End. 6, ¶1 – Insured Organization Coverage, Insuring Clause 3.

12.    For purposes of the Insured Organization Coverage under Insuring Clause 3, the Federal Policy sets forth the following defined terms in relevant part:

- "Loss" means: "the total amount which [Ryerson] becomes legally obligated to pay on account of each Claim and for all Claims in each Policy Period and the Extended Reporting Period, if exercised, made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgements, settlements, costs and Defense Costs." "Loss" does not include (i) any amount not indemnified by the Insured Organization for which the Insured Person is absolved from payment by reason of any covenant, agreement or court order, (ii) any amount incurred by the Insured Organization (including its board of directors or any committee of the board of directors) in connection with the investigation or evaluation of any Claim or potential Claim by or on behalf of the Insured Organization, (iii) fines or penalties imposed by law or the multiple portion of any multiplied damage award, or (iv) matters

uninsurable under the law pursuant to which this coverage section is construed. Ex. A, Definitions, ¶18

"LOSS" does not include any amount allocated to uncovered loss pursuant to subsection 12, ALLOCATION. "LOSS" includes punitive or exemplary damages which any INSURED becomes legally obligated to pay, provided the punitive and exemplary damages are on account of a CLAIM which is otherwise covered under this coverage section and which is based on a SECURITIES TRANSACTION and provided such punitive and exemplary damages are insurable under the law pursuant to which this coverage section is construed. Ex. A, End. 6, ¶2(c).

The Company shall not be liable under Insuring Clause 3 for that part of LOSS, other than DEFENSE COSTS: (a) which is based upon, arises from, or is in consequence of the actual or proposed payment by any INSURED ORGANIZATION of allegedly inadequate or excessive consideration in connection with its purchase of securities issued by any INSURED ORGANIZATION; or (b) which is based upon, arises from, or in consequence of any INSURED ORGANIZATION having gained in fact any profit or advantage to which it was not legally entitled. Ex. A, End. 6, ¶5.

- **"Defense Costs"** means: "that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of [Ryerson]) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds. Ex. A, Definitions, ¶18.

- **"Claim"** includes: "a civil proceeding commenced by the service of a complaint or similar pleading[.]" Ex. A, End. 6, ¶2(a).

- **"Wrongful Act"** means: "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by [Ryerson] based upon[,] arising from, or in consequence of any Securities Transaction." Ex. A, End. 6, ¶2(a).

- **"Securities Transaction"** means: "(i) the purchase or sale of, or offer to purchase or sell, any securities issued by [Ryerson]; (ii) the ownership of securities of [Ryerson] by a securities holder." Ex. A, End. 6, ¶2(b).

## THE UNDERLYING EMC SECURITIES TRANSACTION CLAIM

13.     On April 9, 1999, EMC Group, Inc. ("EMC") filed a complaint against Ryerson

in the Circuit Court of Cook County, Illinois, Chancery Division, No. 99 CH 05521 (the "EMC

4

Action"). Thereafter, EMC filed a First Amended Complaint against Ryerson in the EMC Action. A copy of the First Amended Complaint in the EMC Action is attached as Exhibit B.

14. The EMC Action arose out of EMC's purchase, pursuant to a November 17, 1998 stock purchase agreement, of Inland Engineered Materials Corporation ("IEMC") – a wholly owned subsidiary of Ryerson. IEMC was comprised of the holding company – IEMC, and two subsidiaries – Magnetics International Inc. ("MII") and Brockway Pressed Metals, Inc. ("BPM").

15. The EMC action alleged, among other things, that Ryerson did not adequately disclose material facts and documents when selling securities in a stock sale to EMC, including as to MII's relations with MII's allegedly most significant customer – all of which were allegedly material to the value of MII's stock, the viability of the business, and income streams that EMC anticipated generating.

16. EMC asserted various claims for wrongful acts by Ryerson alleging, among other things, misleadingly inducing it into the purchase, breach of contract and breach of warranty.

17. In its First Amended Complaint, EMC sought, among other things, compensatory damages against Ryerson based on the allegedly wrongful conduct.

## RYERSON'S NOTICE OF THE EMC ACTION TO FEDERAL AND FEDERAL'S DENIAL OF THE CLAIM

18. Shortly after being served with the complaint in the EMC Action, Ryerson provided notice to Federal and sought assistance with the defense and resolution of the litigation, as provided for under the Federal Policy.

19. On June 16, 1999, Federal wrote to Ryerson and denied coverage for the EMC Action under the Federal Policy. A copy of Federal's June 16, 1999 letter is attached as Exhibit C. Federal claimed that Ryerson was not entitled to coverage under Insuring Clause 3 of the Federal Policy because the EMC Action allegedly did not "meet the definition of a Securities

5

Transaction under the Policy." Ex. C. Federal took this position despite the fact that the EMC Action clearly arose out of a stock purchase agreement – the sale of securities by Ryerson to EMC – a Securities Transaction as defined by the Federal Policy.

## RYERSON'S SETTLEMENT OF THE EMC ACTION

20.     After being wrongfully denied coverage by Federal, Ryerson was forced to defend the EMC Action on its own and, in the process, incurred significant defense costs while litigating the matter for over three years – all without any support or backing from Federal despite having paid valuable premiums for coverage.

21.     In early June 2002, Ryerson and EMC entered into a Confidential Settlement Agreement And Full And Final Release Of All Claims (the "Settlement Agreement").

22.     In the Settlement Agreement, Ryerson continued to deny the allegations contained in the First Amended Complaint in the EMC Action and further generally denied any liability whatsoever.

23.     Nevertheless, to avoid further expense and costly litigation (and to avoid the risk of a potentially much greater covered liability), Ryerson agreed to make a payment of $8.5 million to EMC in exchange for a full and complete release of any and all claims and liability arising out of the stock purchase agreement which gave rise to the EMC Action, the First Amended Complaint in the EMC Action and/or all facts giving rise to the First Amended Complaint in the EMC Action. Further, in conjunction with Ryerson's settlement payment to EMC, EMC caused the First Amended Complaint in the EMC Action to be dismissed with prejudice. Ryerson also incurred significant costs defending the EMC Action, which when combined with pre-judgment interest and the amount of the settlement payment, takes Ryerson's covered out of pocket loss well over $10 million.

6

## COUNT I

### (Breach of Contract)

24.      Ryerson incorporates the averments of paragraphs 1 through 23 as if fully set forth herein.

25.      The allegations of the First Amended Complaint in the EMC Action against Ryerson fall squarely within the coverage provided by the Federal Policy under Insuring Clause 3 for "Wrongful Acts" arising from or in consequence of a "Securities Transaction."

26.      The defense costs incurred by Ryerson and the settlement payment made by Ryerson in connection with the EMC Action both clearly constitute "Loss" covered by the Federal Policy, well in excess of any applicable retention.

27.      Any condition precedent to recovery under the Federal Policy has been satisfied, waived, or is otherwise inapplicable.

28.      To date, in breach of its obligations under the Federal Policy, Federal has failed and/or refused to indemnify Ryerson for the defense costs incurred and settlement payment made in connection with the EMC Action.

29.      As a result of its breaches of contract, Federal is liable to Ryerson for damages – for all amounts incurred by Ryerson in defense of the EMC Action and all amounts paid by Ryerson in settlement of the EMC Action.

## COUNT II

### (Violation of Illinois Insurance Code §155)

30.      Ryerson incorporates the averments of paragraphs 1 through 29 as if fully set forth herein.

31. Given that at all times relevant hereto, the EMC Action clearly involved allegations covered under Insuring Clause 3 of the Federal Policy for "Wrongful Acts" arising from or in consequence of a "Securities Transaction," Federal's failure and/or refusal to acknowledge and provide coverage for Ryerson's defense costs and settlement payment constitutes vexatious and unreasonable conduct in violation of §155 of the Illinois Insurance Code.

32. As a result of Federal's violation of 215 ILCS 5/155, Ryerson is entitled to statutory relief under that provision.

## PRAYER FOR RELIEF

**WHEREFORE**, Ryerson respectfully requests that this Court enter judgment in Ryerson's favor and against Federal as follows:

a. Awarding Ryerson all direct and consequential money damages it has suffered as a consequence of Federal's breaches, including all sums expended as part of Ryerson's defense and resolution of the EMC Action;

b. Awarding Ryerson statutory damages – including its reasonable fees and costs incurred in prosecuting this action and the maximum statutory amount – as a result of Federal's violation of §155 of the Illinois Insurance Code, 215 ILCS 5/155;

c. Awarding Ryerson pre- and post-judgment interest;

d. Determining that Federal breached both its defense and settlement payment obligations and that Federal is both estopped from denying coverage and, in any event liable for coverage under the plain terms of the Federal Policy; and

e.     Awarding Ryerson any and all other relief that the Court deems just and proper.

**A JURY TRIAL IS DEMANDED AS TO ALL COUNTS AND ISSUES SO TRIABLE.**

Respectfully submitted,

RYERSON INC.

By: _____
        One of Its Attorneys

Alan J. Martin
Adam K. Hollander
Barnes & Thornburg LLP
One North Wacker Drive
Chicago, Illinois 60606
Tel: (312) 357-1313
Firm I.D. No. 32715

9

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| RYERSON INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S ILLINOIS SUPREME COURT RULE 222(b) AFFIDAVIT

| | | |
|---|---|---|
| COUNTY OF COOK | ) | |
| | ) | ss. |
| STATE OF ILLINOIS | ) | |

Adam K. Hollander, after being duly sworn on oath, deposes and states the following:

1. I am a partner in the law firm of Barnes & Thornburg LLP located in Chicago, Illinois.

2. I am a member in good standing of the State Bar of Illinois.

3. I am one of the attorneys representing Ryerson Inc. ("Ryerson") in this matter.

4. I have personal knowledge of the matters set forth in this Affidavit and, if called upon to do so, could testify as to the same.

5. The total amount of money damages that Ryerson seeks in this action exceeds $50,000.

6. Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I certify that the statements set forth in this Affidavit are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

7.    Further Affiant sayeth naught.

_Adam K. Hollander_ (signature)
Adam K. Hollander

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _9th_ DAY OF JUNE, 2009

_Debbie Marcordes_ (signature)
Notary Public

OFFICIAL SEAL
DEBBIE MARCORDES
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:02/08/12

- 2 -



# Executive Protection Policy

Coverage Section: GENERAL TERMS·

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 1

To be attached to and form part of
Policy No. 8114-31-05B

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1.  Subsection 11, Termination of Policy or Coverage Section, is deleted in its entirety and the following is inserted:

    11.  This policy or any coverage section shall terminate at the earliest of the following times:

    (A)  ten days after the receipt by the **Parent Organization** of a written notice of termination from the Company based upon failure to pay premium due, unless such premium is received by the Company prior to such tenth day,

    (B)  at such other time as may be agreed upon by the Company and the **Parent Organization**, or

    (C)  upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations of this policy.

    The premium charged for this policy shall be fully earned at inception of the **Policy Period**.

2.  Subsection 13, Definitions, is amended by deleting the definition of **Policy Period** and inserting the following:

    **Policy Period** as used in subsection 11, above, means the period of time specified in Item 2 of the Declarations of this policy;

    **Policy Period** as used in each coverage section of this policy means the twelve month period commencing 12:01 a.m. on January 01, 1998 , and on the anniversary of such date, subject to prior termination in accordance with subsection 11, above.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date

## General Terms and Conditions

**Valuation and Foreign Currency**    6. All premiums, limits, retentions, loss and other amounts under this policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in any coverage section, if judgement is rendered, settlement is denominated or another element of loss under this policy is stated in a currency other than United States of America dollars, payment under this policy shall be made in United States dollars at the rate of exchange published in the Wall Street Journal on the date the final judgement is reached, the amount of the settlement is agreed upon or the other element of loss is due, respectively.

**Subrogation**    7. In the event of any payment under this policy, the Company shall be subrogated to the extent of such payment to all the Insured's rights of recovery, and the Insured shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Company effectively to bring suit in the name of the Insured.

**Action Against the Company**    8. No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy. No person or organization shall have any right under this policy to join the Company as a party to any action against the Insured to determine the Insured's liability nor shall the Company be impleaded by the Insured or his legal representatives. Bankruptcy or insolvency of an Insured or of the estate of an Insured shall not relieve the Company of its obligations nor deprive the Company of its rights under this policy.

**Authorization Clause**    9. By acceptance of this policy, the **Parent Organization** agrees to act on behalf of all Insureds with respect to the giving and receiving of notice of claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this policy, the negotiation, agreement to and acceptance of endorsements, and the giving or receiving of any notice provided for in this policy (except the giving of notice to apply for the Extended Reporting Period), and the Insureds agree that the **Parent Organization** shall act on their behalf.

**Alteration and Assignment**    10. No change in, modification of, or assignment of interest under this policy shall be effective except when made by a written endorsement to this policy which is signed by an authorized employee of Chubb & Son Inc.

**Termination of Policy or Coverage Section**    11. This policy or any coverage section shall terminate at the earliest of the following times:

(A) sixty days after the receipt by the **Parent Organization** of a written notice of termination from the Company,

(B) upon the receipt by the Company of written notice of termination from the Parent Organization,



## General Terms and Conditions

**Termination of Policy or Coverage Section (continued)**

(C) upon expiration of the **Policy Period** as set forth in Item 2 of the Declarations of this policy, or

(D) at such other time as may be agreed upon by the Company and the **Parent Organization**.

The Company shall refund the unearned premium computed at customary short rates if the policy or any coverage section is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata.

---

**Termination of Prior Bonds or Policies**

12. Any bonds or policies issued by the Company or its affiliates and specified in Item 4 of the Declarations of this policy shall terminate, if not already terminated, as of the inception date of this policy. Such prior bonds or policies shall not cover any loss under the Crime or Kidnap/Ransom & Extortion coverage sections not discovered and notified to the Company prior to the inception date of this policy.

---

**Definitions**

13. When used in this policy:

**Parent Organization** means the organization designated in Item 1 of the Declarations of this policy.

**Policy Period** means the period of time specified in Item 2 of the Declarations of this policy, subject to prior termination in accordance with subsection 11 above. If this period is less than or greater than one year, then the Limits of Liability specified in the Declarations for each coverage section shall be the Company's maximum limit of liability under such coverage section for the entire period.

---



# *Executive Protection Policy*

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 1

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

## ILLINOIS AMENDATORY ENDORSEMENT

It is agreed that:

Subsection 4. "Extended Reporting Period", shall be deleted and replaced by the following:

### EXTENDED REPORTING PERIOD

4.    If the Company or the **Insured** terminates or refuses to renew this coverage section, the **Parent Organization** and the **Insured Persons** shall have the right, upon payment of the additional premium set forth in Item 7(A) of the Declarations for this coverage section, to an extension of the coverage granted by the coverage section for a period of one year as set forth in Item 7(B) of the Declarations for this coverage section (Extended Reporting Period) following the effective date of termination or nonrenewal, but only for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to the effective date of termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within 30 days following the effective date of termination or nonrenewal. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period.**

It is further agreed that Subsection 18, "Definitions", shall be amended by deleting **Defense Costs** and replacing it with the following:

   **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization** or the salaries of the employees, officers or staff attorneys of the Company) incurred in defending or investigating **Claims** and the premium for appeal, attachment or similar bonds.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

John S. Bain
_____
Authorized Representative

January 23, 1998
_____
Date



CHUBB

Executive Protection Policy

Coverage Section: EXECUTIVE LIABILITY    Company: FEDERAL INSURANCE COMPANY

Effective date of                        Endorsement No.   2
this endorsement:  JANUARY 01, 1998

To be attached to and form part of
Policy No.  8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

It is agreed that Item 6 of the Declarations, INSURED PERSONS, has been
amended to read as follows:

Any person who has been, now is, or shall become a General Manager of the
Sales Department of Inland Steel Company; an General Manager--
Communications & Stakeholder Relations; a Director--National Accounts of
Inland Steel Industries; Director--Management & Organization Development
of Inland Steel Industries, Inc.; a Divisional Corporate Officer of
Inland Steel Flat Products Company; the Deputy General Counsel, the
Associate General Counsel, or an Assistant General Counsel of Inland
Steel Industries, Inc.; Director--National Markets of Inland Steel
Company - Inland Steel Flat Products Company (division), and any
equivalent in any INSURED ORGANIZATION under the law of any jurisdiction
outside the United States, and with respect to any subsidiary incorporated
outside the United States of America, their functional equivalent.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

John S. Bain
Authorized Representative

January 23, 1998
Date


CHUBB

ecutive Protection Po. y

Coverage Section: EXECUTIVE LIABILITY     Company: FEDERAL INSURANCE COMPANY

Effective date of                         Endorsement No.   3
this endorsement: JANUARY 01, 1998

To be attached to and form part of
Policy No.  8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

It is agreed that Subsection 5, EXCLUSIONS, is amended by deleting (b)
in its entirety.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date



**ENDORSEMENT**

Coverage Section: EXECUTIVE LIABILITY       Company:  FEDERAL INSURANCE COMPANY

Effective date of                           Endorsement No.   4
this endorsement:  JANUARY 01, 1998

To be attached to and form part of
Policy No.   8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

---

It is agreed that Subsection 18, INSURED CAPACITY, is deleted in its
entirety and the following is substituted in lieu thereof:

Insured Capacity means the position or capacity designated in Item 6
of the Declarations for this coverage section held by any Insured Person.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

_____
January 23, 1998
Date



## ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY          Company: FEDERAL INSURANCE COMPANY

Effective date of                                           Endorsement No.   5
this endorsement:  JANUARY 01, 1998

To be attached to and form part of
Policy No.  8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

---

It is agreed that Item 5 of the Declarations, INSURED ORGANIZATION, is
amended to include the following:

The Inland Steel Credit Union

As respects to The Inland Steel Credit Union the LIMITS OF LIABILITY are
as follows:

Limits of Liability:        (a)  Each LOSS                $5,000,000.
                            (b)  Each POLICY PERIOD       $5,000,000.

Provided, however, that any Loss as respects to The Inland Steel Credit
Union shall be included within the LIMITS OF LIABILITY specified in Item 1
of the Declarations and shall in no way serve to increase such LIMITS
OF LIABILITY specified in Item 1 of the Declarations.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date



CHUBB

**ENDORSEMENT**

Coverage Section: EXECUTIVE LIABILITY     Company: FEDERAL INSURANCE COMPANY

Effective date of                                        Endorsement No. 6
this endorsement: JANUARY 01, 1998

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1. This coverage section is amended by adding the following:



INSURING CLAUSE 3

The Company shall pay on behalf of any INSURED ORGANIZATION all LOSS for
which it becomes legally obligated to pay on account of any CLAIM first
made against it during the POLICY PERIOD or, if exercised, during the
Extended Reporting Period, for a WRONGFUL ACT committed, attempted, or
allegedly committed or attempted by any INSURED before or during the
POLICY PERIOD.

2. Subsection 18, DEFINITIONS, is amended as follows:

   a. The definitions of CLAIM and WRONGFUL ACT are deleted in their
      entirety and the following is inserted:

      CLAIM means:
      (a) For purposes of coverage under Insuring Clauses 1 or 2:
          (i)   a written demand for monetary or non-monetary damages;
          (ii)  a civil proceeding commenced by the service of a
                complaint or similar pleading;
          (iii) a criminal proceeding commenced by the return of an
                indictment; or
          (iv)  a formal administrative or regulatory proceeding commenced
                by the filing of a notice of changes, formal investigative
                order or similar document;
          against any INSURED PERSON for a WRONGFUL ACT including any
          appeal therefrom;
      (b) For purposes of coverage under Insuring Clause 3:
          (i)   a written demand for monetary or non-monetary damages;
          (ii)  a civil proceeding commenced by the service of a complaint or
                similar pleading; or
          (iii) a criminal proceeding commenced by the return of an
                indictment;

against any INSURED ORGANIZATION for a WRONGFUL ACT, including any appeal therefrom.

WRONGFUL ACT means:
(a) For purposes of coverage under Insuring Clauses 1 or 2, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by any INSURED PERSON individually or otherwise in his INSURED CAPACITY, or any matter claimed against him solely by reason of serving in such INSURED CAPACITY;
(b) For purposes of coverage under Insuring Clause 3, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allededly committed or attempted by any INSURED based upon arising from, or in consequence of any SECURITIES TRANSACTION.

b. The following definition is added:

SECURITIES TRANSACTION means:
(i) the purchase or sale of, or offer to purchase or sell, any securities ~~of or by~~ any INSURED ORGANIZATION;
(ii) the ownership of securities of the INSURED ORGANIZATION by a securities holder.

c. The definitions of INSURED PERSON and LOSS are amended by adding the following:

INSURED PERSON also means:
(i) For purposes of coverage under Insuring Clause 1 or 2, any past, present and future employee of any INSURED ORGANIZATION, but only for WRONGFUL ACTS based upon, arising from or in consequence of any ~~SECURITIES TRANSACTION~~; and
(ii) For purposes of coverage under Insuring Clause 3, any ~~INSURED ORGANIZATION~~.

LOSS does not include any amount allocated to uncovered loss pursuant to subsecton 12, ALLOCATION. LOSS includes punitive or exemplary damages which any INSURED becomes legally obligated to pay, provided the punitive or exemplary damages are on account of a CLAIM which is otherwise covered under this coverage section and which is based on a SECURITIES TRANSACTION and provided such punitive or exemplary damages are insurable under the law pursuant to which this coverage section is construed.

3. The heading for subsection 5 is deleted in its entirety and the following is inserted:

EXCLUSIONS APPLICABLE TO ALL INSURING CLAUSES

4. Subsection 5, EXCLUSIONS: EXCLUSIONS APPLICABLE TO ALL INSURING CLAUSES, is amended by adding the following to paragraph (c):

(iv) a CLAIM that is brought by any INSURED PERSON identified in section 2c(i) of this endorsement for any WRONGFUL ACT based upon, arising from or in consequence of any SECURITIES TRANSACTION.

5. EXCLUSIONS is amended by adding the following:

EXCLUSIONS APPLICABLE TO INSURING CLAUSE 3 ONLY

6.1 The Company shall not be liable under Insuring Clause 3 for LOSS on

SECURITIES TRANSACTION shall not apply if:
   (i) a final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment in such CLAIM, or
(ii) a complete and final settlement of such CLAIM with prejudice, establishes that no INSURED in such CLAIM is liable for any LOSS, other than DEFENSE COSTS. The Company shall reimburse any INSURED which has funded a Deductible Amount if such amount subsequently becomes inapplicable based upon (i) or (ii) above.

The maximum Deductible Amount applicable to a single LOSS which is covered under more than one Insuring Clause shall be the amount set forth in Item 4 of the Declarations for this coverage section.

7. The first paragraph of subsection 12, ALLOCATION, is deleted in its entirety and the following is inserted:

  (a) if a CLAIM based on, arising from or in consequence of a Securities TRANSACTION covered, in whole or in part, under Insuring Clauses 2 or 3 results in any INSURED PERSON under Insuring Clause 2 or any INSURED ORGANIZATION under Insuring Clause 3 incurring both LOSS covered by this coverage section and loss not covered by this coverage section, because such CLAIM includes both covered and uncovered matters or is made against both covered and uncovered parties, the INSUREDS and the Company shall allocate such amount to LOSS as follows:
    (i) 100% of such amount constituting defense costs shall be allocated to covered LOSS; and
    (ii) 80% of such amount other than defense costs shall be allocated to covered LOSS.

  (b) If any other CLAIM results in both LOSS covered by this coverage section and loss not covered by this coverage section, because such CLAIM includes both covered and uncovered matters or is made against both covered and uncovered parties, the INSUREDS and the Company shall allocate such amount between covered LOSS and uncovered loss as follows:
    (i) 80% of all defense costs shall be allocated to covered LOSS; and
    (ii) with respect to all LOSS other than defense costs, the Company and the INSUREDS shall allocate such amount based upon the relative legal exposures of the parties to such matters.

8. For purposes of coverage under Insuring Clause 3 only, the second sentence of the second paragraph of subsection 17, REPRESENTATIONS AND SEVERABILITY, is deleted in its entirety and the following is inserted:

With respect to the declarations and statements contained in the written application(s) for coverage, all declarations and statements contained in such application and knowledge possessed by any INSURED PERSON identified in Item 6 of the Declarations shall be imputed to any INSURED ORGANIZATION for the purpose of determining if coverage is available.

9. For purposes of coverage under Insuring Clause 3 only, subsection 7, SEVERABILITY OF EXCLUSIONS, is deleted in its entirety and the following is inserted:

With respect to the exclusions in subsections 5, 6.1 and 6.2, only facts pertaining to and knowledge possessed by any past, present or future chief financial officer, President or Chairman of any INSURED



Coverage Section: EXECUTIVE LIABILITY        Company: FEDERAL INSURANCE COMPANY

Effective date of                            Endorsement No.  6
this endorsement: JANUARY 01, 1998

                                             To be attached to and form part of
                                             Policy No.  8114-31-05H


Issued to:   INLAND STEEL INDUSTRIES, INC.

account of any CLAIM made against any INSURED ORGANIZATION based
upon, arising from, or in consequence of any deliberately
fraudulent act or omission or any willful violation of any statue
or regulation by any past, present or future chief financial
officer, President or Chairman if a judgment or other final
adjudication adverse to the INSURED ORGANIZATION establishes such
a deliberately fraudulent act or omission or willful violation.

6.2 The Company shall not be liable under Insuring Clause 3 for that
part of LOSS, other than DEFENSE COSTS:

(a)  which is based upon, arises from, or is in consequence of the
actual or proposed payment by any INSURED ORGANIZATION of
allegedly inadequate or excessive consideration in connection
with its purchase of securities issued by any INSURED
ORGANIZATION; or

(b)  which is based upon, arises from, or in consequence of any
INSURED ORGANIZATION having gained in fact any profit or
advantage to which it was not legally entitled.

6. The second, third and fourth paragraph of subsection 8, LIMIT OF
LIABILITY, DEDUCTIBLE AND COINSURANCE, are deleted in their entirety
and the following is inserted:

The Company's maximum liability for each LOSS whether covered under one
or more Insuring Clauses, shall be the Limit of Liability for each
LOSS set forth in Item 2(a) of the Declarations for this coverage
section.  The Company's maximum aggregate liability for all LOSS
on account of all CLAIMS first made during the same POLICY PERIOD,
whether covered under one or more Insuring Clauses, shall be the Limit
of Liability for each POLICY PERIOD set foth in Item 2(B) of the
Declarations for this coverage section.

The Company's liability under Insuring Clause 2 or Insuring Clause 3
shall apply only to that part of each LOSS which is excess of the
Deductible Amount set forth in Item 4 of the Declarations for this
coverage section, and such Deductible Amount shall be home by the
INSUREDS uninsured and at their own risk.  However, the Deductible
Amount applicable to each LOSS on account of any CLAIM for
WRONGFUL ACTS based upon, arising from or in consequence of any


CHUBB

Coverage Section: EXECUTIVE LIABILITY    Company: FEDERAL INSURANCE COMPANY

Effective date of                         Endorsement No.  6
this endorsement:  JANUARY 01, 1998

                                          To be attached to and form part of
                                          Policy No.  8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

---

ORGANIZATION shall be imputed to any INSURED ORGANIZATION to determine
if coverage is available for such INSURED ORGANIZATION.

10 For purposes of coverage for employees who are INSURED PERSONS
   pursuant to paragraph 2c(i) of this endorsement, subsection 9,
   PRESUMPTIVE INDEMNIFICATION, is amended as follows:

   a. Paragraph (b) is deleted in its entirety and the following is
      inserted:

      (b) is permitted or required to indemnify the INSURED PERSON for
          such LOSS pursuant to common or statutory law.

   b. The final paragraph in the subsection is deleted in its entirety and
      the following is inserted:

      For purposes of this subsection 10, the shareholder and board of
      director resolutions of the INSURED ORGANIZATION shall be deemed
      to provide indemnifiction for such LOSS to the fullest extent
      permitted by common or statutory law.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date


CHUBB

ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY     Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998     Endorsement No. 7

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

It is agreed that Item 5 of the Declarations, INSURED ORGANIZATION,
is amended by adding the following:

J.M. Tull Metals Company, Inc. and its Subsidiary Corporations

provided, however, that the Company shall not be liable under this
endorsement for LOSS on account of any CLAIM made against any INSURED
PERSON based upon, arising from, or in consequence of any demand , suit,
or other proceeding pending, or order, decree or judgment entered
against any INSURED on or prior to May 20, 1986.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

John S. Bain
Authorized Representative

January 23, 1998
Date



CHUBB

ecutive Protection Po y

Coverage Section: EXECUTIVE LIABILITY     Company: FEDERAL INSURANCE COMPANY

Effective date of                         Endorsement No.  8
this endorsement:  JANUARY 01, 1998

                                          To be attached to and form part of
                                          Policy No.  8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

---

It is agreed that subsection 5, EXCLSUSIONS: EXCLUSIONS APPLICABLE TO
INSURING CLAUSES 1 AND 2, is amended by deleting paragraph (c) in its
entirety with respect to a CLAIM brought and maintained:

1. Solely and entirely in a jurisdiction other than the United States
   of America, its territories and possessions; and

2. Subject to the substantive and procedural laws of a jurisdiction other
   than the United States of American, its territories and possessions.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
                  Authorized Representative

              January 23, 1998
_____
                  Date



CHUBB

ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY    Company: FEDERAL INSURANCE COMPANY

Effective date of                          Endorsement No. 9
this endorsement: JANUARY 01, 1998

To be attached to and form part of
Policy No. 8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

It is agreed that subsection 5, EXCLUSIONS: EXCLUSIONS APPLICABLE TO
INSURING CLAUSES 1 AND 2, is amended by deleting paragraph (f) in its
entirety with respect to a CLAIM brought and maintained:

1. Solely and entirely in a jurisdiction other than the United States of
   America, its territories and possessions; and

2. Subject to the substantive and procedural laws of a jurisdiction
   other than the United States of America, its territories and
   possessions.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
Date



**ENDORSEMENT**

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 10

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that Item 5 of the Declarations, **Insured Organization**, is amended by adding the following:

> Southern Metals Corp. and its Subsidiary
> Corporations.

> provided, however, that coverage afforded by this endorsement shall not apply to that portion of **Wrongful Acts** and **Interrelated Wrongful Acts** committed, attempted, or allegedly committed or attempted, prior to February 01, 1989.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_John S. Bain_
Authorized Representative

January 23, 1998
Date



CHUBB

# *Executive Protection Policy*

## ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 11

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

It is agreed that Item 5 of the Declarations, **Insured Organization,** is amended by adding the following:

Processed Metals, Inc. and its
Subsidiary Corporations

provided, however, that coverage afforded by this endorsement shall not apply to that portion of **Wrongful Acts** and **Interrelated Wrongful Acts** committed, attempted, or allegedly committed or attempted, prior to February 01, 1989.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
Date


CHUBB

# *Executive Protection Policy*

## ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 12

To be attached to and form part of
Policy No. 8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

---

It is agreed that Item 5 of the Declarations, **Insured Organization**, is amended by adding the following:

AFCO Metals and its
Subsidiary Corporations

provided, however, that coverage afforded by this endorsement shall not apply to that portion of **Wrongful Acts** and **Interrelated Wrongful Acts** committed, attempted, or allegedly committed or attempted, prior to June 06, 1988.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

John S. Bain
Authorized Representative

January 23, 1998
Date

Form 14-02-1042 (Ed 4/92)



CHUBB

# Executive Protection Policy

Coverage Section: EXECUTIVE LIABILITY    Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998    Endorsement No. 13

To be attached to and form part of
Policy No.  8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

It is agreed that Item 5 of the Declarations, **Insured Organization**, is amended by adding the following:

    IN/TEK and I/N KOTE

provided, however, that the Company shall not be liable under this endorsement for **Loss** on account of any **Claim** made against any **Insured Person** based upon, arising from, or in consequence of any demand, suit, or other proceeding pending, or order, decree or judgement entered against any **Insured** on or prior to July 01, 1992          , or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date

Form 14-02-1207 (Ed 11/93)



CHUBB

# Executive Protection Policy

## ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of this endorsement: JANUARY 01, 1998

Endorsement No. 14

To be attached to and form part of Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1. Item 6 of the Declarations, **Insured Persons**, is amended by adding the following:

   Past, present and future employees of the **Insured Organization**;

   Provided, however, that coverage provided to employees pursuant to this paragraph shall apply only to **Employment Claims**.

2. Subsection 5, **Exclusions: Exclusions Applicable to Insuring Clauses 1 and 2**, is amended by deleting paragraphs (c), (d) and (e) in their entirety and inserting the following:

   (c) brought or maintained by or on behalf of any **Insured** except:

   (i) a **Claim** that is a derivative action brought or maintained on behalf of an **Insured Organization** by one or more persons who are not **Insured Persons** and who bring and maintain the **Claim** without the solicitation, assistance, or participation or any **Insured**;

   (ii) an **Employment Claim**;

   (iii) a **Claim** brought or maintained by or on behalf of an **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this policy;

   (iv) a **Claim** brought or maintained by an **Insured Person** for the actual or alleged wrongful termination of the **Insured Person**;

   (d) for an actual or alleged violation of the responsibilities, obligations, or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, rules or regulations promulgated thereunder and amendments thereto or similar provisions of any federal, state, or local statutory law or common law;

   (e) for mental or emotional distress (except with respect to **Employment Claims**), bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; or

3. Subsection 9, **Presumptive Indemnification**, is amended as follows, but only with respect to **Employment Claims**:

   a. Paragraphs (i) and (ii) are deleted in their entirety and the following is inserted:

      the broadest application of law:

   b. The final paragraph of subsection 9 is deleted in its entirety.

*A.* Subsection 18, **Definitions**, is amended by adding the following:

**Employment Claim** means a claim which is brought and maintained by or on behalf of any past, present or prospective employees of the **Insured Organization** against any **Insured Person** for any **Wrongful Act** in connection with any actual or alleged wrongful dismissal, discharge or termination of employment, breach of any oral or written employment contract or quasi-employment contract, employment-related misrepresentation, violation of employment discrimination laws (including workplace harassment), wrongful failure to employ or promote, wrongful discipline, wrongful deprivation of a career opportunity, failure to grant tenure, negligent evaluation, invasion of privacy, employment-related defamation or employment-related wrongful infliction of emotional distress.

**Financial Impairment** means the status of the **Insured Organization** resulting from (i) the appointment by any state or federal offical, agency or court of any receiver, conservatory, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Insured Organization**, or (ii) the **Insured Organization** becoming a debtor in possession.

All other terms and conditions remain unchanged.

_____
Authorized Representative

January 23, 1998
_____
Date



CHUBB

# *Executive Protection Policy*

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 15

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1.  The following is added to this coverage section:

    Investigative Costs Coverage
    Insuring Clause 4

    The Company shall pay on behalf of the **Insured Organization** all **Investigation Costs** which such **Insured Organization** becomes legally obligated to pay on account of any **Shareholder Derivative Demand** first made during the **Policy Period** or, if exercised, the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted, by an **Insured Person** before or during the **Policy Period.**

2.  Subsection 5, **Exclusions Applicable to Insuring Clauses 1 and 2,** is amended by deleting the subsection heading in its entirety and inserting the following:

    **Exclusions Applicable to Insuring Clauses 1, 2 and 4**

3.  Subsection 8, **Limit of Liability, Deductible and Coinsurance,** is amended as follows:

    a.  The following is added to paragraph two:

        The Company's maximum liability for all **Investigative Costs** covered under Insuring Clause 4 on account of all **Shareholder Derivative Demands** first made during the same **Policy Period** shall be $250,000. This is a sublimit which further limits and does not increase the Company's maximum liability under this coverage section as set forth in Item 2(B) of the Declarations for this coverage section.

    b.  The following is added to paragraph three:

        No deductible amount shall apply to **Investigation Costs** covered under Insuring Clause 4.

4.  Subsection 11, **Defense and Settlement,** is amended for purposes of coverage under Insuring Clause 4 by deleting the first paragraph in its entirety and inserting the following:

    Subject to this subsection, it shall be the duty of the **Insured Organization** and not the duty of the Company to investigate and evaluate any **Shareholder Derivative Demand.**

5.  Subsection 18, **Definitions,** is amended by adding the following:

    **Investigation Costs** means reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred by the **Insured Organization** (including its board of directors or any committee of the board of directors) in connection with the investigation or evaluation of any **Shareholder Derivative Demand.**

**Shareholder Derivative Demand** means any written demand, by one or more shareholders of an **Insured Organization**, upon the board of directors of such **Insured Organization**, to bring a civil proceeding in a court of law against any **Insured Person** for a **Wrongful Act** committed, attempted or allegedly committed or attempted by an **Insured Person** before or during the **Policy Period**.

6. For purposes of coverage under Insuring Clause 4 only,

    a. all references in this coverage section to **Loss** or **Defense Costs** shall only mean **Investigation Costs**; and

    b. all references in this coverage section to **Claim** or to "**Claim** against any **Insured Person**" shall only mean any **Shareholder Derivative Demand**.

All other terms and conditions remain unchanged.

_____
Authorized Representative

January 23, 1998
_____
Date



CHUBB

# Executive Protection Policy

Coverage Section: EXECUTIVE LIABILITY          Company: FEDERAL INSURANCE COMPANY

Effective date of                              Endorsement No. 16
this endorsement: JANUARY 01, 1998

To be attached to and form part of
Policy No. 8114-31-05H

Issued to:  INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1. Subsection 5, "Exclusions: Exclusions Applicable to Insuring Clauses 1 and 2" is amended by deleting paragraph (f) in its entirety and replacing it with the following:

   (f) Based upon, arising from, or in consequence of:

   (1) the actual, alleged or threatened discharge, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or

   (2) any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

   including but not limited to any **Claim** for financial loss to the **Insured Organization**, its security holders or its creditors based upon, arising from or in consequence of the matters described in (1) and (2) above. However, this exclusion shall not apply to **Loss** (i) which is on account of any **Claim** brought by any shareholder of the **Insured Organization** in his capacity as such, whether in his own right or on behalf of the **Insured Organization**, provided that such **Claim** is brought and maintained without the assistance, participation or solicitation of any **Insured**, and (ii) for which the **Insured Organization**, either is not permitted or required, or fails or refuses by reason of **Financial Impairment**, to indemnify the **Insured Person(s)**. For purposes of this endorsement, the certificate of incorporation, by-laws and shareholder and board of director resolutions of the **Insured Organization** shall be deemed to provide indemnification to the **Insured Persons(s)** to the fullest extent permitted by law.

2. This endorsement shall apply, and Exclusion 5 (f) shall be amended as provided herein, only with respect to **Claims** first made in fact during the **Policy Period**. This endorsement shall not apply, and Excusion 5 (f) shall not be amended as provided herein, with respect to **Claims** first made in fact after the **Policy Period** but considered pursuant to the second paragraph of subsection 10 of this coverage section to have been made during the **Policy Period** because such **Claim** arises out of circumstances noticed to the Company during the **Policy Period**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date



# *Executive Protection Policy*

## ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 17

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

---

It is agreed that:

1. Item 6 of the Declarations, **Insured Persons**, is amended by adding the following:

   ... and any elected or appointed officer of the **Insured Organization** in an **Outside Directorship**.

2. Subsection 18, "Definitions", is amended by adding the following:

   **Outside Directorship** means the position of director, officer, trustee, governor, or equivalent executive position with an **Outside Entity** if service by an **Insured Person** in such position was at the specific request of the **Insured Organization** or was part of the duties regularly assigned to the **Insured Person** by the **Insured Organization**.

   **Outside Entity** means any non-profit corporation, community chest, fund organization or foundation exempt from federal income tax as an organization described in Section 501(c)(3), Internal Revenue Code of 1986, as amended.

3. The following subsection is added to this coverage section:

   OUTSIDE DIRECTORSHIPS

   19. Coverage provided to any **Insured Person** in an **Outside Directorship** shall:

       (a) not extend to the **Outside Entity** or to any director, officer, trustee, governor or any other equivalent executive or employee of the **Outside Entity**, other than the **Insured Person** serving in the **Outside Directorship**;

       (b) be specifically excess of any indemnity (other than any indemnity provided by the **Insured Organization**) or insurance available to such **Insured Person** by reason of serving in the **Outside Directorship**, including any indemnity or insurance available from or provided by the **Outside Entity**;

       (c) not extend to **Loss** on account of any **Claim** made against any **Insured Person** for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** while serving in the **Outside Directorship** if such **Wrongful Act** is committed, attempted, or allegedly committed or attempted, after the date (i) such **Insured Person** ceases to be an officer of the **Insured Organization**, or (ii) service by such **Insured Person** in the **Outside Directorship** ceases to be at the specific request of the **Insured Organization** or a part of the duties regularly assigned to the **Insured Person** by the **Insured Organization**;

       (d) not extend to **Loss** on account of any **Claim** made against any **Insured Person** for a **Wrongful Act** committed, attempted or alledgedly committed or attempted by such **Insured Person** while serving in the **Outside Directorship** where such **Claim** is (i) by the **Outside Entity**, or (ii) on behalf of the **Outside Entity** and a director, officer, trustee, governor or equivalent executive of the **Outside Entity** instigates such **Claim**, or (iii) by any director, officer, trustee, governor or equivalent executive of the **Outside Entity**.

4. The Company's maximum liability to pay Loss under this coverage section, including this endorsement, shall not exceed the amount set forth in Item 2 of the Declarations. This endorsement does not increase the Company's maximum liability beyond the Limits of Liability set forth in Item 2 of the Declarations.

5. Payment by the Company or any of its subsidiaries or affiliated companies under another policy on account of a Claim also covered pursuant to this endorsement shall reduce by the amount of the payment the Company's Limits of Liability under this coverage section with respect to such Claim.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

January 23, 1998
_____
Date



# *Executive Protection Policy*

CHUBB

ENDORSEMENT

Coverage Section: EXECUTIVE LIABILITY

Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998

Endorsement No. 18

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

It is agreed that if a **Claim** against an **Insured Person** includes a claim against the **Insured Person's** lawful spouse solely by reason of (i) such spouse's status as a spouse of the **Insured Person,** or (ii) such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person,** all loss which such spouse becomes legally obligated to pay on account of such **Claim** shall be treated for purposes of this coverage section as **Loss** which the **Insured Person** becomes legally obligated to pay on account of the **Claim** made against the **Insured Person.** All limitations, conditions, provisions and other terms of coverage (including the deductible) applicable to the **Insured Person's Loss** shall also be applicable to such spousal loss.

The coverage extension afforded by this Endorsement does not apply to any **Claim** alleging any wrongful act or omission by the **Insured Person's** spouse.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

John S. Bain
Authorized Representative

January 23, 1998
Date

Form 14-02-1166 (Ed 6/92)



CHUBB

Executive Protection Policy

Coverage Section: EXECUTIVE LIABILITY       Company: FEDERAL INSURANCE COMPANY

Effective date of                           Endorsement No.   19
this endorsement: JANUARY 01, 1998

                                            To be attached to and form part of
                                            Policy No.  8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

---

It is agreed that Item 6, of the Declarations, INSURED PERSONS, has
been deleted in its entirety and replaced with the following:

Item 6.     INSURED PERSONS:

            Any person who has been, now is, or shall become a duly
            elected or appointed director or a duly elected or
            appointed officer of the Insured Organization and those
            persons listed on Endorsement No.2.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

                    July 1, 1998
_____
                    Date


CHUBB

# xecutive Protection Policy

Coverage Section: EXECUTIVE LIABILITY    Company: FEDERAL INSURANCE COMPANY

Effective date of
this endorsement: JANUARY 01, 1998    Endorsement No. 20

To be attached to and form part of
Policy No. 8114-31-05H

Issued to: INLAND STEEL INDUSTRIES, INC.

It is agreed that subsection 14 paragraph 2, CHANGES IN EXPOSURE, has
been amended to read as follows:

If the fair value of all cash, securities, assumed indebtedness and other
consideration paid by the INSURED ORGANIZATION for any such acquisition
or creation exceeds 15% of the total assets of the PARENT ORGANIZATION
as reflected in the PARENT ORGANIZATION'S most recent audited consolidated
financial statements, the PARENT ORGANIZATION shall give written notice
of such acquisition or creation to the Company as soon as practicable
together with such information as the Company may require and shall pay
any reasonable additional premium required by the Company.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

_____
Authorized Representative

July 1, 1998
Date



**CHUBB GROUP OF INSURANCE COMPANIES**

CHUBB

# PREMIUM BILL

Insured    INLAND STEEL INDUSTRIES, INC.          Date: January 12, 1998

Producer:    WILLIS CORROON CORPORATION OF ILLINOIS
10 S. LASALLE STREET
CHICAGO, IL 60603-0000

Company:    FEDERAL INSURANCE COMPANY

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Policy Number:    8114-31-05H

Policy Period    JANUARY 01, 1998    to    JANUARY 01, 2001

NOTE: · PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

PLEASE REMIT TO PRODUCER INDICATED ABOVE.

| COVERAGE | COMM RATE | PREMIUM |
|---|---|---|
| Executive Liability & Indemnification | 9.5% | $1,176,795. |
| Fiduciary Liability | 9% | $ 154,944. |
| Crime | 7% | $ 142,581. |
| Kidnap/Ransom | 8% | $ 42,393. |

1st Installment  -  $505,571.
2nd Installment  -  $505,571.
3rd Installment  -  $505,571.

|  |  |
|---|---|
| TOTAL | $1,516,713. |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Form 14-02-1324 (Rev 1/95)



CHUBB

# *Executive Protection Policy*

Effective date of
this endorsement: JANUARY 01, 1998

To be attached to and form part of          Company: FEDERAL INSURANCE COMPANY
Policy No. 8114-31-05H

Issued to:   INLAND STEEL INDUSTRIES, INC.

The following is a schedule of forms attaching to and forming a part of this policy:

## GENERAL TERMS AND CONDITIONS

FORM NUMBER

    14-02-1844
    14-02-1374

## EXECUTIVE LIABILITY AND INDEMNIFICATION

FORM NUMBER

    14-02-1294
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-1042
    14-02-1042
    14-02-1042
    14-02-1207
    14-02-1969
    14-02-2233
    14-02-1972
    14-02-1100
    14-02-1166

## FIDUCIARY LIABILITY

FORM NUMBER

    14-02-1168
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-0961
    14-02-2005

**CRIME INSURANCE**

FORM NUMBER

14-02-1880
14-02-0961
14-02-0961
14-02-1882
14-02-1498
14-02-0975
14-02-0976
14-02-0983
14-02-0997
14-02-0998
14-02-1001
14-02-1002
14-02-1005

**KIDNAP/RANSOM AND EXTORTION**

FORM NUMBER

14-02-2302
14-02-0961
14-02-0961
14-02-0961
14-02-1024
14-02-1025


**CHUBB**

# Executive Protection Policy

Item 1.  Parent Organization:
INLAND STEEL INDUSTRIES, INC.

Item 2.  Limits of Liability:

    (A)  Each Loss  $25,000,000.
    (B)  Each Policy Period  $25,000,000.

Note that the limits of liability and any deductible or retention are reduced or exhausted by
**Defense Costs.**

Item 3.  Coinsurance Percent: -0-%

Item 4.  Deductible Amount:

    Insuring Clause 2  $2,000,000.

Item 5.  Insured Organization:
INLAND STEEL INDUSTRIES, INC.

Item 6.  Insured Persons:
See Attached Endorsement

Item 7.  Extended Reporting Period:

    (A)  Additional Premium:  50% of the Annual Premium
    (B)  Additional Period:  One Year

Item 8.  Pending or Prior Date: None

Item 9.  Continuity Date: July 24, 1968

Form 14-02-0943 (Ed. 1/92)


## Executive Liability and Indemnification Coverage Section

In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this coverage section, the Company agrees as follows:

## Insuring Clauses

### Executive Liability Coverage Insuring Clause 1

1.  The Company shall pay on behalf of each of the **Insured Persons** all **Loss** for which the **Insured Person** is not indemnified by the **Insured Organization** and which the **Insured Person** becomes legally obligated to pay on account of any **Claim** first made against him, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** before or during the **Policy Period**.

### Executive Indemnification Coverage Insuring Clause 2

2.  The Company shall pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** grants indemnification to each **Insured Person**, as permitted or required by law, which the **Insured Person** has become legally obligated to pay on account of any **Claim** first made against him, individually or otherwise, during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by such **Insured Person** before or during the **Policy Period**.

### Estates and Legal Representatives

3.  Subject otherwise to the General Terms and Conditions and the limitations, conditions, provisions and other terms of this coverage section, coverage shall extend to **Claims** for the **Wrongful Acts** of **Insured Persons** made against the estates, heirs, legal representatives or assigns of **Insured Persons** who are deceased or against the legal representatives or assigns of **Insured Persons** who are incompetent, insolvent or bankrupt.

### Extended Reporting Period

4.  If the Company terminates or refuses to renew this coverage section other than for nonpayment of premium, the **Parent Organization** and the **Insured Persons** shall have the right, upon payment of the additional premium set forth in Item 7(A) of the Declarations for this coverage section, to an extension of the coverage granted by this coverage section for the period set forth in Item 7(B) of the Declarations for this coverage section (Extended Reporting Period) following the effective date of termination or nonrenewal, but only for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to the effective date of termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is received by the Company within 30 days following the effective date of termination or nonrenewal. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the immediately preceding **Policy Period**.

    If the **Parent Organization** terminates or declines to accept renewal, the Company may, if requested, at its sole option, grant an Extended Reporting Period. The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

## Exclusions

5. The Company shall not be liable for Loss on account of any Claim made against any **Insured Person**:

    (a) based upon, arising from, or in consequence of any circumstance if written notice of such circumstance has been given under any policy or coverage section of which this coverage section is a renewal or replacement and if such prior policy or coverage section affords coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such **Loss**, in whole or in part, as a result of such notice;

    (b) based upon, arising from, or in consequence of any demand, suit or other proceeding pending, or order, decree or judgement entered against any **Insured** on or prior to the Pending or Prior Date set forth in Item 8 of the Declarations for this coverage section, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein;

    (c) brought or maintained by or on behalf of any **Insured** except:
        (i) a **Claim** that is a derivative action brought or maintained on behalf of an **Insured Organization** by one or more persons who are not **Insured Persons** and who bring and maintain the **Claim** without the solicitation, assistance or participation of any **Insured**,
        (ii) a **Claim** brought or maintained by an **Insured Person** for the actual or alleged wrongful termination of the **Insured Person**, or
        (iii) a **Claim** brought or maintained by an **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this coverage section;

    (d) for an actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 and amendments thereto or similar provisions of any federal, state or local statutory law or common law upon fiduciaries of any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of an **Insured Organization**;

    (e) for bodily injury, mental or emotional distress, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof; or

    (f) based upon, arising from, or in consequence of (i) the actual, alleged or threatened discharge, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or (ii) any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; including but not limited to any **Claim** for financial loss to the **Insured Organization**, its security holders or its creditors based upon, arising from, or in consequence of the matters described in (i) or (ii) of this exclusion.


## Exclusions
*(continued)*

| | | |
|---|---|---|

*Exclusions Applicable to Insuring Clause 1 Only*

6. The Company shall not be liable under Insuring Clause 1 for **Loss** on account of any **Claim** made against any **Insured Person:**

    (a) for an accounting of profits made from the purchase or sale by such **Insured Person** of securities of the **Insured Organization** within the meaning of Section 16 (b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any federal, state or local statutory law or common law;

    (b) based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such **Insured Person,** if a judgement or other final adjudication adverse to the **Insured Person** establishes such a deliberately fraudulent act or omission or willful violation; or

    (c) based upon, arising from, or in consequence of such **Insured Person** having gained in fact any personal profit, remuneration or advantage to which such **Insured Person** was not legally entitled.

*Severability of Exclusions*

7. With respect to the Exclusions in Subsections 5 and 6 of this coverage section, no fact pertaining to or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** to determine if coverage is available.

*Limit of Liability, Deductible and Coinsurance*

8. For the purposes of this coverage section, all **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of any **Insured Person** shall be deemed one **Loss,** and such **Loss** shall be deemed to have originated in the earliest **Policy Period** in which a **Claim** is first made against any **Insured Person** alleging any such **Wrongful Act** or **Interrelated Wrongful Acts.**

The Company's maximum liability for each **Loss,** whether covered under Insuring Clause 1 or Insuring Clause 2 or both, shall be the Limit of Liability for each **Loss** set forth in Item 2(A) of the Declarations for this coverage section. The Company's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period,** whether covered under Insuring Clause 1 or Insuring Clause 2 or both, shall be the Limit of Liability for each **Policy Period** set forth in Item 2(B) of the Declarations for this coverage section.

The Company's liability under Insuring Clause 2 shall apply only to that part of each **Loss** which is excess of the Deductible Amount set forth in Item 4 of the Declarations for this coverage section and such Deductible Amount shall be borne by the **Insureds** uninsured and at their own risk.

If a single **Loss** is covered in part under Insuring Clause 1 and in part under Insuring Clause 2, the Deductible Amount applicable to the **Loss** shall be the Insuring Clause 2 deductible set forth in Item 4 of the Declarations for this coverage section.

| | |
|---|---|
| *Limit of Liability,*<br>*Deductible and*<br>*Coinsurance*<br>*(continued)* | With respect to all **Loss** (excess of the applicable Deductible Amount) originating in any one **Policy Period**, the **Insureds** shall bear uninsured and at their own risk that percent of all such **Loss** specified as the Coinsurance Percent in Item 3 of the Declarations for this coverage section, and the Company's liability hereunder shall apply only to the remaining percent of all such **Loss**. |

Any **Loss** covered in whole or in part by this coverage section and the Employment Practices Liability coverage section of this policy (if purchased) shall be subject to the limits of liability, deductible and coinsurance percent applicable to such other coverage section; provided, however, if any limit of liability applicable to such other coverage section is exhausted with respect to such **Loss**, any remaining portion of such **Loss** otherwise covered by this coverage section shall be subject to the Limits of Liability and Coinsurance Percent applicable to this coverage section, as reduced by the amount of such **Loss** otherwise covered by this coverage section which is paid by the Company pursuant to such other coverage section.

For purposes of this Subsection 8 only, the Extended Reporting Period, if exercised, shall be part of and not in addition to the immediately preceding **Policy Period**.

| | | |
|---|---|---|
| *Presumptive*<br>*Indemnification* | 9. | If the **Insured Organization**: |

(a) fails or refuses, other than for reason of **Financial Impairment**, to indemnify the **Insured Person** for **Loss**; and

(b) is permitted or required to indemnify the **Insured Person** for such **Loss** pursuant to:

    (i) the by-laws or certificate of incorporation of the **Insured Organization** in effect at the inception of this coverage section, or

    (ii) any subsequently amended or superseding by-laws or certificate of incorporation of the **Insured Organization** provided, however, that such amended or superseding by-laws or certificate of incorporation expand or broaden, and do not restrict or in any way limit, the **Insured Organization's** ability to indemnify the **Insured Person**;

then, notwithstanding any other conditions, provisions or terms of this coverage section to the contrary, any payment by the Company of such **Loss** shall be subject to (i) the Insuring Clause 2 Deductible Amount set forth in Item 4 of the Declarations for this coverage section, and (ii) all of the Exclusions set forth in Subsections 5 and 6 of this coverage section.

For purposes of this Subsection 9, the shareholder and board of director resolutions of the **Insured Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by such by-laws or certificate of incorporation.



| | | |
|---|---|---|
| **Reporting and Notice** | 10. | The **Insureds** shall, as a condition precedent to exercising their rights under this coverage section, give to the Company written notice as soon as practicable of any **Claim** made against any of them for a **Wrongful Act**. |

If during the **Policy Period** or Extended Reporting Period (if exercised) an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstance(s) to the Company, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period** or the Extended Reporting Period in which the circumstances were first reported to the Company.

The **Insureds** shall, as a condition precedent to exercising their rights under this coverage section, give to the Company such information and cooperation as it may reasonably require, including but not limited to a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the **Claim** or circumstances.

| | | |
|---|---|---|
| **Defense and Settlement** | 11. | Subject to this Subsection, it shall be the duty of the **Insured Persons** and not the duty of the Company to defend **Claims** made against the **Insured Persons**. |

The **Insureds** agree not to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Company's written consent, which shall not be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

The Company shall have the right and shall be given the opportunity to effectively associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any **Claim** that appears reasonably likely to be covered in whole or in part by this coverage section.

The **Insureds** agree to provide the Company with all information, assistance and cooperation which the Company reasonably requests and agree that in the event of a **Claim** the **Insureds** will do nothing that may prejudice the Company's position or its potential or actual rights of recovery.

**Defense Costs** are part of and not in addition to the Limits of Liability set forth in Item 2 of the Declarations for this coverage section, and the payment by the Company of Defense Costs reduces such Limits of Liability.

| | | |
|---|---|---|
| **Allocation** | 12. | If both **Loss** covered by this coverage section and loss not covered by this coverage section are incurred, either because a **Claim** against the **Insured Persons** includes both covered and uncovered matters or because a **Claim** is made against both an **Insured Person** and others, including the **Insured Organization**, the **Insureds** and the Company shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. |

| **Allocation** (continued) | If the **Insureds** and the Company agree on an allocation of **Defense Costs**, the Company shall advance on a current basis **Defense Costs** allocated to the covered **Loss**. If the **Insureds** and the Company cannot agree on an allocation: |
|---|---|

(a) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(b) the Company shall advance on a current basis **Defense Costs** which the Company believes to be covered under this coverage section until a different allocation is negotiated, arbitrated or judicially determined; and

(c) the Company, if requested by the **Insureds**, shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by the Company, and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of Defense Costs on account of a **Claim** shall be applied retroactively to all **Defense Costs** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Defense Costs** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**.

| **Other Insurance** | 13. | If any **Loss** arising from any **Claim** made against any **Insured Persons** is insured under any other valid policy(ies), prior or current, then this coverage section shall cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this coverage section. |
|---|---|---|

## Changes in Exposure

| **Acquisition or Creation of Another Organization** | 14. | If the **Insured Organization** (i) acquires securities or voting rights in another organization or creates another organization, which as a result of such acquisition or creation becomes a **Subsidiary**, or (ii) acquires any organization by merger into or consolidation with an **Insured Organization**, such organization and its **Insured Persons** shall be **Insureds** under this coverage section but only with respect to **Wrongful Acts** committed, attempted, or allegedly committed or attempted, after such acquisition or creation unless the Company agrees, after presentation of a complete application and all appropriate information, to provide coverage by endorsement for **Wrongful Acts** committed, attempted, or allegedly committed or attempted, by such **Insured Persons** prior to such acquisition or creation. |
|---|---|---|

## Changes in Exposure

**Acquisition or Creation of Another Organization (continued)**

If the fair value of all cash, securities, assumed indebtedness and other consideration paid by the **Insured Organization** for any such acquisition or creation exceeds 10% of the total assets of the **Parent Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statements, the **Parent Organization** shall give written notice of such acquisition or creation to the Company as soon as practicable together with such information as the Company may require and shall pay any reasonable additional premium required by the Company.

---

**Acquisition of Parent Organization by Another Organization**

15. If (i) the **Parent Organization** merges into or consolidates with another organization, or (ii) another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Parent Organization,** coverage under this coverage section shall continue until termination of this coverage section, but only with respect to **Claims** for **Wrongful Acts** committed, attempted, or allegedly committed or attempted, by **Insured Persons** prior to such merger, consolidation or acquisition. The **Parent Organization** shall give written notice of such merger, consolidation or acquisition to the Company as soon as practicable together with such information as the Company may require.

---

**Cessation of Subsidiaries**

16. In the event an organization ceases to be a **Subsidiary** before or after the Inception Date of this coverage section, coverage with respect to such **Subsidiary** and its **Insured Persons** shall continue until termination of this coverage section but only with respect to **Claims** for **Wrongful Acts** committed, attempted or allegedly committed or attempted prior to the date such organization ceased to be a **Subsidiary.**

---

**Representations and Severability**

17. In granting coverage to any one of the **Insureds,** the Company has relied upon the declarations and statements in the written application for this coverage section and upon any declarations and statements in the original written application submitted to another insurer in respect of the prior coverage incepting as of the Continuity Date set forth in Item 9 of the Declarations for this coverage section. All such declarations and statements are the basis of such coverage and shall be considered as incorporated in and constituting part of this coverage section.

Such written application(s) for coverage shall be construed as a separate application for coverage by each of the **Insured Persons.** With respect to the declarations and statements contained in such written application(s) for coverage, no statement in the application or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining if coverage is available.

---

**Definitions**

18. When used in this coverage section:

Claim means:

(i) a written demand for monetary damages,

(ii) a civil proceeding commenced by the service of a complaint or similar pleading,

(iii) a criminal proceeding commenced by a return of an indictment, or

(iv) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.

against any Insured Person for a Wrongful Act, including any appeal therefrom.

Defense Costs means that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Insured Organization) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds.

Financial Impairment means the status of the Insured Organization resulting from (i) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the Insured Organization, or (ii) the Insured Organization becoming a debtor in possession.

Insured, either in the singular or plural, means the Insured Organization and any Insured Person.

Insured Capacity means the position or capacity designated in Item 6 of the Declarations for this coverage section held by any Insured Person but shall not include any position or capacity in any organization other than the Insured Organization, even if the Insured Organization directed or requested the Insured Person to serve in such other position or capacity.

Insured Organization means, collectively, those organizations designated in Item 5 of the Declarations for this coverage section.

Insured Person, either in the singular or plural, means any one or more of those persons designated in Item 6 of the Declarations for this coverage section.

Interrelated Wrongful Acts means all causally connected Wrongful Acts.

Loss means the total amount which any Insured Person becomes legally obligated to pay on account of each Claim and for all Claims in each Policy Period and the Extended Reporting Period, if exercised, made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgements, settlements, costs and Defense Costs. Loss does not include (i) any amount not indemnified by the Insured Organization for which the Insured Person is absolved from payment by reason of any covenant, agreement or court order, (ii) any amount incurred by the Insured Organization (including its board of directors or any committee of the board of directors) in connection with the investigation or evaluation of any Claim or potential Claim by or on behalf of the Insured Organization, (iii) fines or penalties imposed by law or the multiple portion of any multiplied damage award, or (iv) matters uninsurable under the law pursuant to which this coverage section is construed.



*Definitions*
*(continued)*

**Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. Such substances shall include, without limitation, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products and any noise.

**Subsidiary**, either in the singular or plural, means any organization in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more **Insured Organizations**.

**Wrongful Act** means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by an **Insured Person**, individually or otherwise, in his **Insured Capacity**, or any matter claimed against him solely by reason of his serving in such **Insured Capacity**.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| EMC GROUP, INC.,<br>a Delaware corporation, | ) | |
| | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  99 CH 05521 |
| | ) | |
| RYERSON TULL, INC., f/k/a | ) | |
| INLAND STEEL INDUSTRIES, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST  AMENDED  COMPLAINT

In the Summer and Fall of 1998, Defendant Inland Steel Industries, Inc.

("ISI"), perpetrated a fraud with the express and ultimately successful purpose of

inducing Plaintiff EMC Group, Inc. ("EMC") to purchase ISI's wholly owned subsidiary,

Inland Engineered Materials Corporation ("IEMC") (comprised of the holding company,

IEMC, and two subsidiaries, Magnetics International Inc. ("MII") and Brockway Pressed

Metals, Inc. ("BPM")).  Specifically, ISI actively concealed material facts and documents

and made material misrepresentations of fact about MII's relations with its most

significant customer, Ispat Inland, Inc. ("ISC/Ispat"), a former wholly owned subsidiary

of ISI that accounted for more than 50 percent of MII's total annual sales.

While telling EMC that ISC/Ispat "needed" MII and assuring EMC that the

ISC/Ispat customer relationship was sound, ISI actively concealed material facts it

learned about ISC/Ispat's alternatives to continuing its supply relationship with MII. ISI also actively concealed its knowledge of an express offer made to ISC by MII's competitor to replace MII, and actively concealed its knowledge that ISC/Ispat was considering the construction of its own on-site plant to eliminate its dependence upon MII. ISI knew these facts were material to MII's value and viability as a business but fraudulently withheld them in order to induce EMC's purchase of IEMC.

To block EMC's access to the truth, ISI refused to consent to EMC's repeated requests to speak with MII's customers, and instead expressly barred EMC from contacting ISC/Ispat before the IEMC sale closed. Under the parties' confidentiality agreement, ISI's express consent was required before EMC could talk to anyone about the transaction. Simultaneously, ISI assured EMC that the ISC/Ispat customer relationship was sound, and represented in the Stock Purchase Agreement executed on November 17, 1998, that it was not aware of any adverse changes in MII's relations with its customers. If not for ISI's fraudulent omissions, deceptive conduct, concealment of documents, and suppression of material facts, EMC would not have purchased IEMC.

For ISI's actions, EMC brings claims for fraud in the inducement, breach of contract, and breach of warranty, for which it seeks rescission of the Stock Purchase Agreement to purchase IEMC and restitution of the monies that it paid under that contract, compensatory and punitive damages, and other alternative relief.

For its First Amended Complaint, EMC further states as follows:

2

## PARTIES

1.     Plaintiff **EMC Group, Inc.** is a Delaware corporation with its principal place of business in St. Louis, Missouri. EMC Group, Inc. is a wholly owned subsidiary of **Engineered Materials Corporation**, a Delaware corporation formed in 1998 by a group of individuals who were also the founders, stockholders and management of **Woodridge Resources Corporation** ("Woodridge"), and IEMC Acquisition Corporation. In this Complaint, the definition "EMC" shall include EMC Group, Inc., Engineered Materials Corporation, Woodridge, and IEMC Acquisition Corporation.

2.     Defendant **Ryerson Tull, Inc.**, formerly known as **Inland Steel Industries, Inc.** (collectively "ISI"), is a Delaware corporation with its principal place of business in Chicago, Illinois. Prior to November 17, 1998, ISI was the sole owner of **Inland Engineered Material Corporation** ("IEMC"), a holding company that owned Magnetics International Inc. and Brockway Pressed Metals, Inc. Until July 16, 1998, ISI owned 100 percent of **Inland Steel Company** ("ISC"), an integrated steel company. At all relevant times up until November 17, 1998, **George A. Ranney, Jr.** was the Vice President and General Counsel of ISI, and President of IEMC. At all relevant times up until November 15, 1998, **Bruce A. Greinke** was a Vice President of IEMC and President of MII. On November 15, 1998, Greinke became an employee of ISI. His principal responsibility as an ISI employee was to facilitate the sale of MII to EMC. In

February of this year, ISI merged with Ryerson Tull Inc., one of ISI's former subsidiaries, and changed its corporate name to Ryerson Tull, Inc.

## NON-PARTIES

3.    MII is a Delaware corporation with its principal place of business in Burns Harbor, Indiana.

4.    BPM is a Pennsylvania corporation with its principal place of business in Brockway, Pennsylvania. BPM was purchased by IEMC in March 1998 for approximately $8 million, at which time it became a sister company of MII and ISC.

5.    Inland Steel Company ("ISC") is a Delaware corporation with its principal place of business in East Chicago, Indiana. Until July 16, 1998, ISC was a wholly owned subsidiary of ISI. On July 16, 1998, ISC was sold by ISI to Ispat International N.V. ("Ispat"), for approximately $1.4 billion. Ispat subsequently changed Inland Steel Company's name to Ispat Inland, Inc. ("ISC/Ispat"). At all relevant times, **Guy H. Ausmus** and **Michael Rippey** were employees of ISC and then ISC/Ispat, and were involved in ISC's and ISC/Ispat's discussions with MII.

6.    **American Iron Oxide Company** ("AMROX") is a joint venture between **International Steel Services Inc.** ("ISSI") and **Marubeni Corporation**, with its principal place of business in Pittsburgh, Pennsylvania. ISSI builds hydrochloric acid regeneration plants and AMROX operates such plants.

4

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the defendant pursuant to 735 ILCS 5/2-209(a) and 735 ILCS 5/2-209(b), because ISI does business within this State and transacted business in this State from which this cause of action arises.

8.      Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because Cook County is the defendant's residence, as defined by 735 ILCS 5/2-102.

## MII'S RELATIONSHIP WITH ISC, ITS LARGEST CUSTOMER

9.      Prior to July 16, 1998, ISC was a sister company of MII, with both MII and ISC being direct or indirect wholly owned subsidiaries of ISI.

10.      As an integrated steel-making operation, ISC (now ISC/Ispat) needs an 18% hydrochloric acid solution for pickling operations in its manufacture of steel. Through the pickling process, this acid solution becomes a ferrous chloride solution sometimes referred to as "waste pickle liquor" or WPL. WPL must then be disposed of or recycled and replaced with fresh or regenerated acid. ISC generates approximately 16,000,000 gallons of WPL per year.

11.      I/N Tek, a joint venture between ISC and Nippon Steel Corporation, is another steel-making operation with similar requirements for WPL disposal and regenerated acid replacement. I/N Tek generates approximately 10,000,000 gallons of WPL per year.

12.      MII was started by ISI in 1990 to handle ISC's WPL processing and regenerated acid supply requirements. MII purchases WPL from steel-making

operations, including ISC and I/N Tek, and, using a licensed process, converts the WPL to regenerated 18% hydrochloric acid. The regenerated 18% hydrochloric acid is then sold back to the steel operations. During this process, MII also produces high-purity iron oxide from the WPL, which MII then sells to third parties worldwide.

13. In 1996, MII and ISC entered into a three-year, fixed-price contract for WPL processing and the supply of regenerated acid, which expires on December 31, 1999.

14. In May of 1998 (retroactive to January 1, 1998), MII and I/N Tek entered into a four-year, fixed-price contract for WPL processing and the supply regenerated acid, which expires on December 31, 2001.

15. ISC/Ispat and I/N Tek are by far the largest customers of MII, together representing over 70 percent of MII's total annual sales.

16. MII's iron oxide sales represent additional revenue to MII, revenue that is heavily dependent upon MII's processing of ISC/Ispat's and I/N Tek's WPL.

### THE JANUARY 1998 AMROX OFFER

17. Starting in the fall of 1997 and continuing through the spring of 1998, representatives from MII, ISC, and ISI were engaged in discussions with AMROX, MII's primary competitor in the acid regeneration and iron oxide business, regarding a potential sale of MII to AMROX.

18. These discussions involved Guy Ausmus and Michael Rippey of ISC, Bruce Greinke, Vice President of IEMC and President of MII, George A. Ranney,

6

Jr., Vice President and General Counsel of ISI and President of IEMC, Jay M. Gratz, Vice President and CFO of ISI, William Klupchak, Director of Financial Management for ISI, and Walter Sieckman and Michael Sieckman of ISSI and AMROX.

19.     Even though ISC was then a sister company of MII as well as MII's customer, ISC handled the negotiations with AMROX.

20.     On information and belief, during his discussions with ISC, Walter Sieckman of AMROX made clear to ISC that AMROX's primary interest was in taking over ISC's WPL processing needs -- either through a purchase of MII, or, alternatively, through a contract to process ISC's WPL at new facility that AMROX was building at National Steel's Portage, Indiana location.

21.     On January 29, 1998, in a letter from Walter Sieckman of AMROX to Michael Rippey of ISC, Sieckman offered to process ISC's WPL on a long-term contract basis at the new AMROX National Steel facility at a price of **$0.15 per gallon** -- far below the $0.429 price charged by MII under its contract with ISC -- and to supply regenerated acid back to ISC free of charge.

22.     On information and belief, AMROX's $0.15 offer to process ISC's WPL and supply ISC with regenerated acid was for a ten-year contract period.

23.     On **February 3, 1998**, Greinke received a copy of the January 29, 1998 AMROX letter by fax from Guy Ausmus.

24.     On **February 9, 1998**, Ausmus wrote a confidential memorandum to William Klupchak of ISI, with copies to Rippey and Greinke.  According to Ausmus,

7

"We (Bruce, Mike and I) are simply looking to answer the question: 'On a cash flow basis, which alternative (sale or continued operation [of MII]) is best for ISI?'" In that memo, Ausmus warned that this information must be kept "need to know only."

25.    ISC, MII, and ISI continued their discussions with AMROX throughout the spring of 1998. These discussions included, on information and belief, a lunch meeting between Ranney of ISI and Walter Sieckman of AMROX on or about **March 2, 1998.**

26.    During the spring of 1998, ISI was negotiating with Ispat International N.V. for the potential sale of ISC to Ispat.

27.    On information and belief, at some point between April 30, 1998 and May 4, 1998, Greinke undertook an analysis of MII's contracts with ISC/Ispat and I/N Tek through at least the year 2006. In this analysis, Greinke calculated the return on MII's contracts with ISC/Ispat and I/N Tek if ISI retained MII as a subsidiary after the sale of ISC to Ispat closed.

28.    On information and belief, in determining the value of MII's contract with ISC/Ispat, Greinke calculated that, after the current contract pricing expired on December 31, 1999, the ISC/Ispat contract price would fall to a level *equivalent* to the price offered by AMROX.

29.    On information and belief, in determining the value of MII's contract with I/N Tek, Greinke again calculated that after the current contract pricing

expired on December 31, 2001, the I/N Tek contract price would fall to a level *equivalent* to the price offered by AMROX.

30.　Thus, Greinke's internal analysis of the ISC and I/N Tek contracts utilized the price offered by AMROX in January 1998 as the future price for those customers after MII's current contracts-- with their much higher prices -- expired.

31.　On information and belief, Greinke shared these analyses with Ranney, Gratz and other ISI executives in early May 1998.

## EMC'S INTRODUCTION TO ISI

32.　On **April 8, 1998**, Alvan Sage, President and Chief Operating Officer of EMC, contacted Jay Gratz, to express a potential interest in purchasing ISI's IEMC subsidiary. Subsequently, Vince Quinn, a financial advisor to EMC, contacted a mutual friend of George Ranney, Jr., and requested an introduction. In early May, Ranney called EMC and discussed with Dwight Miller, EMC's General Counsel, EMC's interest in acquiring MII and BPM. A meeting was scheduled for May 7, 1998 at ISI's offices in Chicago to discuss the potential transaction.

33.　On **May 7, 1998**, Miller, Quinn and Sage met with Ranney at ISI's offices in Chicago. At that afternoon meeting, Ranney introduced Greinke as the man responsible for the two companies that together comprised IEMC, and turned the meeting over to Greinke.

34.　Greinke then gave a slide presentation on ISI's behalf about MII's and BPM's businesses, and distributed documents to EMC relating to the same. Greinke

described MII's contracts to process WPL and supply regenerated acid, including the contracts with ISC and I/N Tek. Greinke represented that MII's services were critical to both the ISC and the I/N Tek steel operations.

35. Documents distributed by ISI to EMC at the conclusion of this initial May 7, 1998 meeting contained projections of IEMC's cash flows, summary financial information for 1997-2000, and other pro forma financial data for 1998, 2000 and 2003. These written projections were based on the current contract prices for ISC and I/N Tek continuing at their present levels into the future, with the resulting total current business value of IEMC (MII and BPM) estimated to be approximately $32-39 million, based on its cash flows, prior to capital expenditures and using a range of market multiples. ISI's estimated business value of MII's Iron Oxide and Acid Regeneration business was approximately $25-30 million; the estimated business value of BPM was approximately $7-9 million.

36. Greinke never disclosed at that meeting, or at any other time, that his own analysis of the ISC and I/N Tek contracts -- done just days before this first meeting with EMC -- utilized renewal prices for those contracts that were dramatically lower than the existing contract prices.

37. Based on the oral and written representations made by ISI at the May 7, 1998 meeting, and subsequent telephone conversations between Greinke and Miller shortly thereafter, EMC decided to pursue the possible acquisition of IEMC.

10

## EMC'S MAY DUE DILIGENCE

38.     On May 26, 1998, at ISI's specific request, EMC and ISI executed a confidentiality agreement. The terms of that agreement barred EMC from speaking with anyone -- including MII's customers -- about the possible transaction without the express prior written consent of IEMC.

39.     On May 28, 1998, Lynn Dull (EMC's Vice President, Treasurer, and Controller), Miller, Sage, Wright and members of EMC's finance and banking groups traveled to MII's facility in Burns Harbor, Indiana to perform initial due diligence on the potential acquisition.

40.     On May 29, 1998, the second day of due diligence, Dull asked Greinke to explain how the ISC contract price had been determined, and specifically, why the contract price for ISC was $0.429 per gallon.

41.     In response to Dull's inquiry, Greinke stated that the ISC contract had been negotiated at "arm's length." According to Greinke, the contract price was a function of two components: (i) the cost of fresh acid and (ii) the cost of ISC's alternatives for disposal of its large volumes of WPL, and thus the price in the ISC contract accurately reflected ISC's true cost of alternative disposal of its WPL and alternative acquisition of its requirements for 18% hydrochloric acid solution (other than from MII).

42.     Greinke represented further that ISC's higher contract price reflected the true cost to ISC of its only possible alternative to MII, shipping ISC's 16,000,000 gallons of WPL to remote water treatment plants and other disposal sites.

43.     Greinke concluded by stating that ISC had no choice but to remain an MII customer, stating to EMC and its representatives that, because of ISC's dependency on MII for WPL processing and ISC's lack of alternatives for disposal of its large volume of WPL, **"They need you."**

44.     Despite numerous direct inquiries by EMC and its representatives about the ISC contract, Greinke actively concealed the fact that AMROX had offered to process ISC's WPL at a price of $0.15 per gallon and concealed the January 29, 1998 letter from AMROX that contained that offer. Greinke further misrepresented to EMC that ISC lacked "alternatives" to MII.

45.     On **June 2, 1998**, following its initial due diligence, EMC sent a letter of intent to ISI for the purchase of IEMC.

46.     EMC sought to move forward with the transaction through June and July of 1998. During that time, Ranney represented that ISI's pending $1.4 billion sale of ISC to Ispat was requiring his attention, and further negotiations with EMC would have to be put on hold.

12

## GREINKE'S NEGOTIATIONS WITH ISC/ISPAT

47. On **July 16, 1998,** ISI closed its sale of ISC to Ispat International N.V., for approximately $1.4 billion. Following the sale, ISC was renamed Ispat Inland Inc. (herein, "ISC/Ispat").

48. Within days of selling ISC to Ispat, Greinke began negotiations with the new entity ISC/Ispat concerning the future relationship between MII and ISC/Ispat.

49. On information and belief, Greinke spoke with Michael Rippey of ISC/Ispat during the week of July 27, 1998.

50. On or about July 30, 1998, Rippey and Greinke discussed the possible sale of MII to ISC/Ispat and the renegotiation of MII's contracts with ISC/Ispat ·in-favor-of-new-WPL processing contracts for both ISC/Ispat and I/N Tek.

51. On Friday, **July 31, 1998,** Greinke wrote a memorandum to Ranney to report on his discussions with ISC/Ispat.

52. As memorialized in Greinke's memorandum to Ranney, ISC/Ispat made a specific proposal to MII on July 30, 1998 for a new long-term processing contract with MII at a price level that would have a catastrophic impact on MII's economic value as a business: **"ISPAT would enter into a long-term processing contract with MII at a reduced price . . . Initial pricing suggested by ISPAT would reduce the economic value of MII from $25 million to $10 million."**

13

53. Greinke also reported to Ranney that he would be negotiating with ISC/Ispat over the course of the next week, with negotiations to be completed by Friday, August 7, 1998.

54. At no point in time did Greinke or Ranney disclose to EMC or its representatives that ISC/Ispat had made pricing proposals on or about July 30, 1998 for a new long-term contract, or the fact that ISC/Ispat's proposed pricing would reduce MII's economic value by 60%, from $25 million to $10 million.

55. At no point in time did Greinke or Ranney disclose to EMC or its representatives Greinke's July 31, 1998 memorandum setting forth ISC/Ispat's proposal for a new long-term contract with MII and Greinke's conclusion that ISC/Ispat's proposed pricing would reduce MII's economic value by 60%, from $25 million to $10 million.

56. On Tuesday, **August 4, 1998,** Rippey and John Brett of ISC/Ispat met with Greinke to discuss ISC/Ispat's future relationship with MII.

57. On information and belief, at that August 4, 1998 meeting, Rippey, Brett, and Greinke discussed a potential, long-term contract for MII to continue to process WPL for and supply regenerated acid to ISC/Ispat and I/N Tek.

58. On information and belief, Rippey informed Greinke that ISC/Ispat was considering two alternatives to continuing its relationship with MII.

59. On information and belief, Rippey told Greinke that ISC/Ispat was evaluating the construction of its own, on-site WPL recycling plant, a plant it would

14

build from scratch at its Indiana Harbor Works location, to replace ISC/Ispat's dependence upon MII. Rippey informed Greinke that the on-site plant would be built to service both ISC/Ispat and I/N Tek, with the I/N Tek WPL sent by rail to the proposed Indiana Harbor Works facility.

60.     On information and belief, Rippey also told Greinke that ISC/Ispat was alternatively considering moving its WPL to a competitor of MII's, for ISC/Ispat felt it could get a $0.17 per gallon price for the services that MII was providing at $0.429 per gallon.

61.     Again, Rippey was the very individual who had received the AMROX offer of $0.15 per gallon price set forth in its January 29, 1998 letter. At that point in time he had been an ISC employee; with the sale of ISC to Ispat, he was now an ISC/Ispat employee.

62.     On information and belief, Greinke proposed to Rippey a new, five year contract for **both** ISC/Ispat and I/N Tek at a new single price of $0.30 per gallon. Greinke's $0.30 offer was for an immediate contract revision of both the ISC/Ispat and I/N Tek agreements with MII. In his notes, Greinke calculated this offer to be the equivalent of having a renewal price of $0.25 per gallon starting in January 2000 for ISC/Ispat and January 2002 for I/N Tek.

63.     On information and belief, Rippey informed Greinke that ISC/Ispat's alternatives -- (1) building an on-site WPL recycling plant from scratch, or (2) moving ISC/Ispat's and I/N Tek's WPL to one of MII's competitors -- made a long-

15

term contract with MII unacceptable, even at the proposed $0.25 price. Then Rippey rejected Greinke's offer.

64.     On Thursday, August 6, 1998, a follow-up meeting was held between Greinke and Rippey where the future business relationship of MII and ISC/Ispat was again discussed.

65.     On information and belief, the counter proposals and terms offered by Rippey to Greinke during these early August 1998 meetings were significantly below Greinke's $0.25 per gallon offer, would have had a severe negative impact on MII's value as a business and were rejected by MII.

66.     On information and belief, Greinke reported the results of his ~~meetings with ISC/Ispat~~ to Ranney shortly after those meetings concluded.

67.     On information and belief, as a result of the terms offered by ISC/Ispat and ISC/Ispat's clear alternatives to MII, Ranney and Greinke concluded that MII was a damaged asset and that any future contract with ISC/Ispat would require a contract price too low for MII to operate profitably.

68.     As a result, Greinke and Ranney determined that ISI could maximize its return on MII by selling it to EMC, so long as EMC did not learn about ISC/Ispat's and I/N Tek's new alternatives to MII. Greinke and Ranney knew that if EMC learned of ISC/Ispat's new proposals and alternatives for handling its and I/N Tek's WPL processing, then EMC would not purchase IEMC.

16

## ISI RESUMES NEGOTIATIONS WITH EMC

69.     On Friday, **August 7, 1998**, Greinke set up a conference call with EMC for Monday, August 10, 1998.

70.     On Monday, **August 10, 1998**, Sage and Miller participated in a telephone conference call with Ranney.

71.     During that telephone conference call, Sage asked Ranney whether ISC/Ispat was prepared to enter into a long-term WPL processing contract with MII after the current contract expired on December 31, 1999. Sage also asked about the future of the I/N Tek contract with MII.

72.     Ranney responded that he understood EMC's questions and would talk to ISC/Ispat in order to answer them. Ranney also indicated that Greinke was handling all of ISI's discussions with ISC/Ispat.

73.     At no point in time did Ranney disclose to EMC that over the past 10 days, ISI had attempted to renegotiate a new long-term WPL processing contract with ISC/Ispat and I/N Tek and had been unsuccessful. Nor did Ranney disclose that during those discussions, initial pricing suggested by ISC/Ispat for a new long-term contract would reduce MII's value by 60%, from $25 million to $10 million.

74.     Later that same week, on **August 13, 1998**, Greinke conducted a short tour of the Brockway Pressed Metals plant in Brockway, Pennsylvania for Wright, Sage and Miller. During that tour, Wright, Sage, Miller and Greinke had a discussion about MII's WPL contracts. Sage asked for the name of a person at ISC/Ispat whom

EMC could contact directly. Greinke disclosed the name of his contact at ISC/Ispat -- Michael Rippey -- but told Wright, Sage and Miller that they would need Ranney's permission before they could contact Rippey.

75.    On **August 17, 1998**, Ranney called Sage to set up a meeting to discuss EMC's offer for IEMC. Ranney pushed for an immediate meeting and indicated that August 21, 1998 was ISI's deadline for an offer from EMC.

## THE AUGUST 19, 1998 MEETING

76.    On **August 19, 1998**, Miller, Quinn, and Sage met with Ranney and Greinke at ISI's Chicago office.

77.    At this meeting, Ranney and Greinke advised Miller, Quinn and Sage that the current price for WPL under MII's existing contract with ISC/Ispat -- $0.429 per gallon -- was in fact an above-market price. Ranney explained that when MII's contract with ISC/Ispat expired at the end of 1999, ISC/Ispat would expect a lower, "market" price for MII's services. Ranney then suggested that EMC reduce its proposed purchase price for IEMC and submit a revised offer to account for this price reduction in the new ISC/Ispat contract starting January 1, 2000.

78.    In response, Sage inquired as to what that "market" price would be for the new ISC/Ispat contract and whether it would be in the range of the $0.32 per gallon contract MII recently entered into with I/N Tek in May of 1998. Greinke confirmed that to be correct. Further, neither Greinke nor Ranney disputed Sage's

18

calculation of the total impact on MII's future cash flow resulting from the ISC/Ispat contract going from $0.429 to $0.32 per gallon.

79. To confirm the new information regarding ISC/Ispat, Miller, Quinn, and Sage then asked Ranney and Greinke if EMC could speak directly with ISC/Ispat. **Ranney and Greinke both insisted that EMC *not* contact ISC/Ispat, or any of MII's other customers, and denied EMC permission to have any such contacts.**

80. When Ranney and Greinke stated that EMC could not contact MII's customers, they did not limit the time frame of this bar.

81. However, Ranney and Greinke repeatedly assured Miller, Quinn, and Sage that EMC had no cause for concern and no need to speak with ISC/Ispat, because ISC/Ispat was not interested in any business outside the manufacture of steel, and, specifically, that ISC/Ispat was not interested in the business of WPL processing. Ranney and Greinke also reiterated that ISC/Ispat had no alternative to MII for processing its 16 million gallons of WPL.

82. Ranney's and Greinke's affirmative comments lulled EMC into a false sense of security about the health of the MII - ISC/Ispat customer relationship.

83. At no point during or after the August 19, 1998 meeting did Greinke disclose to EMC or its representatives that ISC/Ispat was in fact considering the construction of its own WPL processing facility as an alternative to MII.

19

90.     On September 29, 1998, Sage had a meeting with Greinke at MII. During that meeting, Sage again requested permission to contact MII's customer ISC/Ispat directly. Greinke repeated the earlier bar and told Sage again that EMC could not talk to MII's customers, and refused to consent to any such contact, while continuing his assurances that such contact was unnecessary.

91.     To assist in its due diligence on IEMC, EMC retained Ernst & Young LLP.

92.     In conducting due diligence inquiries, Ernst & Young representatives asked Greinke about rumors of a potential acid regeneration and iron oxide production facility planned to be constructed at National Steel.

93.     In response, Greinke stated that he was aware of the facility but was unable to confirm the construction. Greinke stated that the facility was "rumored" to be constructed on National Steel property by AMROX. However, Greinke informed Ernst & Young that even if the "rumored" AMROX facility was constructed, the acid regeneration market would most likely not be affected.

94.     Despite being asked about the new AMROX facility and its impact on competition, at no point in time did Greinke reveal the fact that AMROX had made an offer to process ISC's WPL at that very facility at a price of $0.15 per gallon.

95.     In late October 1998, Greinke was again asked about MII's relationship with ISC/Ispat. Specifically, Ernst & Young representatives asked Greinke whether he was aware of any issues that would impact MII's successful renegotiation of

the ISC/Ispat contract. In response, Greinke stated that he was unaware of any evidence suggesting that ISC/Ispat would not renegotiate its contract with MII.

96. At no point in time did Greinke disclose to Ernst & Young that he had already attempted to renegotiate a new long-term WPL processing contract with ISC/Ispat and I/N Tek and had been unsuccessful. Nor did Greinke disclose that during those discussions, initial pricing suggested by ISC/Ispat for a new long-term contract would reduce MII's value by 60%, from $25 million to $10 million.

97. At no point in time did Greinke inform EMC or any of its representatives that ISC/Ispat was considering the construction of its own, on-site WPL processing plant to eliminate its need for MII.

98. At no point in time did Greinke supply EMC or any of its representatives with AMROX's January 29, 1998 letter to ISC, or with Greinke's July 31, 1998 memorandum to Ranney summarizing ISC/Ispat's bargaining position.

99. At no point in time did Greinke or Ranney inform EMC that the terms of the May 26, 1998 confidentiality agreement (carried forward in the September 4, 1998 letter of intent) preventing EMC from contacting anyone about EMC's possible purchase of MII without prior permission, the August 19, 1998 bar against talking to MII's customers or the September 29, 1998 bar on contacting ISC/Ispat had expired or were no longer in effect.

100. Because of ISI's ultimatum that EMC not contact MII's customers -- made on several different occasions in response to specific requests by EMC for

22

permission -- and ISI's express denial of consent to any such contacts by EMC, EMC did not contact ISC/Ispat or any other MII customers before the IEMC transaction was closed.

## GREINKE'S ISI EMPLOYMENT

101. By the terms of an express agreement between Greinke and Ranney, effective as of **November 15, 1998** -- two days prior to closing -- Greinke ceased to be an MII employee and became an employee of ISI. Greinke's principal duty as a new employee of ISI was to facilitate the sale of MII to EMC.

102. Under this agreement, as long as the sale of MII closed prior to the end of 1998, Greinke would qualify for retirement as an ISI employee with a preferential severance package. However, if the sale of MII did not close, Greinke would resume his job and lesser benefit package at MII.

## THE NOVEMBER 17, 1998 CLOSING

103. On **November 17, 1998**, George Ranney, in his capacity as Vice President and General Counsel of ISI and President of IEMC, expressly represented on ISI's behalf that there had been no material adverse changes in MII's relations with its customers. (*See* §2.7 of Stock Purchase Agreement, Ex. A attached hereto at 9)

104. On that date, Ranney, in his capacity as Vice President and General Counsel of ISI and President of IEMC, expressly affirmed on ISI's behalf that neither the Stock Purchase Agreement nor the schedules attached thereto contained any untrue statement of material fact regarding IEMC or MII, nor omitted any material facts

necessary to make the statements contained in the Stock Purchase Agreement or its

schedules not misleading. (*See* §2.27 of Stock Purchase Agreement, Ex. A at 19-20)

105.    On November 17, 1998, pursuant to the Stock Purchase Agreement,

EMC (in the name IEMC Acquisition Corp.), purchased 100 percent of IEMC's stock

from ISI at a price of approximately $29 million, thereby acquiring MII and

BPM. (Ex. A)

106.    At the closing of the sale of IEMC to EMC, Greinke resigned as

President of MII and BPM, and qualified for the ISI severance package set forth in his

November 15, 1998 agreement with Ranney.

## THE FRAUD REVEALED

107.    On November 20, 1998, just three days after EMC acquired MII,

two of MII's employees, Jim Malloch and Franz Mullings, met with Guy Ausmus,

Manager, Energy/Capital/Healthcare Purchasing for ISC/Ispat, at ISC/Ispat's Indiana

Harbor Works facility.

108.    At that meeting, Ausmus revealed to Malloch and Mullings that

ISC/Ispat was in fact considering building its own on-site WPL processing plant at

Indiana Harbor Works. Ausmus stated that ISC/Ispat had already received a proposal to

build the plant and that the planned facility was designed to handle the regenerated acid

needs of both ISC/Ispat and I/N Tek.

109. This was the first time that either Malloch or Mullings -- both MII employees -- had ever heard that ISC/Ispat was considering building its own on-site WPL processing plant.

110. At that meeting, Ausmus threatened that, unless MII immediately renegotiated its existing contract with ISC/Ispat to a cost level competitive with ISC/Ispat's projected processing costs for the proposed plant, ISC/Ispat would cease its relationship with MII and build the new facility.

111. On **December 7, 1998**, after learning of ISC/Ispat's plans and internally evaluating the detailed cost information provided by Ausmus concerning ISC/Ispat's proposed plant, Miller and Sage traveled to ISC/Ispat's East Chicago facility to meet with Ausmus for the very first time.

112. At that meeting, the first question Ausmus asked Miller and Sage was why EMC had bought MII from ISI. His next question was, "Why didn't you talk to me first?"

113. Surprised, Sage asked Ausmus how long ISC/Ispat had been considering moving its millions of gallons of WPL to an in-house WPL processing plant and away from MII. Ausmus responded that the construction of a facility at ISC/Ispat had been under discussion for a considerable period of time, well prior to November 17, 1998.

114.    Ausmus also told Miller and Sage that he had spoken with Greinke about ISC/Ispat's plans to build its own acid plant on at least one prior occasion in the Fall of 1998, before the date EMC closed on its acquisition of IEMC.

115.    On information and belief, the proposal received by ISC/Ispat for the construction of a WPL processing plant at its East Chicago facility was made to ISC/Ispat by AMROX.

## EMC'S SEARCH OF GREINKE'S FILES

116.    In December 1998, after learning that significant and material facts concerning MII's relationship with ISC/Ispat had been concealed by Greinke, EMC searched files left behind by Greinke at MII.

117.    In those files, EMC found documents which had not been disclosed by ISI during EMC's due diligence. Included were the January 29, 1998 letter from AMROX to ISC, and other evidence of discussions between ISC, MII and AMROX.

118.    This discovery caused EMC to conduct a larger search of MII's entire office building in Burns Harbor, which uncovered a box located in the attic of MII's offices. EMC also searched Greinke's old computer files, which revealed more documents that were not disclosed to EMC. The concealed documents included the July 31, 1998 memo from Greinke to Ranney revealing that ISC/Ispat's proposed pricing for a new long-term contract with MII would reduce MII's economic value from $25 million to $10 million, as well as other notes made by Greinke concerning and analyzing the AMROX offer to ISC.

26

119. On information and belief, Greinke took documents with him after he left MII in November 1998, documents which included his notes from meetings with ISC/Ispat in August 1998.

## ISC/ISPAT ENDS NEGOTIATIONS WITH MII

120. In December 1998, facing the devastating prospect of losing approximately 70 percent of its total sales, EMC acceded to Guy Ausmus's request to proceed with an unanticipated, early attempt to renegotiate ISC/Ispat's current contract with MII.

121. After three months of discussion, Sage received a letter from Ausmus on **March 24, 1999** that detailed the terms that ISC/Ispat would require from MII for both ISC/Ispat and I/N Tek. The new prices were more than $0.20 per gallon lower than the terms Ranney and Greinke represented ISC/Ispat would require for a new contract, and more than $0.10 per gallon lower than the price I/N Tek was then paying under its current contract.

122. On **April 6, 1999**, Sage called Ausmus to discuss ISC/Ispat's new terms. Ausmus indicated that these terms had been offered to ISC/Ispat by MII's competitor. On information and belief, the terms were offered by AMROX, and ISC/Ispat knew that MII could not meet these terms.

123. On **April 8, 1999**, Ausmus ceased negotiations with EMC.

124. On information and belief, ISC/Ispat and I/N Tek have now entered into a new contract with AMROX for the processing of all of their WPL and supply of

27

their regenerated acid requirements, with processing to take place upon the expiration of their current contracts with MII.

## COUNT I: FRAUD IN THE INDUCEMENT

125.    Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 124 above.

126.    At EMC's initial meeting with ISI on May 7, 1998, George A. Ranney, Jr., Vice President and General Counsel of ISI, introduced Bruce Greinke, Vice President of IEMC and President of MII and BPM, as someone with actual authority to act as an agent on ISI's behalf in its negotiations with EMC concerning the sale of IEMC. Bruce Greinke's actual authority to act as an agent of ISI was both express and implied by George Ranney's conduct.

127.    In addition, Bruce Greinke had apparent authority to act as an agent on ISI's behalf in its negotiations with EMC. George Ranney, Vice President and General Counsel of ISI, informed EMC that Greinke would be in charge of disclosure for ISI and consented to and knowingly acquiesced in Greinke's exercise of authority on behalf of ISI. On Ranney's introduction, Greinke conducted the very first meeting between ISI and EMC, coordinated with EMC during its due diligence activities, and participated in the negotiations between ISI and EMC, often in concert with George Ranney.

28

128.    EMC, exercising diligence and discretion, acted appropriately in assuming that Greinke had authority to act on ISI's behalf, in light of George Ranney's words and conduct.

129.    In addition, on November 15, 1998, Bruce Greinke became an employee of ISI, with his primary responsibility being the closing of the sale of MII to EMC.

130.    As an agent and employee of ISI, Bruce Greinke's actions and omissions towards EMC are binding upon ISI.

131.    Throughout 1998, Ranney and Greinke, both working on ISI's behalf, concealed material facts from EMC representatives including Lynn Dull, Dwight Miller, Vince Quinn, Alvan Sage, John Wright, employees of Ernst & Young, and other individuals working on EMC's behalf.

132.    As pled in the paragraphs above, these omissions, which the ISI representatives knew to be material, included active concealment of the following facts:

    A.    That AMROX, MII's competitor, had offered to process ISC's WPL for a price of $0.15 per gallon in January 1998 at a facility AMROX was constructing at National Steel;

    B.    That in late April - early May 1998, Greinke himself accepted that the price of the ISC/Ispat and I/N Tek contracts would drop to a level equivalent to the undisclosed price AMROX had offered after those current contracts expired;

C.   That in late July- early August 1998, ISC/Ispat demanded new price terms for a long-term processing contract with MII, pricing that would reduce the economic value of MII from $25 million to $10 million;

D.   That in early August 1998, ISC/Ispat rejected MII's offer of a new, long-term processing contract for **both** ISC/Ispat and I/N Tek at an effective price of $0.25 per gallon;

E.   That ISC/Ispat was considering the construction of its own, on-site WPL processing plant, a plant that would be built from scratch at its Indiana Harbor Works location and that would service both ISC/Ispat and I/N Tek; and

F.   That ISC/Ispat was considering moving its WPL to another processing company, as ISC/Ispat felt it could get a $0.17 price per gallon for services that MII was providing at $0.429.

133.   Despite direct inquiry by Dull, Miller, Sage, Quinn and Wright, representatives from Ernst & Young, and representatives of EMC's financial and banking institutions, Ranney and Greinke actively concealed their knowledge of these material facts.

134. ISI withheld documents from EMC that would have revealed some of these facts, including the January 29, 1998 letter from AMROX, the July 31, 1998 memo from Greinke to Ranney, and others.

135. In order to deceive EMC, block EMC's investigation, and prevent EMC from learning of these material facts, Ranney and Greinke intentionally and repeatedly employed deceptive conduct on numerous occasions, in their refusal to allow EMC to contact ISC/Ispat.

136. Greinke and Ranney also inhibited EMC's inquiries by lulling EMC into a feeling of false security about the ISC/Ispat contract by stating, in response to numerous EMC's inquiries about ISC/Ispat's relationship with MII, that ISC/Ispat "needed" MII, that ISC/Ispat had no alternatives to MII, that ISC/Ispat was not interested in the WPL recycling business, and that ISC/Ispat would renegotiate its current contract with MII at a market price of around $0.32 per gallon.

137. Greinke's and Ranney's deceptive conduct gave rise to a duty to disclose their knowledge of ISC/Ispat's plans to obtain regenerated acid through an alternative source. Despite inquiry by EMC representatives, Greinke and Ranney suppressed material facts for the express purpose of inducing EMC to enter into a contract to purchase IEMC.

138. ISI actively and intentionally blocked EMC's investigation into the facts and access to critical documents in order to prevent EMC from discovering the truth.

139.    In addition to the above omissions, Ranney and Greinke, both working on ISI's behalf, also made false statements of material fact to EMC representatives including Lynn Dull, Dwight Miller, Vince Quinn, Alvan Sage, John Wright, and other individuals working on EMC's behalf, concerning MII's relations with its single largest customer, ISC/Ispat.

140.    As pled in the paragraphs above, these false statements included:

A.    That ISC/Ispat had no alternatives to MII for processing its millions of gallons of WPL and obtaining regenerated acid, and "needed" MII;

B.    That ISC/Ispat had no interest in obtaining regenerated acid from any source other than MII;

C.    That ISC/Ispat did not want to be involved in the WPL processing business;

D.    That ISC/Ispat would negotiate a new acid supply contract with MII after the current contract expired on December 31, 1999, at a market price of approximately $0.32 per gallon;

E.    That the new AMROX facility being constructed at National Steel's property in Portage, Indiana would not likely affect competition in the acid regeneration market; and

32

F. That Greinke was unaware of **any** evidence suggesting that ISC/Ispat would not successfully re-negotiate its contract with MII.

141. Greinke and Ranney knew these statements to be false when they were made.

142. Greinke and Ranney knew that EMC would rely on these statements in its consideration of the purchase of IEMC and made these false statements for the express purpose of inducing EMC to purchase IEMC.

143. Greinke's and Ranney's repeated assurances that EMC had no cause for concern with the renegotiation of the ISC/Ispat contract, coupled with their affirmative blocking of EMC's direct access to ISC/Ispat, directly inhibited EMC's inquiries and lulled EMC into a false sense of security about the ISC/Ispat contract and MII's relationship with that customer.

144. Greinke's and Ranney's omissions, misrepresentations and deceptive conduct, occurring on numerous dates over several months, were employed as part of an overall fraudulent scheme to induce EMC into purchasing IEMC.

145. Had EMC been aware of the full truth and/or the material facts suppressed by ISI, EMC would not have entered into a contract to purchase IEMC.

146. As a result of ISI's omissions of material facts, EMC was induced into a contract to purchase 100 percent of the stock of IEMC for approximately $29 million and thereby suffered harm.

33

147. As a result of its reasonable reliance upon ISI's false statements, EMC was induced into a contract to purchase 100 percent of the stock of IEMC for approximately $29 million and thereby suffered harm.

148. EMC is entitled to rescind the Stock Purchase Agreement to purchase IEMC, an agreement induced by ISI's fraud, and to full restitution of all monies paid under that contract including transaction costs.

149. In the alternative, EMC is entitled to rescind its purchase of MII, which was induced by ISI's fraud, and to full restitution of all monies paid for MII, including transaction costs.

150. In the alternative, EMC is entitled to compensatory damages.

151. ISI's omissions and misrepresentations were made wilfully, wantonly, and with reckless disregard for the rights of EMC such that punitive damages should be awarded against ISI.

152. ISI should not be permitted to profit or benefit from its wrongdoing.

## COUNT II: BREACH OF CONTRACT

153. Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 152 above.

154. At EMC's initial meeting with ISI on May 7, 1998, George A. Ranney, Jr., Vice President and General Counsel of ISI, introduced Bruce Greinke, Vice President of IEMC and President of MII and BPM, as someone with actual authority to act as an agent on ISI's behalf in its negotiations with EMC concerning the sale of

IEMC. Bruce Greinke's actual authority to act as an agent of ISI was both express and implied by George Ranney's conduct.

155.    In addition, Bruce Greinke had apparent authority to act as an agent on ISI's behalf in its negotiations with EMC. George Ranney, Vice President and General Counsel of ISI, informed EMC that Greinke would be in charge of disclosure for ISI and consented to and knowingly acquiesced in Greinke's exercise of authority on behalf of ISI. On Ranney's introduction, Greinke conducted the very first meeting between ISI and EMC, coordinated with EMC during its due diligence activities, and participated in the negotiations between ISI and EMC, often in concert with George Ranney.

156.    ~~EMC, exercising diligence and discretion,~~ acted appropriately in assuming that Greinke had authority to act on ISI's behalf, in light of George Ranney's words and conduct.

157.    In addition, on November 15, 1998, Bruce Greinke became an employee of ISI, with his primary responsibility being the closing of the sale of MII to EMC.

158.    As an agent and employee of ISI, Bruce Greinke's actions and omissions towards EMC are binding upon ISI.

159.    ISI's representatives, including Greinke and Ranney, were aware of material facts concerning ISC/Ispat's intention to cease its relationship with MII. In specific, ISI omitted and concealed the following facts:

35

A. That AMROX, MII's competitor, had offered to process ISC's WPL for a price of $0.15 per gallon in January 1998 at a facility AMROX was constructing at National Steel;

B. That in late April - early May 1998, Greinke himself accepted that the price of the ISC/Ispat and I/N Tek contracts would drop to a level equivalent to the undisclosed price AMROX had offered after those current contracts expired;

C. That in late July- early August 1998, ISC/Ispat demanded new price terms for a long-term processing contract with MII, pricing that would reduce the economic value of MII from $25 million to $10 million;

D. That in early August 1998, ISC/Ispat rejected MII's offer of a new, long-term processing contract for **both** ISC/Ispat and I/N Tek at an effective price of $0.25 per gallon;

E. That ISC/Ispat was considering the construction of its own, on-site WPL processing plant, a plant that would be built from scratch at its Indiana Harbor Works location and that would service both ISC/Ispat **and** I/N Tek; and

F. That ISC/Ispat was considering moving its WPL to another processing company, as ISC/Ispat felt it could get a $0.17

price per gallon for services that MII was providing at $0.429.

160. In addition to omitting disclosure of the above facts, ISI concealed documents that would have revealed some of these facts, including the January 29, 1998 letter from AMROX, the July 31, 1998 memo from Greinke to Ranney, and other documents.

161. ISI was also aware that loss of ISC/Ispat and I/N Tek would reduce MII's total annual sales by approximately 70 percent, and would be a material adverse change.

162. ISI never made these facts known to EMC.

163. Under the Stock Purchase Agreement, specifically Sections 2.7 and 2.27, ISI was obligated to notify EMC of any material adverse change in MII's customer relations occurring between July 31, 1998 and November 17, 1998. ISI also represented that it had not omitted any material facts necessary to make statements contained in that agreement not misleading. (*See* §§ 2.7, 2.27 of Ex. A)

164. ISI never disclosed its knowledge of material facts relating to changes in MII's relationship with ISC/Ispat, its single largest customer, in material breach of Sections 2.7 and 2.27 of the Stock Purchase Agreement.

165. EMC would not have purchased IEMC had ISI met its obligation to disclose these material adverse changes in MII's customer relations.

166. EMC performed all of its obligations under the Stock Purchase Agreement prior to ISI's breach.

167. For ISI's breach of contract, EMC is entitled to rescind the Stock Purchase Agreement to purchase IEMC and to full restitution of all monies paid under that contract, including transaction costs.

168. In the alternative, EMC is entitled to rescind its purchase of MII and to full restitution of all monies paid for MII, including transaction costs.

169. In the alternative, EMC is entitled to compensatory damages.

## COUNT III:  BREACH OF WARRANTY

170. Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 169 above.

171. At EMC's initial meeting with ISI on May 7, 1998, George A. Ranney, Jr., Vice President and General Counsel of ISI, introduced Bruce Greinke, Vice President of IEMC and President of MII and BPM, as someone with actual authority to act as an agent on ISI's behalf in its negotiations with EMC concerning the sale of IEMC. Bruce Greinke's actual authority to act as an agent of ISI was both express and implied by George Ranney.

172. In addition, Bruce Greinke had apparent authority to act as an agent on ISI's behalf in its negotiations with EMC. George Ranney, Vice President and General Counsel of ISI, informed EMC that Greinke would be in charge of disclosure for ISI and consented to and knowingly acquiesced in Greinke's exercise of authority on

38

behalf of ISI. On Ranney's introduction, Greinke conducted the very first meeting between ISI and EMC, coordinated with EMC during its due diligence activities, and participated in the negotiations between ISI and EMC, often in concert with George Ranney.

173. EMC, exercising diligence and discretion, acted appropriately in assuming that Greinke had authority to act on ISI's behalf, in light of George Ranney's words and conduct.

174. In addition, on November 15, 1998, Bruce Greinke became an employee of ISI, with his primary responsibility being the closing of the sale of MII to EMC.

175. As an agent and employee of ISI, Bruce Greinke's actions and omissions towards EMC are binding upon ISI.

176. ISI's representatives, including Greinke and Ranney, were aware of material facts concerning ISC/Ispat's intention to cease its relationship with MII. In specific, ISI omitted disclosure:

A. That AMROX, MII's competitor, had offered to process ISC's WPL for a price of $0.15 per gallon in January 1998 at a facility AMROX was constructing at National Steel;

B. That in late April - early May 1998, Greinke himself accepted that the price of the ISC/Ispat and I/N Tek contracts would

drop to a level equivalent to the undisclosed price AMROX had offered after those current contracts expired;

C.    That in late July- early August 1998, ISC/Ispat demanded new price terms for a long-term processing contract with MII, pricing that would reduce the economic value of MII from $25 million to $10 million;

D.    That in early August 1998, ISC/Ispat rejected MII's offer of a new, long-term processing contract for **both** ISC/Ispat and I/N Tek at an effective price of $0.25 per gallon;

E.    That ISC/Ispat was considering the construction of its own, on-site WPL processing plant, a plant that would be built from scratch at its Indiana Harbor Works location and that would service both ISC/Ispat **and** I/N Tek; and

F.    That ISC/Ispat was considering moving its WPL to another processing company, as ISC/Ispat felt it could get a $0.17 price per gallon for services that MII was providing at $0.429.

177.    In addition to omitting disclosure of the above facts, ISI concealed documents that would have revealed some of these facts, including the January 29, 1998 letter from AMROX, the July 31, 1998 memo from Greinke to Ranney, and other documents.

40

178.   ISI's omissions were in material breach of its warranties under the Stock Purchase Agreement that no material adverse change in MII's customer relations had occurred between July 31, 1998 and August 17, 1998, that ISI's representations were accurate, and that ISI had not omitted any material facts necessary to make its representations accurate. (*See* §§ 2.7, 2.27 of Ex. A)

179.   EMC relied on ISI's warranties to its detriment in agreeing to purchase IEMC.

180.   For ISI's breach of warranty, EMC is entitled to rescind the Stock Purchase Agreement and to full restitution of all monies paid under that contract including transaction costs.

181.   In the alternative, EMC is entitled to rescind its purchase of MII and to full restitution of all monies paid for MII, including transaction costs.

182.   In the alternative, EMC is entitled to compensatory damages.

WHEREFORE, EMC prays that the Court enter judgment in its favor and against Ryerson Tull, Inc., f/k/a Inland Steel Industries, Inc., and award relief including:

- Rescission of the Stock Purchase Agreement and restitution of the monies paid by EMC under that agreement, an amount in excess of approximately $29 million, and transaction costs incurred by EMC;

- In the alternative, rescission of EMC's purchase of MII and restitution of the monies paid for MII as a component of the purchase of IEMC, including transaction costs;

- Compensatory damages against ISI in an amount yet to be determined;

- Punitive damages in an amount yet to be determined;

- Pre-judgment and post-judgment interest to the full extent allowed under the law;

- Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

EMC demands a trial by jury, and has previously filed its Jury Demand.

"Environmental Permit" shall mean any of the Permits required by or pursuant to any applicable Environmental Law.

"Equipment" shall mean any and all of the machinery, equipment, installations, furniture, tools, molds, spare parts, supplies, maintenance equipment and supplies, materials, automobiles, trucks and other vehicles and other items of personal property of every kind and description, usually located on or at the Real Property, or otherwise used in connection with the business or operation of the Company and the Subsidiaries.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended

"ERISA Affiliate" means, with respect to any person, any corporation, trade or business which, together with such person, is a member of a controlled group of corporations or a group of trades or businesses under common control within the meaning of sections 414(b) or (c) of the Code

"Financial Statements" shall mean (a) the unaudited consolidated financial statements of Magnetics as of (i) December 31, 1995 and for the 12 months then ended, (ii) December 31, 1996 and for the 12 months then ended, (iii) December 31, 1997 and for the 12 months then ended, and (iv) September 30, 1998 and for the nine months then ended (balance sheet and income statement only), and (b) the audited financial statements of Brockway as of (i) June 30, 1996 and for the 12 months then ended, (ii) June 30, 1997 and for the 12 months then ended, (iii) June 30, 1998 and for the 12 months then ended, and (iv) September 30, 1998 and for the three months then ended (balance sheet and income statement only), all of such financial statements consisting of a balance sheet at such date and the related statements of income and cash flows (except where otherwise indicated), a copy of all of which is attached hereto as Exhibit A.

"Financing Commitments" shall have the meaning set forth in Section 3.4

"GAAP" shall mean the United States generally accepted accounting principles at the time in effect.

"Governmental Authority" shall mean the government of the United States or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Materials" shall mean any materials which are crude or refined oil or fraction thereof, petroleum substances, petrochemical products, PCBs, asbestos, asbestos containing materials, urea formaldehyde, salts, flammable explosives, radioactive materials, hazardous wastes, hazardous substances, contaminants, toxic, mutagenic or pathogenic substances or related materials, including, without limitation, any substances which are substances defined as or included in the definition of "hazardous chemicals," "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended

"Intellectual Property" shall mean all United States and foreign patents, patent applications, patent licenses, trade names, trademarks, trade name and trademark registrations (and applications therefor), copyrights and copyright registrations (and applications therefor), trade secrets, inventions, processes, designs, know-how, formulae, operating manuals and computer software which are in any way connected to the business or operation of the Company and the Subsidiaries, except for the red diamond logo used by the Company and/or the Subsidiaries, and the Inland name.

"Inventories" shall mean all of the Company's and its Subsidiaries' inventories, including all raw materials, work in process and finished goods inventories, wherever located.

"Krause Agreement" shall have the meaning set forth in Section 5.4

"Leased Real Property" shall have the meaning set forth in Section 2.9(b).

"Leases" shall have the meaning set forth in Section 2.9(b).

"Liability Period" shall have the meaning set forth in Section 5.5.

"Losses" shall mean all losses, liabilities, costs, damages, penalties or expenses whether or not arising out of a third party claim (including, without limitation, attorneys' fees and expenses and reasonable costs of investigation and litigation)

"Magnetics" shall mean Magnetics International, Inc., a Delaware corporation

"Owned Real Property" shall have the meaning set forth in Section 2.9(a).

"PBGC" shall mean the Pension Benefit Guaranty Corporation.

"PBGC Letter" shall mean the letter dated November 16, 1998 between the PBGC and Seller relating to the Brockway Defined Benefit Plans.

"Permits" shall mean all of the licenses, permits, variances, interim permits, permit applications, approvals or other authorizations under any law, statute, rule, regulation, order or ordinance applicable to the Company or any of its Subsidiaries or otherwise required by any Governmental Authority in connection with the operation of the Company or any of its Subsidiaries.

"Permitted Encumbrances" shall mean: (a) statutory liens for current taxes or other governmental charges with respect to the Real Property not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by Seller; (b) mechanics, carriers, workers, repairers and similar statutory liens arising or incurred in the ordinary course of business for amounts which are not, individually or in the aggregate, material to the business; (c) zoning, entitlement, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use and operation of the Real Property; (d) covenants, conditions, restrictions, easements and other similar matters of record or not of record but known to Purchaser and set forth on Schedule 2.9(a) affecting title to the Real Property which do not materially impair the occupancy or use of the Real Property

for the purposes for which it is currently used in connection with the business, and (e) the possible outstanding interest/estate vested in the heirs of Vance, Leroy, Cochran as remainderman under the Last Will and Testament of James Cochran, deceased.

"Plant, Property & Equipment" shall mean, as of a given time, the book value of the Company's plant, property and equipment (without regard to Accumulated Depreciation), determined on a consolidated basis in accordance with GAAP and in a manner consistent with the Company's past practices, which amount as of July 31, 1998 was $28,413,024.

"Purchase Price" shall have the meaning set forth in Section 1.2.

"Purchaser's Accountants" shall have the meaning set forth in Section 1.3.

"Purchaser's Plans" shall have the meaning set forth in Section 5.4

"Real Property" shall have the meaning set forth in Section 2.9(b)

"Seller Benefit Plans" shall have the meaning set forth in Section 2.13.

"Seller's Accountants" shall have the meaning set forth in Section 1.3

"Shares" shall mean all of the shares of common stock, $1.00 par value, of the Company, all of which are held by Seller and which are to be transferred to Purchaser at Closing, and which, as of the date hereof, constitute 100% of the Company's issued and outstanding capital stock.

"Subsidiaries" shall mean Magnetics and Brockway.

"Subsidiaries Stock" shall have the meaning set forth in Section 2.1(b).

"Survey" shall have the meaning set forth in Section 6.8

"Tax Return" shall mean any report, return, statement, or schedule or other filing (including any related or supporting information) required to be supplied to a taxing authority in connection with Taxes.

"Tax" or "Taxes" shall mean all taxes, charges, fees, duties, levies or other assessments, including (without limitation) income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, severance and employees' income withholding, unemployment and Social Security taxes, which are imposed by the United States, or any state, local or foreign government or subdivision or agency thereof, and such term shall include any interest, penalties or additions to tax attributable to such Taxes.

"Title Commitment" shall have the meaning set forth in Section 6.8.

6274330

-5-

"Title Insurer" shall have the meaning set forth in Section 6.8.

"Title Policy" shall have the meaning set forth in Section 6.8.

"Working Capital" shall mean, as of a given time, an amount equal to the excess of the book value of the Company's current assets over the book value of its current liabilities, in each case determined in accordance with GAAP, but without regard to (i) cash, (ii) current deferred federal tax asset, (iii) intercompany account, ISL, (iv) intercompany account, Brockway, (v) taxes, other than taxes on income, and (vi) income taxes. The working capital amount as of July 31, 1998 was $3,530,484.

## ARTICLE I
## PURCHASE AND SALE

1.1    Sale and Purchase. Subject to the terms and conditions set forth in this Agreement, on the Closing Date Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall accept, acquire and take assignment and delivery of, all of the Shares free and clear of any Encumbrance.

1.2    Payment of Purchase Price. Subject to the terms and conditions hereof, at the Closing, Purchaser shall pay, by wire transfer of same-day funds, the sum of $29,000,000 (the "Purchase Price"), less any amounts being credited to Purchaser pursuant to Section 11.2. The Purchase Price shall be payable to Seller in such account as Seller may direct in advance of Closing and payment thereof shall be deemed to satisfy any intercompany balance (except for the balance in the Intercompany Account IMDG) between the Company and its Subsidiaries, on the one hand, and the Seller and its other Affiliates, on the other hand, existing as of the Closing Date. Seller shall cause the Company to distribute to it all cash of the Company as of the Closing Date (provided that for the purposes of this Section 1.2, cash shall be defined as the book cash balance).

1.3    Closing Statement. Within sixty (60) days after the Closing Date, Ernst & Young LLP ("Purchaser's Accountants") shall prepare and deliver a closing statement (the "Closing Statement") setting forth the change, if any, in (i) Working Capital from July 31, 1998 to the Closing Date and (ii) Plant, Property & Equipment (without regard to Accumulated Depreciation) from July 31, 1998 to the Closing Date (the "Closing Statement Amount"). The Closing Statement shall be prepared in accordance with GAAP and in a manner consistent with the Company's past practices and the terms of this Agreement, provided, that inventories of parts, supplies, raw materials and finished goods will be valued at cost. Purchaser shall deliver the Closing Statement to Seller promptly following the preparation and review thereof, but in no event later than sixty (60) days after the Closing Date. The Closing Statement shall be conclusive and binding on Purchaser, Seller and the Company for purposes of this Agreement unless, within sixty (60) days after the receipt thereof by Seller, Seller notifies Purchaser in writing that PricewaterhouseCoopers, Seller's accountants ("Seller's Accountants"), disagrees with Purchaser's Accountants on any material matter relating to the Closing Statement. In the event of any such disagreement, Seller's Accountants and Purchaser's Accountants shall attempt in good faith to resolve the disputed matters. If the two firms are unable in good faith to resolve their differences on any disputed matters within thirty (30) days after the giving of such written notice by Seller to Purchaser, then a third firm of independent

certified accountants of national reputation shall be selected jointly by the two firms and the third firm's resolution of the remaining disputed matters shall be conclusive and binding on the parties hereto. Purchaser and Seller shall bear the fees and expenses of their own accountants and shall share equally the fees and expenses of such third firm, if any

1 4     Adjustment of Purchase Price  At the time that the Closing Statement becomes final and binding, (i) if the Closing Statement Amount is positive, Purchaser shall pay the Closing Statement Amount to Seller within two business days, by wire transfer of same-day funds and (ii) if the Closing Statement Amount is negative, Seller shall pay the Closing Statement Amount to Purchaser within two business days, by wire transfer of same-day funds.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

2 1     Ownership of Shares

    (a)    Each of the Shares to be delivered at the Closing is owned by Seller free and clear of any Encumbrance, other than those listed on Schedule 2 1; at the Closing each of the Shares will be free and clear of any Encumbrance; the Shares in the aggregate constitute all of the issued and outstanding shares of capital stock of the Company; all of the Shares are validly issued, fully paid and non-assessable; Seller has the legal right and all authorization and approval required by law to have approved this Agreement; and none of the Shares is subject to any restriction on transfer, other than those restrictions listed on Schedule 2 1, each of which shall be fully released or terminated prior to the Closing.  Seller has full power and authority to convey good and marketable title to the Shares, free and clear of any Encumbrance, and upon transfer to Purchaser of certificates representing such Shares and payment of the Purchase Price, Purchaser will receive full title to all of the Shares free and clear of any Encumbrance.

    (b)    The Company owns all of the common stock of the Subsidiaries (the "Subsidiaries Stock") and the Subsidiaries Stock constitutes 100% of the Subsidiaries' issued and outstanding capital stock.  The Company owns the Subsidiaries Stock free and clear of any Encumbrance and at the Closing the Company will own the Subsidiaries Stock free and clear of any Encumbrance.

2.2     Due Organization.  The Company and Magnetics are each duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite corporate power and authority to own, lease and operate their respective properties and to carry on their business as now being conducted.  Brockway is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania with all requisite corporate power

and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Company and the Subsidiaries are each duly qualified and in good standing as a foreign corporation to do business in each jurisdiction where the failure to be so qualified would have a material adverse effect on the business or operation of the Company and the Subsidiaries taken as a whole. Schedule 2.2 is a complete and accurate list of all jurisdictions in which the Company and each Subsidiary is so qualified. Except as set forth on Schedule 2.2, neither the Company nor either of the Subsidiaries owns or holds, or has previously owned or held, any shares of stock or any other security or interest in any other Person.

2.3    Due Authorization. Seller has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and this Agreement has been duly and validly executed and delivered by Seller, and constitutes the legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws from time to time in effect which affect creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies. The execution, delivery and performance of this Agreement and all other instruments, agreements, certificates and documents contemplated hereby by Seller does not, on the date hereof, and will not, on the Closing Date, subject to compliance with the HSR Act: (i) violate any decree or judgment of any court or Governmental Authority which may be applicable to the Company, the Company Assets, the Subsidiaries or Seller; (ii) violate any law (or regulation promulgated under any law), (iii) violate any decree or judgment of any court or Governmental Authority binding on Seller, the Company, the Company Assets, the Subsidiaries or the Shares, (iv) violate or conflict with, or result in a breach of, or constitute a default (or an event which, with or without notice or lapse of time or both, would constitute a default) under, or permit cancellation of, or result in the creation of, any Encumbrance upon any of the Company Assets or the Shares under any of the terms, conditions, or provisions of any Contract to which Seller or the Company or the Subsidiaries is a party, or by which any of them or any of the Company Assets or the Shares are bound; (v) permit the acceleration of the maturity of any indebtedness of the Company or the Subsidiaries, or any indebtedness secured by any of the Company Assets or the Shares; (vi) violate or conflict with any provision of the charter or by-laws of the Company or the Subsidiaries; or (vii) except as set forth on Schedule 2.3, trigger any rights of third parties under any "change of control" or other similar provisions

2.4    Capitalization. The authorized capital stock of the Company and each Subsidiary is set forth on Schedule 2.4, together with the total amount of authorized shares and issued and outstanding shares. Neither Seller nor the Company nor the Subsidiaries have granted any option, warrant or similar right to any person or entity to purchase or acquire any rights with respect to any shares of capital stock of the Company or of the Subsidiaries.

2.5    Permits. The Company and the Subsidiaries have obtained and complied with all Permits necessary for the operation of their business and the ownership of the Company Assets or Real Property (excluding Environmental Permits which are covered by Section 2.15), except for those Permits the absence of which would not reasonably be expected to have a material adverse effect on the Company and the Subsidiaries taken as a whole. The Permits that the Company and the Subsidiaries currently hold or have applied for are listed on Schedule 2.5.

2.6    Financial Statements   Seller and the Company have delivered to Purchaser copies of the Financial Statements   The Financial Statements present fairly the financial position and the assets of the Company and the Subsidiaries and the results of the operation of the Company and the Subsidiaries and changes in financial position with respect to the respective dates thereof and the periods covered thereby, in conformity with GAAP and the past accounting practices of the Company and the Subsidiaries, consistently applied during such periods.

2.7    No Adverse Change   Except as listed on Schedule 2 7, since July 31, 1998 the business of the Company and the Subsidiaries has been conducted only in the ordinary course and there has not been (i) any material adverse change in the financial condition, business, property, customer relations, supplier relations or results of operations of the Company and the Subsidiaries taken as a whole (it being recognized by the Purchaser that Inland Steel Company was recently purchased by Ispat International NV); (ii) any loss or damage (whether or not covered by insurance) to any of the Company Assets which materially affects or impairs the ability of the Company and the Subsidiaries taken as a whole, to conduct their business, or any other event or condition of any character which has materially and adversely affected the business or operation of the Company and the Subsidiaries taken as a whole; (iii) the attaching, placing or granting of any Encumbrance (other than a Permitted Encumbrance) on any of the Company Assets or the Shares; (iv) any sale or transfer of the Company Assets, except items of the Inventories which have been sold in the ordinary course of business, or any cancellation of any debts or claims of the Company or the Subsidiaries, except in the ordinary course of business; (v) any changes in the accounting systems, policies or practices of the Company or the Subsidiaries; (vi) the entering into, amendment or termination of any material lease, contract, agreement or commitment, or the taking of any other action or the entering into of any other transaction other than in the ordinary course of business; (vii) the making or granting of any bonus or any wage, salary or compensation increase to any director, officer, employee or sales representative, group of employees or consultant or the making or grant of any increase in any employee benefit plan or arrangement, or amendment or termination of any existing employee benefit plan or arrangement or adoption of any new employee benefit plan or arrangement other than in the ordinary course of business; (viii) the making of any other change in employment terms for any of its directors, officers, and employees outside the ordinary course of business.

2.8    Title to Assets.  The Company and the Subsidiaries have good and marketable title to and are the lawful owners of all of the Company Assets, free and clear of all Encumbrances (except Permitted Encumbrances) and except as set forth on Schedules 2 8 or 2 9 or as reflected on the Financial Statements or the Closing Balance Sheet and except for assets which are subject to leases as described on Schedules 2 09(b) and 2 12  At the Closing, and except as set forth on Schedule 2 8 or as reflected on the Financial Statements or the Closing Balance Sheet and as to Company Assets which are leased as described in Sections 2 09(b) and 2 12, the Company and the Subsidiaries shall be the sole and lawful owners of, and have good and marketable title to, all of the Company Assets, free and clear of all Encumbrances (except Permitted Encumbrances).

2.9    Real Property.

   (a)    Owned Property.  Schedule 2 9(a) sets forth a list of all owned real property (the "Owned Real Property") used by the Company and the Subsidiaries in the operation of the Company's and the Subsidiaries' businesses  With

respect to each such parcel of Owned Real Property and other than set forth on Schedule 2.9(a). (i) the Company or a Subsidiary, as the case may be, has good and marketable title thereto and such parcel is free and clear of all Encumbrances, except Permitted Encumbrances; (ii) there are no leases, subleases, or other agreements, granting to any person the right of use or occupancy of any portion of such parcel; and (iii) there are no outstanding actions or rights of first refusal to purchase such parcel, or any portion thereof or interest therein.

(b)  Leased Property  Schedule 2.9(b) sets forth a list of all of the leases and subleases ("Leases") and each leased and subleased parcel of real property in which the Company and the Subsidiaries have a leasehold and subleasehold interest (the "Leased Real Property" and together with the Owned Real Property the "Real Property").  Each of the Leases are in full force and effect and the Company or a Subsidiary holds a valid and existing leasehold or subleasehold interest under each of the Leases.  Seller has delivered to Purchaser true, correct, complete and accurate copies of each of the Leases described in the Schedule 2.9(b)  With respect to each Lease listed in Schedule 2.9(b)  (i) the Lease is legal, valid, binding, enforceable and in full force and effect, (ii) neither the Company, either Subsidiary nor, to the knowledge of the Company and the Subsidiaries, any other party to the Lease is in breach or default, and no event has occurred which, with notice or lapse of time, would constitute such a breach or default or permit termination, modification or acceleration under the Lease; (iii) no party to the Lease has repudiated any material provision thereof; (iv) there are no material disputes, oral agreements, or forbearance programs in effect as to the Lease; (v) the Lease has not been modified in any respect, except to the extent that such modifications are disclosed by the documents delivered to Purchaser; (vi) the Company or the Subsidiaries have not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Lease, and (vii) the transactions contemplated by this Agreement will not require the consent of any third party to the Lease.

(c)  Condition and Operation of Assets.  To the knowledge of Seller and the Company, the buildings, plants, structures and equipment of the Company and its Subsidiaries are in customary operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures or equipment is in need of maintenance or repairs, except for ordinary, routine maintenance and repairs.

(d)  Compliance with Laws.  None of the Seller, the Company or any Subsidiary has received any notice of violation or claimed violation of any material applicable building, zoning, subdivision and other land use and similar laws affecting the Real Property.

2.10    Equipment. Except as disclosed in Schedule 2.10 hereto, the Company and each Subsidiary has had regular maintenance performed on all of the Equipment.

2.11    Intellectual Property  Schedule 2.11(a) is an accurate and complete list of all of the Intellectual Property. Schedule 2.11(a) also contains a complete and accurate list of all licenses and other rights granted by the Company or any of its Subsidiaries to any third party with respect to any Intellectual Property and all licenses and other rights granted by any third party to the Company or any of its Subsidiaries with respect to any Intellectual Property, in each case identifying the subject Intellectual Property. All of the Intellectual Property is owned by the Company free and clear of all Encumbrances or has been duly licensed for use by the Company except as set forth in Schedule 2.11(b). Except as set forth on Schedule 2.11(b), none of the Intellectual Property has been or is the subject of any pending adverse claim, or to the knowledge of Seller, the Company or the Subsidiaries any threatened litigation or claim of infringement.  Except as set forth on Schedule 2.11(b), no license or royalty agreement to which the Company is a party is in default or the subject of any notice of termination given, nor does the Company have reason to anticipate any such default or notice or that the transactions herein contemplated will result in termination or in any reduction hereafter in royalties payable under any such agreement.

2.12    Contracts.  Schedule 2.12 is a list of Contracts as provided below relating to the business and operation of the Company and the Subsidiaries.  The Company or Seller has delivered to Purchaser true and correct copies of each listed document and a written description of each oral arrangement so listed.  Schedule 2.12 includes all Contracts of the following types to which the Company or either Subsidiary is a party or to which any of the Company Assets or Shares is subject:

(a)     any labor union contract (or a list of any union certifications or votes to certify a union and all related documentation in Seller's possession in connection therewith),

(b)     all agreements, understandings and arrangements of any kind with any executive or director of the Company or any Subsidiary, relating to present or future compensation or other benefits available to such person or otherwise (other than those set forth on Schedule 2.13);

(c)     any contract, purchase order or other arrangement of any kind with any Affiliate of any officer, director or employee of the Company or any Subsidiary;

(d)     any contract or agreement with a broker, sales agency, advertising agency or other person engaged in sales, distributing or promotional activities;

(e)     any contract, purchase order, sales order or other arrangement of any nature which involves an unperformed commitment in excess of $50,000;

(f)     any commitment or arrangement pursuant to which the Company or any Subsidiary has made or will make loans or advances, or has or will have incurred debts or become a guarantor or surety or pledged its credit on or

otherwise become responsible with respect to any undertaking of another (except for the negotiation or collection of negotiable instruments in transactions in the ordinary course of business);

(g)    any indentures, credit agreements, loan agreements, notes, mortgages, security agreements, leases of real property or leases of personal property (provided that, in the case of leases for personal property, no such lease need be disclosed pursuant to this clause (g) unless the aggregate annual payments in respect of such lease are in excess of $25,000 per year) and agreements for financing;

(h)    any commitment or arrangement involving a partnership, joint venture or other cooperative undertaking, or involving any restrictions of the geographical area of operations or scope or type of business of the Company or any Subsidiary;

(i)    all agreements with sales representatives, distributors and dealers;

(j)    any power of attorney or agency agreement or arrangement with any party pursuant to which such party is granted the authority to act for or on behalf of the Company or any Subsidiary;

(k)    any property, casualty and other forms of insurance;

(l)    all agreements which contain a noncompetition covenant, nonsolicitation covenant or otherwise prohibit the Company or either Subsidiary from freely engaging in business anywhere in the world;

(m)    agreements under which the requirements for performance extend beyond 30 days from the date of this Agreement; and

(n)    all other contracts not made in the ordinary course of business which are to be performed at or after the date of this Agreement.

Each of the Contracts listed on Schedule 2.12 hereto is in full force and effect and constitutes a legal, valid and binding agreement of the Company or the Subsidiaries, and to the knowledge of the Company and the Seller, all other parties thereto, enforceable against the Company or the Subsidiaries, and to the knowledge of the Company and the Seller, the other parties thereto in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws from time to time in effect which affect creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies. Neither the Company nor either Subsidiary is in material breach of any of the Contracts listed on Schedule 2.12 and no claim of breach of any such Contract is pending, or to the knowledge of Seller or the Company, threatened. There are no material oral contracts.

2.13    Employee Benefit Plans

(a)    Benefit Plans  Except as set forth on Schedule 2.13, neither the Company nor the Subsidiaries is a party to, participates in, contributes to or has any liability with respect to.

(i)    any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in section 3(1) and 3(2) of ERISA), other than a "multiemployer plan" (as defined in section 3(37) of ERISA),

(ii)    any retirement or deferred compensation plan, incentive compensation plan, stock plan, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, insurance or hospitalization program or any other fringe benefit arrangement for any employee, director, consultant or agent of the Company, or

(iii)    any employment agreement not terminable on 30 days' or less written notice, without further liability

Plans, programs, policies and arrangements listed on Schedule 2.13 (collectively, "Benefit Plans") which are sponsored by the Company or either Subsidiary and in which only employees, former employees, directors, consultants or agents of the Company and the Subsidiaries participate are referred to herein as the "Company Benefit Plans".  Benefit Plans in which employees, former employees, directors, consultants or agents of the Company or the Subsidiaries participate or with respect to which the Company or any Subsidiary has any liability but which are sponsored by an entity other than the Company or either Subsidiary are referred to herein as the "Seller Benefit Plans"

(b)    Plan Documents and Reports.  A true and correct copy of each of the Benefit Plans each as in effect on the date hereof, has been supplied to Purchaser Except as listed on Schedule 2.13, a true and correct copy of the most recent annual report, actuarial report, summary plan description and Internal Revenue Service (the "Service") determination letter with respect to each Benefit Plan, to the extent applicable, has been supplied to Purchaser by the Company

(c)    Compliance with Laws; Liabilities.  Except as set forth in Schedule 2.13(c):

(i)    all Benefit Plans comply and have been administered in form and in operation in all material respects with all requirements of law and regulation applicable thereto, and there has been no notice issued by any governmental agency questioning or challenging such compliance;

(ii)    each Benefit Plan which is intended to be qualified under sections 401(a) and 501(a) of the Code has been amended on a timely basis in accordance with applicable law and has received from the Service a favorable determination letter which considers the terms of such Benefit Plan, as amended;

(iii) there have been no "prohibited transactions" (as described in section 406 of ERISA or section 4975 of the Code) with respect to any Benefit Plan,

(iv) there are no actions, suits or claims (other than routine claims for benefits) pending or threatened involving any Benefit Plan or the assets thereof, and, to the knowledge of the Seller, the Company and the Subsidiaries, no facts exist which could give rise to any such actions, suits or claims (other than routine claims for benefits),

(v) there has been no act or omission which has given rise to, or may give rise to, fines, penalties, taxes or related charges under sections 502(c), 502(i) or 4071 of ERISA or Chapters 43, 47, 68 or 100 of the Code for which the Company may be liable,

(vi) none of the payments contemplated by the Company Benefit Plans would, in the aggregate, constitute excess parachute payments as defined in section 280G of the Code (without regard to subsection (b)(4) thereof);

(vii) with respect to each Benefit Plan that is subject to Title IV of ERISA

(1) there has been no "reportable event" (as defined in section 4043 of ERISA),

(2) no steps have been taken to terminate any such plan,

(3) there has been no withdrawal (within the meaning of section 4063 of ERISA) of a "substantial employer" (as defined in section 4001(a)(2) of ERISA), and

(4) no event or condition has occurred which might constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such plan,

(viii) each Benefit Plan which constitutes a "group health plan" (as defined in section 607(1) of ERISA or section 4980B(g)(2) of the Code), including any plans of current and former affiliates which must be taken into account under section 4980B and 414(t) of the Code, section 601 of ERISA or Chapter 100 of the Code, has been operated in all material respects in compliance with the group health plan continuation coverage requirements and portability requirements of section 4980B of the Code, section 601 of ERISA and Chapter 100 of the Code to the extent such requirements are applicable;

(ix) neither the Company nor either Subsidiary has any liability or contingent liability under any Benefit Plan for providing post-retirement medical or life insurance benefits, other than statutory liability for providing group health plan continuation coverage under Part 6 of Title I of ERISA and section 4980B of the Code; and

(x)     there has been no act or omission that would impair the right or ability of the Company to unilaterally amend or terminate any Company Benefit Plan to the extent permitted by law.

(d)    Multiemployer Plans.  Each employee pension benefit plan which is a "multiemployer plan" (within the meaning of section 3(37) of ERISA) with respect to which the Company or any Subsidiary may have any liability is a Seller Benefit Plan.

(e)    Pension Liabilities.  Except with respect to matters described in the PBGC Letter, neither the Company nor either Subsidiary has incurred nor has any reason to expect that it will incur, any liability to the PBGC or otherwise under Title IV of ERISA (including any withdrawal liability) or under the Code with respect to any employee pension benefit plan (as defined in section 3(2) of ERISA) that the Company, either Subsidiary or any other entity that, together with the Company or either Subsidiary, is treated as a single entity under section 414 of the Code maintains or ever has maintained or to which any of them contributes, ever has contributed, or ever has been required to contribute, other than for PBGC premiums and required contributions.

(f)    PBGC Letter.  Seller has signed the PBGC Letter.

2.14.  No Defaults or Violations.  Except as set forth on Schedule 2.14, (a) neither the Company nor either of the Subsidiaries has breached any provision of, nor are any of them in default under the material terms of, any Contract to which they are a party or under which they have any rights or by which they are bound, and to the knowledge of Seller, the Company or the Subsidiaries no other party to any such Contract is in default or breach thereunder, and (b) neither the Company nor either of the Subsidiaries have violated or are in material violation of or default under or with respect to any law (excluding any Environmental Law which is covered by Section 2.15), governmental regulation or rule or order of any Governmental Authority or any Permit that is applicable in any way to the business or operation of the Company or the Subsidiaries.

2.15    Certain Environmental Matters.  Except as disclosed on Schedule 2.15: (a) neither the business nor operation of the Company or the Subsidiaries nor the ownership or operation of any of the Company Assets or Real Property materially violate, or during the past five years has materially violated, any applicable Environmental Law or Environmental Permits and no condition exists or event has occurred which, with notice or the passage of time or both, would constitute a material violation of any applicable Environmental Law or Environmental Permit or give rise to liability of the Company or any of the Subsidiaries under Environmental Law, (b) the Company and the Subsidiaries have obtained and maintain and are in material compliance with all material Environmental Permits necessary for the operation of their business and the ownership of the Company Assets or Real Property except for those Environmental Permits the absence of which would not reasonably be expected to have a material adverse effect on the Company and the Subsidiaries taken as a whole; (c) the Real Property and any real property formerly owned or operated by the Company or its Subsidiaries (during the period of time owned or operated by the

Company or its Subsidiaries) and each portion thereof is not and has not been a site for the use, generation, manufacture, discharge, assembly, processing, storage, release, disposal, or transportation to or from of any Hazardous Materials, except for inventories of chemicals and finished product which are to be used in the ordinary course of business of the Company or the Subsidiaries (which inventories and finished product have been stored or used in material compliance with all applicable Environmental Permits and all Environmental Laws), (d) none of Seller, the Company, the Subsidiaries or any of their respective Affiliates has received during the previous five years any notice, report or other information from any Governmental Authority or private entity advising or alleging that the Real Property or the operation of the Company's or the Subsidiaries' business has violated or is in violation of any Environmental Law or any Environmental Permit or that the Company or any Subsidiary has actual or potential liability or responsibility under any Environmental Law, including, without limitation, responsibility (or potential responsibility) for the cleanup of any Hazardous Materials at, on or beneath the Real Property or any real property formerly owned or operated by the Company or the Subsidiaries or any offsite waste disposal location or at, on or beneath any land adjacent thereto, and none of Seller, the Company, the Subsidiaries or their respective Affiliates has received any such notice, report or other information prior to the previous five years, the subject of which has not been fully settled and resolved, (e) neither the Company, the Subsidiaries nor the operation thereof is the subject of Federal, state, local or private litigation or proceedings involving a demand for damages or request for injunctive relief with respect to Environmental Laws, (f) the Company has not treated, stored, transported, handled, buried, dumped, disposed, spilled, discharged, emitted or released any Hazardous Materials or arranged for the disposal of any Hazardous Materials at any property where a release of such materials constituted or would constitute a material violation of any Environmental Laws or would reasonably be expected to give rise to material liability under Environmental Laws or owned or operated any property or facility (and no such property or facility is contaminated by any Hazardous Materials) in a manner that constituted or constitutes a material violation of Environmental Laws or would reasonably be expected to give rise to material liability under Environmental Laws; (g) no products, by-products or wastes of any manufacturing process or operation of the Company which may constitute Hazardous Materials are currently stored or otherwise located at the Real Property except as are normally kept in the normal course of business (and all such products, by-products, and wastes are stored in material compliance with all Environmental Permits and Environmental Laws); and (h) to the knowledge of Seller, no unpermitted friable asbestos, friable asbestos-containing materials, underground storage tanks, landfills or waste disposal areas or PCB compounds are or have been present at the Real Property to the extent that they would reasonably be expected to result in a material liability to the Company and the Subsidiaries taken as a whole. The Company and the Subsidiaries have timely filed all reports that they were required to file with respect to the operation of the Company's business and ownership or operation of the Real Property and any real property formerly owned or operated by the Company or its Subsidiaries except as would not result in a material liability to the Company and the Subsidiaries taken as a whole, and has generated and maintained all required data, documentation and records, under any applicable Environmental Laws with respect thereto.

2.16    Litigation.  Except as disclosed on Schedule 2.16, there are no actions, suits, labor disputes or other litigation, proceedings or governmental investigations pending or, to the knowledge of Seller, the Company or the Subsidiaries threatened against or affecting the Company, the Subsidiaries or Seller's ownership of the Shares, or any officers, directors, employees or the

6274330                                    -16-

stockholders thereof in their capacity as such, or any of the properties or businesses thereof, or relating to the transactions contemplated by this Agreement.

2.17  Taxes

(a)  All Federal, state, foreign and other Tax Returns and reports of the Company required by law to be filed as of the Closing Date have been duly filed, and all Taxes imposed upon the Company or any of its properties, assets or income which are due and payable or claimed by any taxing authority to be due and payable have been paid or reserved for as of the Closing Date other than Taxes, assessments, fees and charges being contested by the Company in good faith using appropriate procedures concerning an amount which in the aggregate is not material to the business of the Company  The liability for accrued Taxes as shown in the Balance Sheet is sufficient for the payment of all unpaid Taxes of the Company accrued for or applicable to the period ended on the Closing Date and all years and periods prior thereto and for which the Company may at that date have been liable in its own right or as transferee of the assets of, or successor to, any other corporation or entity or by reason of its being a member of any group of corporations filing consolidated Tax Returns (including any such amounts payable as a result of an audit of any Tax Return for any such period).  The Company utilizes the accrual method of accounting for Tax purposes.

(b)  Except as disclosed on Schedule 2 17(b), there are no claims for Taxes pending against the Company and neither the Company nor Seller know of any threatened claim for Tax deficiencies or any basis for such claims

(c)  The Company has no liability for any Federal, state or other Taxes of any other corporation or entity, including, without limitation, by reason of the application of Treas. Reg. § 1.1502-6 or any analogous provision of state or local law. The Company is not required to file any Tax Returns or to pay any Taxes in foreign countries.

(d)  The Company has paid or is withholding and will pay when due to the proper taxing authorities all withholding amounts required to be withheld with respect to all Taxes on income, unemployment, social security or other similar programs or benefits with respect to salary and other compensation of directors, officers and employees of the Company, and all other Taxes and amounts required to be withheld by the Company.

(e)  None of the shareholders of the Company is a "foreign person" as that term is defined in section 1445(f)(3) of the Code.

(f)  The Company is not and will not be required to recognize after the Closing Date any taxable income in respect of accounting method adjustments

required to be made under any applicable tax law, including section 481(a) of the Code.

(g) The Company and each Subsidiary is not a party to or bound by any Tax allocation or Tax sharing agreement, other than the current Tax sharing agreement among members of the Affiliated Group of which Seller is the common parent and has no current contractual obligation to make an indemnification payment to any other person with respect to Taxes

(h) Except as set forth on Schedule 2.17(h), the Company and each Subsidiary has not made any payments, and is not and will not become obligated (under any contract entered into on or before the Closing Date (other than any contract entered into on the Closing Date, but after the time of Closing) to make any payments, that will be non-deductible under section 280G of the Code (or any corresponding provision of state, local or foreign income Tax law).

2.18  Bank Accounts  Schedule 2.18 is a true, correct and complete list of all of the bank accounts of the Company and the Subsidiaries and sets forth the name of each bank or other financial institution at which either the Company or the Subsidiaries have an account or a safe deposit box and the names of all persons authorized to draw thereon or who have access thereto.

2.19  Inventories  The Inventories are fairly reflected in the inventory accounts on the unaudited balance sheets included in the Financial Statements and are valued at the lower of cost or market

2.20  Accounts Receivable  All Accounts Receivable of the Company and the Subsidiaries have arisen out of bona fide transactions in the ordinary course of business, consistent with past practices.

2.21  Consents  Except as set forth on Schedule 2.21 and except for the filing of such forms with the United States Department of Justice and the Federal Trade Commission as shall be required by the HSR Act, and the expiration or termination of any waiting periods thereunder, no notice to, filing with, authorization of, exemption by, or consent of any person, entity, or public or Governmental Authority is required in order for Seller to consummate the transactions contemplated hereby.

2.22  Employees  Schedule 2.22 is a true, correct and complete list of all of the Company's and the Subsidiaries' employees who earn $50,000 or more, wherever located, indicating the rate of pay of each such employee as of July 31, 1998 and any accrued vacation and accrued bonuses. Except as set forth on Schedule 2.22, the Company and each of its Subsidiaries have complied with all applicable laws relating to the employment of personnel and labor.  Except as set forth on Schedule 2.22, neither the Company nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, nor has such party experienced any strikes, grievances, unfair labor practices claims or other material employee or labor disputes.

2.23 <u>Assets Sufficient for Conduct of Business: Books and Records</u> The Company Assets, including the Real Property, constitute all of the assets and properties required for the operation of the Company's and the Subsidiaries' business as it is presently operated by the Company and the Subsidiaries in all material respects.

2.24 <u>Not an Operating Company</u>. The Company is not currently, and has never been, an operating company, has never owned any entity other than the Subsidiaries, and has never owned any business involved in the production or mining of coal. Neither Seller nor any Affiliate has any liability under the Coal Industry Retiree Health Benefit Act of 1992.

2.25 <u>No Undisclosed Liabilities</u>. Neither the Company nor any of its Subsidiaries has any material obligations or liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known, whether due or to become due and regardless of when asserted) arising out of or relating to the business or operation of the Company or the Subsidiaries at or prior to the Closing, except (i) obligations under Contracts described on <u>Schedule 2.12</u> or under Contracts and commitments which are not required to be disclosed thereon, (ii) obligations or liabilities set forth on any of the Schedules attached hereto, (iii) liabilities reflected on the Balance Sheet, and (iv) liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business or otherwise in accordance with the terms and conditions of this Agreement.

2.26 <u>Compliance with Laws</u> Except as set forth on <u>Schedule 2.26</u>, the Company and each Subsidiary have complied with and are in compliance with all material applicable laws, regulations and ordinances of foreign, federal, state and local governments and all agencies thereof which are applicable to the business of the Company and the Subsidiaries and to which the Company or either Subsidiary may be subject, and no claims have been filed against the Company or either Subsidiary alleging a violation of any material applicable laws or regulations, and neither the Company nor either Subsidiary has received notice of any such violations.

2.27 <u>Accuracy of Statements</u>. Neither this Agreement nor the schedules hereto contain or will contain any untrue statement of a material fact regarding the Company, the Subsidiaries, the Company Assets or the Shares or omits or will omit to state a material fact necessary to make the statements regarding any of the Company, the Subsidiaries, the Company Assets or the Shares contained herein or therein, in light of the circumstances in which they are made, not misleading

2.28 <u>Disclaimer</u>.

(a) EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES BY SELLER IN THIS AGREEMENT, SELLER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. In particular, Seller disclaims any representation or warranty with respect to any information concerning Seller, the Company and the Subsidiaries not expressly represented and warranted to in this Agreement including, without limitation, (a) the Financial Statements or any

other financial projection or forecast relating to Seller, the Company or the Subsidiaries, except as expressly set forth in Section 2 6, (b) the information included in the data room established by Seller or otherwise delivered to Purchaser or its representatives, and (c) all verbal or written communications by Seller, the Company, the Subsidiaries, employees of any thereof, or their respective representatives  Purchaser shall have no claim against Seller, the Company and the Subsidiaries, and Seller, the Company and the Subsidiaries shall have no liability to Purchaser, with respect to any such disclaimed information.

(b)    EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT, PURCHASER IS ACQUIRING THE SHARES AND THE COMPANY ASSETS ON AN "AS IS," "WHERE IS" BASIS.  EXCEPT AS EXPRESSLY SET FORTH HEREIN (AND WITHOUT LIMITING THE FOREGOING), PURCHASER WAIVES ALL RIGHTS TO INDEMNIFICATION OR CONTRIBUTION AGAINST THE SELLER AND ITS AFFILIATES FOR ENVIRONMENTAL CONDITIONS ON, AT, OR MIGRATING FROM THE REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY RIGHTS TO INDEMNIFICATION OR CONTRIBUTION PURSUANT TO ANY APPLICABLE ENVIRONMENTAL OR OTHER LAWS.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller and the Company as follows:

3 1    Due Incorporation, etc  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

3.2    Corporate Authority.  Purchaser has all requisite corporate power and authority to enter into this Agreement and to carry out its obligations under this Agreement.  The execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary corporate action on the part of Purchaser.  This Agreement has been duly executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws from time to time in effect that affect creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies.  The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provisions of the Certificate of Incorporation or by-laws of Purchaser or violate any provision of or result in the acceleration of any obligation or

the creation of any Encumbrance under any Contract to which Purchaser is a party or by which it or any of its properties is bound.

3.5 **Consents** Except as shown on Schedule 3 3 and except for the filing of such forms with the United States Department of Justice and the Federal Trade Commission as shall be required by the HSR Act, and the expiration or termination of any waiting periods thereunder, no notice to, filing with, authorization of, exemption by, or consent of any person, entity, or public or Governmental Authority is required in order for Purchaser to consummate the transactions contemplated hereby.

3 4 **Sufficient Financing and Capitalization**. Purchaser has obtained equity and debt commitment letters (which commitment letters are subject to the conditions and qualifications described therein) which, in the aggregate, describe sufficient financing to pay the Purchase Price and consummate the transactions contemplated by this Agreement, which commitment letters have been provided to Seller (the "Financing Commitments"). Based solely on such Financing Commitments, Purchaser believes that, on the Closing Date, it will have adequate capitalization in order to consummate the transactions contemplated by this Agreement and to carry on the business of the Company

## ARTICLE IV
## COVENANTS OF SELLER

The Seller agrees that from the date hereof to the Closing Date (and thereafter with respect to Sections 4 16 and 4 17)

4.1 **Implementing Agreement**. The Seller will, and the Seller will cause the Company and each Subsidiary to, take all action required of it to fulfill Seller's and the Company's obligations under the terms of this Agreement and the transactions contemplated hereby.

4 2 **Ordinary Course**. Seller shall cause the Company and the Subsidiaries to operate their business only in the usual, regular and ordinary course and manner and, without limiting the foregoing. shall not enter into any agreement. arrangement or transaction which would be required to be listed on Schedule 2 12 hereto if in effect as of the date hereof, except with the written consent of Purchaser or except in connection with the provision or replacement of services to the Company or the Subsidiaries by any Affiliates of the Company or by Ispat Inland Inc. and the transitioning of such services to third parties. In the event that Seller becomes aware of any material adverse change in, or an event which has a material adverse effect on, the financial condition, business, property, customer relations, supplier relations or results of operations of the Company and the Subsidiaries taken as a whole, Seller shall promptly advise Purchaser thereof.

4.3 **Access to Information**. Subject to applicable legal constraints, from the date of this Agreement through the Closing Date, Seller shall (and shall cause each of the Company and the Subsidiaries to) (a) provide Purchaser and its representatives with such information as Purchaser may from time-to-time reasonably request with respect to the business of the Company and the Subsidiaries; (b) provide Purchaser and its representatives access during regular business hours and upon reasonable notice to the books, records, officers, personnel, counsel and accountants of Seller

and the Company and the Subsidiaries, as Purchaser or its representatives may from time-to-time reasonably request; and (c) permit Purchaser and its representatives to make such inspections thereof as Purchaser may reasonably request.

4.4 <u>Books and Records</u>. The Seller shall cause the Company and each Subsidiary to maintain its books, accounts and records in the usual, regular and ordinary manner, and on a basis consistent with the Financial Statements and past practices.

4.5 <u>Compensation</u>. Other than in the ordinary course of business, and except as set forth in <u>Schedule 4.5</u>, no increase or other change shall be made in the compensation arrangements for any officer, director, employee, stockholder, consultant or agent of the Company employed at or in connection with the business or operation of the Company from that in effect as of July 31, 1998, and no pension or profit sharing plan, or any other employee benefit arrangement, shall be in effect, except as listed on <u>Schedule 2.13</u> hereof.

4.6 <u>Consents and Approvals</u>. Seller shall use all commercially reasonable efforts to obtain all necessary consents and approvals to the performance of this Agreement and the transactions contemplated hereby, together with any other necessary consents, approvals or amendments to any Permit, license, Contract, agreement, lease or other right. Seller shall make all filings, applications, statements and reports to all Governmental Authorities which are required to be made prior to the Closing Date by or on behalf of either Seller or the Company or the Subsidiaries or any of their respective Affiliates pursuant to any applicable statute, rule or regulation in connection with this Agreement and the transactions contemplated hereby.

4.7 <u>Employees and Employee Benefit Plans</u>. All employees of the Company and the Subsidiaries shall remain on the payroll records of the Company or either Subsidiary, as applicable, until the Closing Date (except for Bruce Greinke and those employees terminated with cause by the Company or the Subsidiaries or who voluntarily terminate employment prior to the Closing Date), and shall continue to be paid by the Company or either Subsidiary, as applicable, all amounts of wages, bonuses and other remuneration payable to such employees with respect to periods on or prior to the Closing Date pursuant to their terms of employment. None of Seller, the Company or the Subsidiaries will make any material changes to any of the Company Benefit Plans (including the adoption or establishment of any new plan, policy, program or arrangement affecting employees of the Company or either Subsidiary which, if so adopted or established, would constitute a Company Benefit Plan, except with respect to the change of control agreement between Bruce Greinke and Seller referenced on <u>Schedule 2.3</u>) before the Closing without the express written consent of Purchaser. Effective as of the Closing, employees of the Company and each of the Subsidiaries will cease to be active participants in the Seller Benefit Plans and, subject to the provisions of <u>Section 5.4</u>, will be eligible to participate in the Purchaser's Plans, which shall include a severance plan. After the Closing, except as provided in <u>Sections 5.4</u> and <u>10.3</u>, none of Purchaser, the Company or either Subsidiary shall have any obligations or liabilities to, under or with respect to any Seller Benefit Plan and, except as provided in <u>Sections 5.4</u> and <u>10.2</u>, Seller shall not have any obligations or liabilities to, under or with respect to any Company Benefit Plan or any of the Purchaser's Plans; <u>provided</u>, <u>however</u>, that, as provided in <u>Section 10.2</u>, Seller shall indemnify Purchaser for any Losses incurred by Purchaser which are caused by the failure of Brockway, prior to the Closing, to

maintain the Brockway Pension Plans in form and operation in accordance with applicable law, including, without limitation, section 401(a) of the Code.

4.8    No Default; Affiliated Transactions    The Seller will not, and it will cause the Company and each Subsidiary to not, do any act or omit to do any act, or permit any act or omission to act, which will cause a material breach of any Contract to which the Company, the Subsidiaries, the Company Assets or the Shares are subject.

4.9    Compliance with Laws    The Seller shall, and it shall cause the Company and each Subsidiary to, duly comply, in all material respects, with all laws, statutes, regulations, rules and orders applicable to the business or operation of the Company and the Subsidiaries or as may be required for the valid and effective transfer and assignment of the Shares.

4.10    Inland Name.    Immediately prior to the Closing, the Seller will cause the Company (and each subsidiary, if any, that uses the "Inland" name) to change its name to a name which does not include the name "Inland" and to transfer to Seller any and all rights to such name, together with all rights, if any, of the Company and its subsidiaries to the red diamond logo.

4.11    No Modifications.    The Seller will not, and it will cause the Company and each Subsidiary to not, modify, amend or otherwise alter or change any of the material terms or provisions of any of the Contracts to which any of them is a party other than in the ordinary course of business, except as expressly contemplated by this Agreement (including Section 4.2) or consented to in advance by Purchaser.

4.12    Maintenance of Insurance.    Except for changes in the ordinary course of business or in connection with the replacement of services to the Company or the Subsidiaries by any Affiliate of the Company or by Ispat Inland Inc., the Seller will cause the Company and each Subsidiary to not terminate their existing insurance prior to Closing and to give Purchaser prior written notice of any pending or threatened termination by the Company or the Subsidiaries.

4.13    No Organic Change.    No amendment shall be made to the Certificate of Incorporation or the by-laws of the Company or the Subsidiaries, and no change shall be made in its capital stock by reclassification, subdivision, reorganization or otherwise without the prior written consent of Purchaser

4.14    No Issuance of Shares of Capital Stock, Options, etc.    No change shall be made in the number of shares of capital stock of the Company of the Subsidiaries issued and outstanding, and no option, warrant or other right to acquire shares of capital stock or any other security of the Company of the Subsidiaries shall be granted or created.

4.15    Resignation of Officers and Directors    All officers and members of the board of directors of the Company (other than any individuals identified by the Purchaser at least three days prior to the Closing Date) shall resign their positions as officers or directors of the Company, as applicable, effective no later than the Closing Date.  Except as set forth on Schedule 4.15, all existing shareholder agreements and employment agreements of the Company shall be terminated no later than the Closing Date at no cost to the Company.

**4.16** Self Insured Medical Claims, Insurance Policy Retentions and Deductibles. To the extent not accrued for on the Closing Statement, Seller shall retain and properly discharge all liabilities for claims incurred on or before the Closing Date by employees of the Company and the Subsidiaries and their covered dependants under any Seller Benefit Plan which constitutes a group health plan which is self-insured or any self-insured retention, additional premium or any deductible under any insurance policy, upon audit or otherwise.

**4.17** PBGC Matters. Seller has agreed with the PBGC that during the Interim Period (as described in the PBGC Letter), that, for the period commencing on the Closing Date and ending on the 2 year anniversary of the Closing Date (the "Liability Period"), Seller will remain liable under Title IV of ERISA with respect to either or both of the Brockway Defined Benefit Plans that are terminated during the Liability Period (including any such termination that is effected pursuant to any action to terminate that is commenced by the PBGC during the Liability Period) as though Seller was still under common control (as defined in section 4001(a)(14) of ERISA) with the Company and the Subsidiaries. Seller will not take any action to amend or terminate the PBGC Letter without the consent of Purchaser, which consent will not be unreasonably withheld.

## ARTICLE V
## COVENANTS OF PURCHASER

Purchaser agrees that from the date hereof to the Closing Date (and thereafter with respect to Sections 5.3, 5.4, 5.5, and 5.6).

**5.1** Implementing Agreement. Purchaser will take all necessary action required to fulfill its obligations under this Agreement and the transactions contemplated hereby.

**5.2** Consents and Approvals. Purchaser shall use all commercially reasonable efforts to obtain all necessary consents and approvals to the performance of its obligations under this Agreement and the transactions contemplated hereby. Purchaser shall make all filings, applications, statements and reports to all Governmental Authorities which are required to be made prior to the Closing Date by or on behalf of Purchaser pursuant to any applicable statute, rule or regulation in connection with this Agreement and the transactions contemplated hereby.

**5.3** Confidentiality. Except as required by any Governmental Authority, all information supplied by Seller or the Company to Purchaser shall be maintained in strict confidence by Purchaser, and in the event that this Agreement is terminated, Purchaser shall make no further use of such information whatsoever and shall return such information to the Company promptly after such termination.

**5.4** Employee Benefits. For periods after the Closing, employees of the Company and the Subsidiaries shall continue to participate in the Company Benefit Plans and shall be eligible to participate in such other benefit plans, programs, policies and arrangements maintained from time to time by Purchaser for the benefit of similarly situated employees of Purchaser, including, but not limited to, a severance plan which will provide a reasonable level of severance benefits (the

"Purchaser's Plans") To the extent applicable, employees of the Company and the Subsidiaries (and their eligible dependents) shall be given credit under each of Purchaser's Plans which is an employee welfare benefit plan (as that term is described in section 3(1) of ERISA) for their service under corresponding Benefit Plans with the Company, the Subsidiaries and the Seller prior to the Closing for purposes of satisfying any waiting periods, evidence of insurability requirements, or the application of any pre-existing condition limitations and, in the case of any severance plan, for calculation of the amount of severance, and shall be given credit under any such plan for amounts paid under a corresponding Seller Benefit Plan during the same period for purposes of applying deductibles, copayments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of Purchaser's Plans. Subject to the provisions of Section 5.5, but notwithstanding anything else to the contrary, Purchaser shall have full discretionary authority to modify or terminate the Company Benefit Plans on and after the Closing (other than to provide a severance plan as one of the Purchaser Plans). After the Closing, except as provided in Sections 4.7, 4.16 and 10.2, Seller shall have no obligations or liabilities under or with respect to any Company Benefit Plan or any of the Purchaser's Plans and none of Purchaser, the Company or either Subsidiary shall have any obligations or liabilities to, under or with respect to any Seller Benefit Plan, provided, however, that Purchaser shall indemnify Seller for any severance obligations incurred by Seller and its Affiliates on or after the Closing Date under the Inland Steel Industries 1998 Severance Pay Plan with respect to employees of the Company and the Subsidiaries as provided in Section 10.3; and provided, further, that, to the extent necessary, Seller shall amend each Seller Benefit Plan which provides for severance benefits to provide that employees of the Company and the Subsidiaries are ineligible for participation after the Closing Date. On or prior to the Closing Date, Seller shall cause Brockway to request determination letters from the Service with respect to the qualification of the Brockway Defined Benefit Plans and as soon as practicable following the Closing Date, Purchaser shall cause Brockway to request a determination letter from the Service with respect to the qualification of the Brockway Pressed Metals, Inc. Stock Bonus Plan and Trust and shall cause such filing to be made in a manner which is intended to minimize any Losses for which Seller has agreed to indemnify Purchaser pursuant to Sections 4.7 and 10.2, and after the Closing Date the parties shall cooperate with each other in obtaining such determination letters. In addition, Seller shall have no obligations or liabilities under or with respect to any "change of control" or other severance provisions or obligations contained in the change of control agreement between Robert Krause and Seller referenced on Schedule 2.3 (the "Krause Agreement") and shall indemnify and hold Seller harmless against any Losses arising out of or related to the Krause Agreement.

5.5     PBGC Matters. Purchaser will, and will cause the Company and the Subsidiaries to, negotiate in good faith with the PBGC to reach a final agreement with the PBGC (as described in the PBGC Letter) and shall indemnify Seller for any Losses incurred by Seller as a result of the termination of either or both of the Brockway Defined Benefit Plans on or after the Closing Date, including but not limited to, any such termination that is effected pursuant to an action to terminate that is commenced by the PBGC on or after the Closing Date. Except as required under applicable collective bargaining agreements as in effect on the Closing Date, Purchaser will not, and will cause the Company and the subsidiaries to not, increase the level of benefits provided to participants under the Brockway Defined Benefit plans during the Liability Period.

5.6 _Insurance Proceeds_. For periods after the Closing Date, any proceeds received by Purchaser, the Company or the Subsidiaries which relate to claims made or insurable losses incurred by Seller, the Company or the Subsidiaries pursuant to insurance policies, which claims were made or which relate to periods prior to the Closing (except for proceeds arising pursuant to policies purchased by the Company or its Affiliates on or after the Closing), will promptly be remitted to Seller, and Purchaser will cooperate with Seller and the applicable insurance companies in collecting such amounts.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Closing Date:

6.1 _Consents and Approvals_. All consents, approvals, certificates, permits and licenses, as necessary for Purchaser to consummate the transactions contemplated herein and to own and operate the Company, the Subsidiaries and their business following the Closing Date, satisfactory in form and substance to Purchaser, shall have been received by Purchaser, or Purchaser shall have received written assurances in form and substance satisfactory to Purchaser, that such consents, approvals, certificates and licenses will be granted and/or issued promptly after the Closing Date

6.2 _Warranties True as of Both Present Date and Closing Date_. The representations and warranties of Seller contained herein that are qualified by materiality shall be true in all respects on and as of the date of this Agreement and shall also be true in all respects (except for such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date and the representations and warranties of Seller contained herein that are not qualified by materiality shall be true in all material respects on and as of the date of this Agreement, and shall also be true in all material respects (except for such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date, in each case with the same force and effect as though made on and as of the Closing Date.

6.3 _Compliance with Agreements and Covenants; Certificate_. Each of Seller, the Company and each of the Subsidiaries shall, in all material respects, have performed all of its respective obligations and agreements and complied with all of the covenants contained in this Agreement to be performed and complied with by it on or prior to the Closing Date; and Seller shall have delivered to Purchaser a certificate dated as of the Closing Date, signed by Seller and the President or a Vice President of the Company, certifying as to compliance with Section 6.2 and this Section 6.3.

6.4 _Opinion of Counsel_. Purchaser shall have received an opinion, dated the Closing Date, of George A. Ranney, Jr., general counsel for Seller and the Company, in form and substance satisfactory to Purchaser to the effect that:

(i) Each of the Seller, the Company and Magnetics is a corporation validly existing in good standing under the laws of the State of Delaware and Brockway is a corporation validly existing in good standing under the laws of the Commonwealth of

Pennsylvania (based solely upon a certificate of good standing issued by the Secretary of the Commonwealth of Pennsylvania);

(ii)    The authorized, issued and outstanding capital stock of the Company and each Subsidiary is as set forth in this Agreement, and the Shares and the capital stock of each Subsidiary have been duly authorized and validly issued. When all of the Shares are transferred to Purchaser pursuant to this Agreement, Purchaser will receive all of the Shares free and clear of all claims, liens and encumbrances;

(iii)    The Seller has full power and authority to execute, deliver and perform this Agreement;

(iv)    This Agreement has been duly authorized, executed and delivered by the Seller and is enforceable in accordance with its terms, except as enforcement thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws from time to time in effect which affect the enforcement of creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies; and

(v)    Neither the execution and delivery nor the performance of this Agreement by the Seller will violate the Certificate of Incorporation or By-Laws of the Seller or any indenture or loan agreement known to such counsel to which the Seller is a party or by which it is bound.

6.5    Other Agreements.    All of the other agreements, certificates and instruments to be delivered to Purchaser at the Closing pursuant to Article VIII shall have been delivered to Purchaser.

6.6    No Material Change.    There shall have been no material adverse change in the financial condition, business, property, customer relations, supplier relations or results of operations of the Company and the Subsidiaries taken as a whole since the date of the Financial Statements.

6.7    Actions or Proceedings.    No action or proceeding by any Governmental Authority shall have been instituted or threatened which would enjoin, restrain or prohibit, or might result in substantial damages in respect of, this Agreement or the complete consummation of the transactions as contemplated by this Agreement. No court order shall have been entered in any action or proceeding instituted by any party which enjoins, restrains or prohibits this Agreement or the complete consummation of the transactions as contemplated by this Agreement.

6.8    Title Insurance/Survey.

(a)    Title Insurance.    Seller shall have obtained and delivered to Purchaser, as soon as practicable, at Seller's own cost and expense, a commitment for an ALTA Owner's of Title Insurance, Form B-1992, for each parcel of the Owned Real Property located in the United States (the "Title Commitments"), issued by a title insurer satisfactory to Purchaser (the "Title Insurer"), in such amount as Seller determines to be the fair market value (including all improvements thereon), insuring Purchaser's interest in such

parcel as of Closing, subject only to the Permitted Encumbrances. Seller shall deliver at the time of delivery of the Title Commitments, copies of all documents of record referred to therein. Seller will use all commercially reasonable efforts to provide Purchaser with title insurance policies ("Title Policies") as soon as practicable, from the Title Insurer based upon the Title Commitments. Seller will deliver to the Title Insurer all affidavits, undertakings and other title clearance documents necessary to issue the Title Policies and endorsements thereto. Each such Title Policy will be dated on or after the Closing Date and insure title to the applicable parcels of real estate and all recorded easements benefitting such parcels, subject only to Permitted Encumbrances. The Title Policies shall contain the following endorsements if available in the state where the applicable Owned Real Property is located: (a) an "extended coverage endorsement" insuring over the general exceptions contained customarily in such policies, (b) an ALTA Zoning Endorsement 3.1, with parking (or equivalent), (c) an endorsement insuring that the parcel described in such Title Policy is the parcel shown on the survey delivered with respect to such parcel and a survey accuracy endorsement. (d) an endorsement insuring that each street as to which vehicular and pedestrian access is presently existing is a public street and that there is direct and unencumbered pedestrian and vehicular access to such street from such parcel, (e) if the real estate covered by such policy consists of more than one record parcel, a "contiguity" endorsement insuring that all of the record parcels are contiguous to one another with respect to those parcels that are currently configured and occupy as a single operating unit, (f) a non-imputation endorsement, (g) a tax number endorsement and (h) such other endorsements as Purchaser and Purchaser's lender, if any, may reasonably request.

(b)    Surveys. Seller shall have obtained and delivered to Purchaser, as soon as practicable, at Seller's own cost and expense, current surveys of each parcel of Real Property, prepared by a licensed surveyor, and certified as conforming to the 1992 ALTA/ACSM Minimum Standard Detail Requirements for Urban Land Title Surveys (the "Surveys"). The Surveys shall disclose the location of all Improvements, easements, party walls, sidewalks, roadways, utility lines and such matters shown customarily on such surveys. show access affirmatively to public streets and roads, in the manner as required by the Surveyor's Certificate and include Table A Item Nos. 1-4 and 6-13.

6.9    Financing. The lenders identified in the Financing Commitments shall have provided to the Purchaser all of the funds which they have committed to provide upon fulfillment of the conditions described in such Financing Commitments on terms and conditions no less favorable to Purchaser than those described in the Financing Commitments.

6.10    HSR Act. Both Purchaser and the Company shall have filed such forms with the United States Department of Justice and the Federal Trade Commission as shall be required by the

HSR Act. The applicable waiting periods under the HSR Act shall have expired or earlier been terminated without notice from such governmental agencies that additional inquiries are being made

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are, at the option of Seller, subject to the satisfaction of the following conditions precedent on or before the Closing Date

7.1   Warranties True as of Both Present Date and Closing Date   The representations and warranties of Purchaser contained herein that are qualified by materiality shall be true in all respects on and as of the date of this Agreement and shall also be true in all respects (except for such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date and the representations and warranties of Purchaser contained herein that are not qualified by materiality shall be true in all material respects on and as of the date of this Agreement, and shall also be true in all material respects (except for such changes as are contemplated by the terms of this Agreement) on and as of the Closing Date, in each case with the same force and effect as though made on and as of the Closing Date

7.2   Compliance with Agreements and Covenants; Certificate   Purchaser shall, in all material respects, have performed all obligations and agreements and complied with all covenants contained in this Agreement, to be performed and complied with by it on or prior to the Closing Date; and Purchaser shall have delivered to Seller a certificate, dated as of the Closing Date, of a Vice President of Purchaser, certifying as to its compliance with Section 7.1 and this Section 7.2.

7.3   Opinion of Counsel.   Seller shall have received an opinion, dated the Closing Date, of Dwight A. Miller, counsel for Purchaser, in form and substance satisfactory to Seller to the effect that

(i)   Purchaser is a corporation validly existing and in good standing under the laws of the State of Delaware,

(ii)   Purchaser has full corporate power and authority to execute, deliver and perform this Agreement;

(iii)   This Agreement has been duly authorized, executed and delivered by Purchaser and constitute valid and legally binding obligations of Purchaser enforceable in accordance with their respective terms, except as enforcement thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws from time to time in effect which affect the enforcement of creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies; and

(iv)   Neither the execution and delivery nor the performance by Purchaser of this Agreement will violate the Certificate of Incorporation or By-Laws of Purchaser or any indenture or loan agreement known to such counsel to which Purchaser is a party or by which it is bound.

7.4    Other Agreements.  All of the other agreements, certificates and instruments to be delivered to Seller at the Closing pursuant to Article VIII shall have been delivered to Seller

7.5    Actions or Proceedings  No action or proceeding by any Governmental Authority shall have been instituted or threatened which would enjoin, restrain or prohibit, or might result in substantial damages in respect of, this Agreement or the complete consummation of the transactions as contemplated by this Agreement, and no court order shall have been entered in any action or proceeding instituted by any party which enjoins, restrains, or prohibits this Agreement or the complete consummation of the transactions as contemplated by this Agreement.

7.6    HSR Act.  Both Purchaser and the Company shall have filed such forms with the United States Department of Justice and the Federal Trade Commission as shall be required by the HSR Act   The applicable waiting periods under the HSR Act shall have expired or earlier been terminated without notice from such governmental agencies that additional inquiries are being made

ARTICLE VIII
CLOSING

8.1    Closing.  The Closing shall take place at the offices of Mayer, Brown & Platt, 190 South LaSalle Street, Chicago, Illinois 60603, at 9:00 A.M. on November 16, 1998, or on such other date to which the parties hereto shall agree; provided that in any event, if the Purchaser's senior lenders require that the Closing take place at the offices of their attorneys or at the offices of Kirkland & Ellis. the parties agree that the Closing shall take place at such offices.

8.2    Deliveries by Seller   At the Closing, Seller and the Company will deliver to Purchaser the following.

    (a)    Certificates evidencing all of the Shares, which certificates shall be duly endorsed in the name of Purchaser;

    (b)    Certificates evidencing all of the capital stock of the Subsidiaries, which certificates shall be duly endorsed in the name of the Company;

    (c)    Resignations of all directors and officers of the Company as required by Section 4 15;

    (d)    The certificate referred to in Section 6 3;

    (e)    Certificate of Incorporation of the Seller, the Company and Magnetics certified as of a recent date by the Secretary of State of Delaware and Articles of Incorporation of Brockway certified as of a recent date by the Secretary of the Commonwealth of Pennsylvania;

(f) Certificate of the Secretary of the Company as to (i) the By-laws of the Company and the Subsidiaries being duly adopted and in full force from the date of the earliest corporate action relating hereto and continuing in effect until the Closing Date (with copy attached),

(g) Certificate of the Secretary of the Seller as to (i) the By-laws of the Seller being duly adopted and in full force from the date of the earliest corporate action relating hereto and continuing in effect until the Closing Date (with copy attached) and (ii) resolutions adopted by the Board of Directors of the Seller approving this Agreement and the transactions contemplated hereby (with copy attached);

(h) The opinion referred to in Section 6.4;

(i) The stock record books and minute books of the Company and the Subsidiaries; and

(j) Certificate of good standing of the Seller, the Company and Magnetics dated as of a recent date from the Secretary of State of Delaware and the jurisdictions listed on Schedule 2.2 and Certificate of good standing of Brockway dated as of a recent date from the Secretary of the Commonwealth of Pennsylvania and the jurisdiction listed on Schedule 2.2

8.3 Deliveries by Purchaser. At the Closing, Purchaser will deliver to Seller the ____ following

(a) The Purchase Price;

(b) Certificate of Incorporation of Purchaser certified as of a recent date by the Secretary of State of Delaware.

(c) Certificate of the Secretary of Purchaser as to (i) the By-laws of Purchaser being duly adopted and in full force from the date of the earliest corporate action relating hereto and continuing in effect until the Closing Date (with a copy attached) and (ii) resolutions adopted by the Board of Directors of Purchaser approving this Agreement and the transactions contemplated hereby (with copy attached);

(d) The certificate referred to in Section 7.2, and

(e) The opinion referred to in Section 7.3.

# ARTICLE IX
# TERMINATION

9.1 <u>Termination</u> This Agreement may be terminated at any time on or prior to the Closing Date:

    (1)    With the mutual consent of Seller and Purchaser,

    (2)    By Purchaser, if any of the conditions provided in <u>Article VI</u> shall not have been satisfied on or prior to the date specified for fulfillment thereof, and Purchaser shall not have waived such failure of satisfaction; .

    (3)    By Seller, if any of the conditions provided in <u>Article VII</u> shall not have been satisfied on or prior to the date specified for fulfillment thereof, and Seller shall not have waived such failure of satisfaction;

    (4)    By Seller or Purchaser, if the Closing shall not have taken place on or before November 16, 1998 or such later date as may be mutually approved in writing by Purchaser and Seller.

In the event of any termination pursuant to this <u>Section 9.1</u> (other than pursuant to <u>Section 9.1(1)</u>), written notice setting forth the reasons thereof shall forthwith be given by Purchaser, if Purchaser is the terminating party, to Seller, or by Seller, if Seller is the terminating party, to Purchaser In the event of termination of this Agreement as provided in this <u>Section 9.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any party to any other party under this Agreement, except that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination.

# ARTICLE X
# SURVIVAL AND REMEDY; INDEMNIFICATION

10.1 <u>Survival</u>. The representations and warranties of Seller contained herein or in any other certificate or other writing delivered pursuant hereto, together with the indemnification obligations of Seller with respect thereto under <u>Section 10.2</u> shall survive the Closing and shall expire as of 11:59 p.m., Chicago Time, on the date which is the eighteen month anniversary of the Closing Date, except for the representations and warranties contained in <u>Sections 2.1, 2.3, 2.4, 2.13</u> and <u>2.17</u> (and the certificate delivered pursuant to <u>Section 6.3</u>, but only as such certificate applies with respect to such sections), which shall expire on the date upon which the applicable statute of limitations for any such claim would expire, and unless a claim with respect thereto has been made pursuant to this <u>Article X</u>, in which case the expiration as to the claim made will be deferred until the claim is finally resolved.

10.2 <u>Indemnification by Seller</u>. Seller agrees to indemnify Purchaser and each of its Affiliates against, and agrees to hold it and them harmless from and against, any and all Losses

incurred or suffered by Purchaser or any of its Affiliates (including the Company and the Subsidiaries from and after the Closing) or any combination thereof (notwithstanding the definition of Losses. no payments under this Section 10.2 shall be made with respect to any unmatured or contingent liabilities unless and until such Losses mature or become non-contingent)

(a)    to the extent that such Losses are in excess of $250,000 (and then only to the extent of such excess) in the aggregate (it being agreed that Seller shall not be responsible for Losses which individually or as part of a series of related Losses do not exceed $15,000, which Losses shall not be included for any purpose in determining liability under this Section 10.2) and arise out of (i) any breach of or any inaccuracy in any representation or warranty made by Seller pursuant to this Agreement (without regard to any qualification in such representation or warranty as to "materiality" or a "material adverse effect") or (ii) any breach of or failure by Seller and/or the Company to perform any covenant or obligation of Seller and/or the Company set out in this Agreement to be performed by either of them at or prior to the Closing, provided, that the aggregate liability of Seller under clause (a) of this Section 10.2 shall not exceed $5,000,000; provided, further, that the foregoing basket and cap provisions shall not apply to the representations and warranties provided in Section 2.1, Section 2.21, the first two sentences of Section 2.2 and the first sentence of Section 2.3; .

(b)    to the extent that such Losses arise out of or relate to any breach of or failure by Seller and/or the Company to perform any covenant or obligation of Seller and/or the Company set out in this Agreement to be performed by either of them after the Closing;

(c)    to the extent that such Losses arise out of or relate to any Tax of the Company or any Subsidiary for any Taxable period (or portion thereof) ending on or before the Closing Date, including any Losses arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return related thereto),

(d)    to the extent that such Losses arise out of or under or relate to any of the Seller Benefit Plans (except for any severance obligations covered by Section 10.3(e) or any obligations under the Krause Agreement);

(e)    to the extent that such Losses are caused by the failure of Brockway, prior to the Closing, to maintain the Brockway Pension Plans in form and operation in accordance with applicable law, including, without limitation, section 401(a) of the Code; and

(f)    to the extent that such Losses arise out of or relate to fines or penalties incurred for periods prior to the Closing relating to HCL stack emissions which exceeded the limits provided in Air Construction Permit CP(64)1864.

10.3    Indemnification by Purchaser. Purchaser agrees to indemnify Seller and each of its Affiliates against, and agrees to hold it and them harmless from, any and all Losses incurred or suffered by Seller or any of its Affiliates or any combination thereof (notwithstanding the definition of Losses, no payments under this Section 10.3 shall be made with respect to any unmatured or contingent liabilities unless and until such Losses mature or become non-contingent):

(a)    to the extent that such Losses arise out of or relate to (i) any breach of or any inaccuracy in any representation or warranty made by Purchaser pursuant to this Agreement or (ii) any breach of or failure by the Purchaser to perform any covenant or obligation of Purchaser set out in this Agreement;

(b)    to the extent that such Losses arise out of or relate to the business or operation of the Company or the Subsidiaries from and after the Closing Date (provided that this clause (b) shall not limit or otherwise qualify the scope of the indemnification provisions in Section 10.2 above);

(c)    to the extent such Losses arise out of or relate to any iron or chloride contained in any of the water on the property located at 111 North State Road 149, Burns Harbor, Indiana; Purchaser specifically acknowledging that there have been elevated levels of iron and chloride detected in certain monitoring wells located on said property and Purchaser specifically releasing Seller and its Affiliates from any and all claims related to said substances;

(d)    to the extent that such Losses arise out of or under or relate to any of the Company Benefit Plans or the Purchaser's Plans (other than those Losses described in Section 10.2(e));

(e)    to the extent that such Losses arise, on or after the Closing Date, out of or relate to severance obligations under the Inland Steel Industries 1998 Severance Pay Plan with respect to persons who are employees of the Company and the Subsidiaries immediately prior to the Closing Date;

(f)    to the extent that such Losses arise out of or relate to fines or penalties incurred for periods after the Closing, or arise out of or relate to any capital expenditures or other costs or expenses incurred by Purchaser, the Company and their respective Affiliates relating to HCL stack emissions which exceeded the limits provided in Air Construction Permit CP(64)1864; and

(g)    to the extent that such Losses arise out of or relate to the termination of either or both of the Brockway Defined Benefit Plans on or after the Closing Date (other than Losses described in Section 10.2(e)), including any such termination that is effected pursuant to an action to terminate that is commenced by the PBGC on or after the Closing Date.

10.4    Notice of Claims; Assumption of Defense. The indemnified party shall give notice to the indemnifying party, in accordance with the terms of Section 10.8, within thirty days after the

assertion of any claim, or the commencement of any suit, action or proceeding by any third party in respect of which indemnity may be sought by any party hereunder, specifying with reasonable particularity the basis therefor and to give the indemnifying party such information with respect thereto then in the indemnified party's possession as the indemnifying party may reasonably request (but the giving of such notice shall not be a condition precedent to indemnification hereunder, except as provided in Section 10.6). The indemnifying party may, at its own expense, (i) participate in and, (ii) upon notice to the indemnified party and the indemnifying party's written agreement that the indemnified party is entitled to indemnification pursuant to Section 10.2 or Section 10.3 for Losses arising out of such claim, suit, action or proceeding, at any time during the course of any such claim, suit, action or proceeding, assume the defense thereof; provided, that the indemnifying party shall not have the right to assume such defense if the third party claimant is seeking non-monetary relief (e.g., injunctive or other equitable relief or criminal or quasi-criminal allegations), provided further that in any event, (w) the indemnifying party's counsel must be reasonably satisfactory to the indemnified party, (x) the indemnifying party shall thereafter consult with the indemnified party upon the indemnified party's reasonable request for such consultation from time to time with respect to such claim, suit, action or proceeding, (y) the indemnifying party shall not settle such claim, action or proceeding without the prior written consent of the indemnified party, which consent will not be unreasonably withheld, and (z) in the case of a claim arising from a breach of the warranties contained in Section 2.17 hereof for which Seller has, pursuant to this Section 10.4, assumed the defense thereof, if Seller's action may adversely affect Purchaser's or the Company's tax obligations for periods ending after the Closing Date, Seller shall not enter into a settlement agreement, file an amended tax return or seek a refund of taxes with respect to the operations of the Company without the consent of Purchaser, which consent will not be unreasonably withheld. If the indemnifying party assumes such defense, the indemnified party shall have the right (but not the duty) to participate in the defense thereof and to employ other counsel, at its own expense, separate from the counsel employed by the indemnifying party. If the indemnifying party does not assume such defense (or does not have the right to assume such defense), the indemnified party shall have the right to defend such claim, action or proceeding through counsel of its own selection and shall have the right to settle such claim, action or proceeding in its sole discretion, subject to Section 10.5. Whether or not the indemnifying party chooses to defend or prosecute any such claim, suit, action or proceeding, all of the parties hereto shall cooperate in the defense or prosecution thereof.

10.5    Procedures for Environmental Matters. Purchaser shall have the authority to control the investigation, remediation and resolution of environmental matters which Purchaser believes may be covered by Section 10.2; provided, that Seller shall be consulted and kept reasonably apprised of all negotiations and discussions with government authorities or third party claimants relating to such matters. Before Purchaser commences any investigation (including, but not limited to soil or ground water sampling) or remediation or pays an environmental claim for which indemnification from Seller may be sought pursuant to Section 10.2, Purchaser will notify Seller of the proposed course of action or remediation plan. If Seller does not object in writing to the proposed course of action or remediation plan within fifteen (15) business days of receipt of such written notice (or such shorter period as dictated by exigent circumstances as described in such notice) then Purchaser may proceed with the proposed course of action or remediation plan. Should Purchaser receive a timely objection from Seller, Purchaser and Seller shall promptly meet and discuss in good faith Seller's objections and alternative proposals. Failing agreement within five (5) business days after meeting, either party may submit the matter to an independent environmental

consultant (who shall not be a consultant currently advising Purchaser or Seller) mutually agreeable to both parties requesting that the consultant review and modify the proposed course of action or remediation plan, if necessary, to ensure that it is commercially reasonable, consistent with industry practice and does not exceed commercially reasonable costs, complies with and satisfies the requirements of all applicable Environmental Laws and will satisfactorily address the risks to human health or the environment, which course of action or remediation plan will be binding upon both parties, subject to any approvals or modifications of any Governmental Authority. The cost of such environmental consultant shall be divided equally between the parties. Purchaser will permit representatives of Seller to have reasonable access at all reasonable times to the property being remediated (to the extent Purchaser controls access thereto). Purchaser will not knowingly initiate or undertake any activity primarily for the purpose of finding any Losses; provided, that this provision shall not restrict Purchaser from operating, maintaining and monitoring its properties and operations in the ordinary course of business in accordance with Seller's past practices and applicable Environmental Laws. Purchaser shall not seek to accelerate the timing or increase the cost of any remediation unless required by law in response to a Governmental Authority or as is required to protect an imminent risk to human health or the environment. Seller shall cooperate and assist Purchaser in Purchaser's discussion and negotiations with any Governmental Authority concerning any aspects of remediation to be conducted by the Purchaser and Seller shall have the right to participate, at its own expense, in any such negotiations or discussions. Purchaser shall keep Seller reasonably apprised on a regular basis of, and shall provide copies of documents reasonably requested by Seller relating to, (i) any discussions and agreements with a Governmental Authority concerning any remediation, (ii) any testing and remediation programs that Purchaser proposes to implement pursuant to discussions and agreements with a Governmental Authority, (iii) the results of such testing and remediation programs and (iv) any other information reasonably requested by Seller.

10 6    Settlement or Compromise  Any settlement or compromise made or caused to be made by the indemnified party or, the indemnifying party, as the case may be, of any such claim, suit, action or proceeding of the kind referred to in Section 10 4 shall also be binding upon the indemnifying party or the indemnified party, as the case may be, in the same manner as if a final judgment or decree had been entered by a court of competent jurisdiction in the amount of such settlement or compromise  The indemnified party will give the indemnifying party at least 30 days' notice of any proposed settlement or compromise of any claim, suit, action or proceeding it is defending, during which time the indemnifying party may assume the defense of such claim, suit, action or proceeding and if it does so the proposed settlement or compromise may not be made.

10.7    Failure of Indemnifying Party to Act. In the event that the indemnifying party does not elect to assume the defense of any claim, suit, action or proceeding, then any failure of the indemnified party to defend or to participate in the defense of any such claim, suit, action or proceeding or to cause the same to be done, shall not relieve the indemnifying party of its obligations hereunder.

10.8    Procedure for Indemnification. Upon becoming aware of a claim for indemnification hereunder (whether as a result of any claim, suit, action or proceeding of the kind referred to in Section 10 4, or in connection with any Losses which the indemnified party deems to be within the ambit of this Article X), the indemnified party shall promptly give, in accordance with the terms of

Section 11.5, notice of such claim to the indemnifying party, providing reasonable detail of how the claim has arisen and an estimate of the amount the indemnifying party reasonably anticipates that it will be entitled to on account of indemnification by the indemnifying party, provided, however, that the failure to provide such notice shall not release the indemnifying party from any of its obligations hereunder to provide indemnification except to the extent the indemnifying party is prejudiced or harmed by such failure. If the indemnifying party does not object to such claim within 45 days of receiving notice thereof, the indemnified party shall be entitled to recover the amount of such claim If, however, the indemnifying party advises the indemnified party that it disagrees with the indemnified party's claim, the parties shall, for a period of 45 days after the indemnifying party advises the indemnified party of such disagreement, attempt to resolve the difference

10 9   Net Indemnity.  Amounts payable by Seller pursuant to Section 10 2 or by Purchaser pursuant to Section 10.3 shall be (i) reduced by the amount of any realized net income Tax benefit to the indemnified party resulting from the Loss that is the subject of the indemnity and (ii) increased by the amount of any realized net income Tax detriment to the indemnified party resulting from the payment of the indemnity; provided, however, that for purposes of this Section 10 8 a reduction in the tax basis of the Shares shall not be considered a net income tax detriment; provided, that to the extent that any Tax benefit or detriment is realized in a Tax year other than the year in which the indemnity is paid, the indemnified party shall make a payment to the indemnifying party in the amount of such realized Tax benefit or detriment in the year in which it is realized within 10 days of the receipt of a benefit in the form of a Tax refund or a reduction of a Tax payment due including an estimated Tax payment.  For purposes of this Section 10 8, a realized Tax benefit or detriment is a reduction in Taxes payable or a refund of Taxes previously paid, and the amount of a realized Tax benefit will be determined based on a 40 percent tax rate.

10.10   Tax Treatment.  Amounts paid to or on behalf of the Seller or the Purchaser as indemnification shall be treated as adjustments to the Purchase Price for Tax purposes.

10 11   Mitigation  Purchaser and Seller, and their respective Affiliates, shall cooperate with each other with respect to resolving any Loss with respect to which one party is obligated to indemnify the other party under this Article X, including by making commercially reasonable efforts to mitigate or resolve any such Loss.  In the event that Purchaser or Seller, or their respective Affiliates, shall fail to make such commercially reasonable efforts to mitigate or resolve any Loss, then notwithstanding anything else to the contrary contained herein, the other party shall not be required to indemnify any person for any Loss that could reasonably be expected to have been avoided if Purchaser or Seller, as the case may be, had made such efforts.

ARTICLE XI
MISCELLANEOUS

11.1   Disclosure Schedules.  Seller may update any schedule referred to in this Agreement from time to time prior to or at the Closing by notice in accordance with the terms of this Agreement.  If such update or updates make a disclosure of a fact occurring after the date of this Agreement, all references to any schedule hereto which is so updated to make a disclosure of a fact occurring after the date of this Agreement shall, for all purposes (other than for purposes of Section

<u>6.2</u>), be deemed to be a reference to such schedule as so updated. Any disclosure by Seller in any schedule attached hereto which is reasonably apparent on its face as being applicable to any other schedule hereto shall constitute a disclosure under each such other schedule, whether or not such disclosure is specifically referenced within such other schedule. The inclusion of any matter on any schedule shall not constitute an admission by Seller that such matter is material or would reasonably be expected to have a material adverse effect upon the financial condition, business, property. Company Assets or results of operations of the Company and the Subsidiaries taken as a whole

11.2 <u>Expenses</u>. Each party hereto shall bear its own expenses with respect to this transaction. Purchaser shall pay all fees required to paid in connection with the HSR filing. At the Closing, Seller shall credit Purchaser for one-half of such fees through an offset against the Purchase Price

11.3 <u>Amendment</u>. This Agreement may be amended, modified or supplemented but only in writing signed by all of the parties hereto.

11.4 <u>Brokers</u> Each of the parties hereto represents that no broker or finder has acted for it in connection with this Agreement or the transactions contemplated hereby, except for Hedron. Inc., which acted on behalf of Purchaser and that no broker or finder is entitled to any brokerage or finder's fee or other commission based on agreements, arrangements or understandings made by it except for the fee due to Hedron which is the sole responsibility of Purchaser.

11.5 <u>Notices</u> Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person. (ii) on the date of electronic confirmation of receipt if sent by telex, facsimile or other wire transmission or (iii) three days after being deposited in the U.S. mail, certified or registered mail, postage prepaid.

If to Seller, addressed as follows:

Inland Steel Industries, Inc. (to be known as Ryerson Tull, Inc.)
30 West Monroe Street
Chicago, Illinois 60603
Attention Chief Executive Officer
Facsimile (312) 889-3921

with a copy to:

Mayer, Brown & Platt
190 South LaSalle Street
Chicago, Illinois 60603
Attention: John R. Sagan
Facsimile (312) 701-7711

6274330

If to Purchaser, addressed as follows:

IEMC Acquisition Corp.
150 North Meramec Avenue, Suite 300
St. Louis, Missouri 63105-3753
Attention: Dwight A. Miller
Facsimile. (314) 727-8300

with a copy to.

Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601
Attention: Sanford E. Perl
Facsimile: (312) 861-2200

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided

11.6    Waivers. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

11 7    Counterparts  This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11 8    Headings.  The headings preceding the text of Articles and Sections of this Agreement and the Schedules thereto are for convenience only and shall not be deemed part of this Agreement.

11.9    Applicable Law  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Illinois without giving effect to any conflicts of law provisions thereof.

11.10   Incorporation. The respective Schedules and Exhibits attached hereto and referred to herein are incorporated into and form a part of this Agreement.

11.11   Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. No party shall assign any of its responsibilities or obligations under this Agreement without the other party's

written consent, and the written agreement of the assignee to be bound by the provisions hereof. No such assignment shall relieve the assigning party from its responsibilities and obligations hereunder

11.12  Publicity.  Except as required by applicable law or as compelled by administrative or judicial process (and in any such event, either party shall consult with the other party prior to making any disclosure), neither party shall, without the prior written approval of the other party, make any public announcement regarding this transaction.

11.13  Other Discussions.  Upon execution of this Agreement, Seller and its Affiliates including, without limitation, the Company and each of their respective officers, directors, employees, representatives and agents will discontinue all, and not commence any, discussions and negotiations with any other persons, or solicit or entertain any other offers, regarding the sale or transfer of any of the Shares or the Company Assets, and neither Seller nor its Affiliates including, without limitation, the Company will provide any persons other than Purchaser and its Affiliates, and their employees, representatives or agents, with any information regarding such sale or transfer or otherwise cooperate with any other persons in connection with such sale or transfer.

11.14  Tax Matters

(a)  Purchaser and Seller shall treat and report the transactions contemplated by this Agreement in all respects consistently for purposes of any federal, state or local Tax  The parties hereto shall not take any actions or positions inconsistent with the obligations set forth herein

(b)  The books and records of the Company will be maintained and the Federal, state and other Tax Returns of the Company will be filed by Seller, so as to accurately reflect the operations of the Company and the payment of all Taxes through the end of the Closing Date.  Purchaser shall prepare and file all appropriate Tax Returns for the operations of the Company for all periods ending after the Closing Date.

(c)  Purchaser shall make available to Seller, and Seller shall make available to Purchaser, (i) such records as any such party may require for the preparation of any Tax Returns required to be filed by Seller or Purchaser and (ii) such records as Seller or Purchaser may require for the defense of any audit, examination, administrative appeal, or litigation of any Tax Return of the Company or in which Seller was included.

(d)  Seller shall inform Purchaser of any adjustment resulting from the audit of any Tax Return for a taxable year of the Company ending prior to the Closing Date if such adjustment would affect the taxable income or loss or any other item reportable on a Tax Return of the Company for any taxable year beginning after the Closing Date

(e)  Purchaser and Seller will not make any 338(h)(10) election under the Code

(f)  Pro-ration of Taxes.  Seller shall reimburse Purchaser for all Taxes of the Company and the Subsidiaries with respect to any period (or portion thereof) ending on or before the Closing Date, other than (i) Taxes that are taken into account in determining the Closing Statement Amount and (ii) Taxes that are attributable to any action taken by Purchaser or that Purchaser causes the Company or either Subsidiary to take, within fifteen (15) days of payment by Purchaser or the Company of such Taxes  For purposes of this Section 11.14(f), in the case of any Taxes that are imposed on a periodic basis and are payable for a Taxable period that includes (but does not end on) the Closing Date, the portion of such Tax which is in respect to the portion of such Taxable period ending on the Closing Date shall (x) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in the entire Taxable period, and (y) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant Taxable period ended on the Closing Date.

11.15  Confidentiality. From and after the Closing. except as required by the laws, rules and regulations of any Governmental Authority, all information concerning the Company and its Subsidiaries shall be maintained in strict confidence by the Seller and its Affiliates, and the Seller and its Affiliates.

11.16  Other Instruments.  Upon the reasonable request of Purchaser, Seller shall, on and after the Closing Date. execute and deliver to Purchaser such other documents, releases, assignments and other instruments as may be required to effectuate completely the transfer and assignment to Purchaser of, and to vest fully in Purchaser title to, each of the Shares,

11.17  Entire Understanding  This Agreement sets forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof and is not intended to confer upon any other person any rights or remedies hereunder.  There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in this Agreement.

\* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered on the date first above written.

IEMC ACQUISITION CORP

By: _____
Name: John A. Wright
Title: Chairman

INLAND STEEL INDUSTRIES, INC

By: _____
Name: George A. Ranney, Jr.
Title: Vice President and
General Counsel

6274330



# CHUBB GROUP OF INSURANCE COMPANIES

Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222-3099
Phone: (412) 391-6585 • Facsimile: (412) 456-6009

June 16, 1999

Terry Rogers
Inland Steel Industries, Inc.
30 West Monroe Street 6-017
Chicago, IL 60608

|     |            |                              |
|-----|------------|------------------------------|
| RE: | Insured:   | Inland Steel Industries, Inc. |
|     | Policy No.: | 8114-31-05                   |
|     | Company:   | Federal Insurance Company     |
|     | Claimant:  | EMC Group, Inc.               |

Dear Mr. Rogers:

We have reviewed the litigation which you have submitted for coverage as a claim under policy number 8114-31-05 which has a policy period of January 1, 1998 to January 1, 2001. From our review of the litigation noted, the litigation does not name a director or officer of Inland Steel as a defendant. As there is no claim against a director or officer of Inland Steel with respect to these matters, there is no coverage under the above referenced policy. Additionally, there is no coverage under Insuring Clause 3 to the Policy as this matter does not meet the definition of a Securities Transaction under the Policy. Federal does accept this matter as notice of potential claim under the Policy.

Federal's position with respect to this Claim is based upon the information provided to date and is subject to further evaluation as additional information becomes available. Federal reserves its right to assert additional terms and provisions under the policy and at law, which may become applicable as new information is learned.

You may submit for our review any information which you might now have or in the future obtain, that you believe may bear upon the question of insurance coverage in this matter.

RE:          

JUN 21 1999

Terry Rogers
June 16, 1999
Inland Steel Industries. Inc.
Page 2


Please feel free to contact me should you have any questions concerning the coverage available under the policy, or the matters raised in this letter.  We look forward to working with you to resolve this matter.

Very truly yours,
Chubb & Son
A division of Federal Insurance Company

by:    Margaret M. Klimczyk, Esq.
Assistant Vice President
Directors & Officers Litigation

MMK/ke.178.cov

cc:    Michael Tatum
Willis Corroon Corporation of Illinois
10 South LaSalle Street, Suite 8000
Chicago, IL 60603